FILED

APR 6  11 26 AM '04

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DISTRICT COURT
NEW HAVEN, CONN.

LOLITA PRIDGEON,

        Plaintiff,

VS.

AMERICAN AIRLINES,

        Defendant.

Docket No.

3:02 CV 1032 GLG

MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

ORAL ARGUMENT NOT REQUESTED

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................................................... ii

SUMMARY OF CASE.............................................................................................................. 2

THE FACTS RELEVANT TO A DISPOSITION OF THE MOTION ............................................. 5

ARGUMENT ...................................................................................................................... 13

I.          THE WARSAW CONVENTION EXCLUSIVELY GOVERNS
            THE RIGHTS AND LIABILITIES OF THE PARTIES ......................................... 13

II.         PLAINTIFF'S INJURIES WERE NOT CAUSED BY AN
           "ACCIDENT" WITHIN THE MEANING OF ARTICLE 17
           OF THE WARSAW CONVENTION ..................................................................... 15

III.        AMERICAN'S LIABILITY IS LIMITED TO U.S. $148,473
           PURSUANT TO ARTICLE 20 OF THE WARSAW
           CONVENTION ...................................................................................................... 21

CONCLUSION .................................................................................................................... 26

# TABLE OF AUTHORITIES

**CASES:**                                                          **PAGE**

*In re Air Disaster at Lockerbie, Scotland on December 21, 1988,*
    928 F.2d 1267 (2d Cir.), *cert. denied,* 502 U.S. 920 (1991)...........................................14

*Air France v. Saks,* 470 U.S. 392 (1985) ................................................................13, 15, 16

*In Re Alleged Food Poisoning Incident, March, 1984,*
    770 F.3d 3 (2d Cir. 1985)...................................................................................18

*Bausso v. Iberia Airlines,* 1998 WL 148422 (S.D.N.Y. 1998)...........................................18

*Cortez v. Ansett Australia, Ltd.,* 29 Av. Cas. 18, 243 (C.D. Cal. 2003) ...........................20

*Diaz Lugo v. American Airlines, Inc.,* 686 F. Supp. 373 (D.R.P. 1988)..........................18

*Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530 (1991) ..........................................15

*El Al Israel Airlines, Ltd. v. Tseng,* 525 U.S. 155 (1999)............................................13, 14

*Fishman v. Delta Air Lines, Inc.,* 938 F. Supp. 228 (S.D.N.Y. 1996),
    *aff'd,* 132 F.3d 138 (2d Cir. 1998) ..................................................................14

*Gotz v. Delta Air Lines, Inc.,* 12 F.Supp. 2d 199 (D. Mass. 1998)............................20, 21

*Horvath v. Deutsche Lufthansa, AG,* 2004 WL 486976 (S.D.N.Y. 2004) .......................18

*King v. American Airlines, Inc.,* 284 F.3d 352 (2d Cir. 2002)...........................................14

*Klos v. Polskie Linie Lotnicze,* 133 F.3d 164 (2d Cir. 1997)..........................................14

*Louie v. British Airways, Ltd.,* 29 Av. Cas. 18, 2003 WL 22769110 (D. Alaska 2003).....19

*Magan v. Lufthansa German Airlines,* 339 F.3d 158 (2d Cir. 2003)..........................14, 17

*Manufacturers Hanover Trust Co. v. Alitalia Airlines,* 429 F.Supp. 964
    (S.D.N.Y. 1977), *aff'd,* 573 F.2d 1292 (2d Cir. 1977),
    *cert. denied,* 435 U.S. 971, 98 S. Ct. 1612, 56 L.Ed. 2d 63 (1978)...............................25

*Margrave v. British Airways,* 643 F.Supp. 518 (S.D.N.Y. 1986)......................................20

*Motorola, Inc. v. Federal Express Corp.,* 308 F.3d 995 (9th Cir. 2002)............................25

**CASES**                                                                      **PAGE**

*Obuzor v. Sabena Belgian World Airways*, 1999 U.S. Dist.
  LEXIS 5317, 1999 WL 223162 (S.D.N.Y. April 16, 1999)............................................25

*Olympic Airways  v. Husain*, 540 U.S.___, 124 S.Ct. 1221
  (Feb. 24, 2004)..........................................................................................15, 17, 22

*Price v. KLM-Royal Dutch Airlines*, 107 F.Supp. 2d 1365
  (N.D. Ga. 2000) ............................................................................................23, 25

*Rajcooar v. Air India Ltd.*, 89 F. Supp.2d 324 (E.D.N.Y. 2000).......................................17

*Rhodes v. American Airlines, Inc.*, 1996 WL 108897 (E.D.N.Y. 1996)............................18

*Scala v. American Airlines*,249 F.Supp. 2d 176 (E.D. Conn. 2003)............................14, 18

*Tandon v. United Airlines*, 926 F.Supp. 366 (S.D.N.Y. 1996).........................................17

*Verdesca v. American Airlines, Inc.*, 27 Av. Cas. (CCH) 18,160
  (N.D. Tex. 2000) ......................................................................................23, 25, 26


**STATUTES:**

49 U.S.C. § 40105 note.....................................................................................13

Fed.R.Civ.P. 26(a)(2).................................................................................11, 18

U.S. Const. art. VI, cl. 2.....................................................................................13

Convention for Certain Rules Relating to International Transportation By Air,
  concluded at Warsaw, Poland, October 12, 1929, 49 Stat. 3000,
  T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in*, note following
  49 U.S.C. 40105...........................................................................................2


**MISCELLANEOUS**

U.S. Department of State, *Treaties in Force* at 342 (2003)..............................................14

American Airlines International Rules and
  Fares Tariff Rule 55(b) ................................................................................4, 12, 22

Defendant American Airlines, Inc. submits this Memorandum of Law in Support of its Motion for Summary Judgment dismissing the Amended Complaint filed by plaintiff Lolita Pridgeon seeking damages for her personal injuries allegedly caused by her eating undercooked poultry aboard American Airlines Flight 121 from Paris, France to John F. Kennedy International Airport in New York on June 13, 2000.

## SUMMARY OF CASE

Plaintiff's claim is that she contracted Guillain-Barre Syndrome[1] from Campylobacter Jejuni, a bacteria which can be contracted by, *intra alia*, eating raw or undercooked poultry meat, after consuming two or three bites of the Chicken Rosemary meal which was offered to her aboard American Airlines flight 121 from Charles de Gaulle Airport in Paris, France to John F. Kennedy International Airport in New York on June 13, 2000. No other passenger aboard that flight claimed illness as a result of eating the Chicken Rosemary meal and American Airlines' records do not show any other complaints made by passengers for food poisoning on any Paris to United States flights in June of 2000. Plaintiff did not make any claim against American Airlines until she filed suit on May 15, 2002, one month before the expiry of the two year statute of limitations under Article 29 of the Warsaw Convention.[2]

---

[1]    Guillain-Barre Syndrome is a disease which attacks the central nervous system, resulting in paralysis (usually temporary) of the arms and legs.

[2]    Official Title: Convention for Certain Rules Relating to International Transportation by Air, concluded at Warsaw, Poland, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in*, note following 49 U.S.C. 40105.

Plaintiff did not make any written complaint to American Airlines in advance of filing suit and did not make any complaint to American Airlines' cabin personnel at the time she consumed the chicken aboard the flight.  The extensive medical records compiled at St. Raphael's Hospital during plaintiff's lengthy hospitalization make absolutely no reference to any food served to plaintiff aboard the American Airlines flight as having anything to do with her illness.  As is evidenced by the affidavits of Dr. Kevin M. Cahill, a parasitic and infectious disease specialist, and Dr. Jerome M. Block, a neurologist, submitted in support of the within motion, the only way to serologically confirm Campylobacter Jejuni is for a stool sample to confirm the presence of the bacteria in the ill person.  While plaintiff's medical records indicate that a stool sample test was ordered on Ms. Pridgeon at the time of her hospitalization, the stool sample was apparently not taken, no medical results were obtained and there is no serological evidence that the Campylobacter Jejuni bacteria was even present in Ms. Pridgeon, which bacteria allegedly led to plaintiff's development of Guillain-Barre Syndrome.[3]

Plaintiff's rights in this case against American Airlines[4] are exclusively governed by the terms and provisions of a treaty of the United States known as the Warsaw Convention.  Article 17 of the Warsaw Convention provides that the carrier is liable for damages sustained in the event of the wounding of a passenger or for any other bodily injury sustained by a passenger, if

---

[3]    "The cause of GBS [Guillain-Barre Syndrome] is not known and there is no effective treatment".  *See* http://www.guillain_barre.com/overview.html (website for Guillain-Barre Syndrome Foundation International), attached as Exhibit "H" to the affidavit of Michael J. Holland, sworn to April 5, 2004).

[4]    While Sky Chefs, Inc. a/k/a LSG Lufthansa Service Holding AG, LSG Skychef and Deutsche Lufthansa AG, the alleged caterers for the in-flight meal, were originally sued in this case, the action against these parties was dismissed by Stipulation and Order of Dismissal with prejudice filed with the Court on June 19, 2003.

the accident which caused the damage so sustained took place on board the aircraft or during the course of any of the operations of embarking or disembarking.

In order for plaintiff to successfully recover in this case, she must show that there was an "accident" which "took place on board the aircraft" and that she sustained a "bodily injury" as a result of that "accident". While plaintiff's unfortunate contracting of Guillain-Barre Syndrome is undoubtedly a bodily injury, it is clear based on the factual and serological evidence that the plaintiff's contracting of Guillain-Barre Syndrome was not caused by an "accident", as that term has been defined by cases interpreting Article 17 of the Warsaw Convention.

Finally, even though American Airlines signed the IATA Intercarrier Agreement, by which the airline agrees to be presumptively liable for up to 100,000 SDRs (approximately $148,473)[5] in the event of an accident which takes place on board the aircraft causing a bodily injury, the airline can limit its liability to that sum if it shows that it took "all necessary measures" to prevent the loss, or that it was impossible for the airline to take such measures. *See* Article 20(1) of the Warsaw Convention. Even assuming that plaintiff can meet her burden of proving an "accident" which occurred "on board the aircraft", the facts clearly demonstrate that American Airlines took "all necessary measures" to prevent the alleged incident and its liability is, therefore, limited under Article 20 of the Warsaw Convention, the IATA Intercarrier Agreement on Passenger Liability (Intercarrier Agreement) and the Agreement on Measures to

---

[5]     SDRs (Special Drawing Rights) are an international basket of currencies established by the International Monetary Fund. The dollar equivalent of the SDR fluctuates on a daily basis and the daily conversion rate can be obtained from the International Monetary Fund Website at http://www.imf.org. The conversion rate on April 2, 2004 is 1 SDR = U.S. $1.48473.

Implement the IATA Intercarrier Agreement.  *See also*, American Airlines International Rules and Fares Tariff Rule 55(b) attached hereto as Exhibit "A".  Given the complete absence of any evidence that there was anything wrong with any meal served to plaintiff or indeed the food served to any passenger aboard any American Airlines flight from Paris to the United States during the entire month of June of 2000, it is indisputable that American Airlines took "all necessary measures" to prevent the loss and the airline is entitled to limit its liability to 100,000 SDRs (approximately $148,473 U.S.).

Defendant American Airlines asks the Court to grant its motion for summary judgment dismissing the Amended Complaint, or alternatively, to enter an order limiting American Airlines' liability in this matter to the sum of 100,000 SDRs (approximately $148,473).

### THE FACTS RELEVANT TO A
### DISPOSITION OF THE MOTION

The facts relevant to a disposition of this motion are uncomplicated and undisputed.[6]

Plaintiff Lolita Pridgeon, a 39 year old resident of Woodbridge, Connecticut, took a trip to Paris with Dr. Siegfried Kra, departing New York on May 31, 2000.  Ms. Pridgeon and Dr. Kra were scheduled to return to New York aboard American Airlines Flight 121 from Charles de Gaulle Airport in Paris, France on June 13, 2000.  Prior to her going to France on May 31,

---

[6]    A Statement of Undisputed Facts pursuant to Local Rule 56(a) 1 is submitted in support of this motion. All facts concerning the occurrence are taken from the deposition of plaintiff Lolita Pridgeon conducted on December 18, 2003.  A copy of the deposition transcript is annexed to the moving affidavit of Michael J. Holland, sworn to April 5, 2004 as Exhibit "D".

2000, Ms. Pridgeon had travelled to Dr. Kra's home in St. Thomas, where she had stayed for approximately ten days, between May 18 and May 28, 2000.

While in France, Ms. Pridgeon and Dr. Kra stayed at a friend's apartment in Paris for a few days and thereafter toured France in a rental vehicle, staying at various chateaus and little inns. Ms. Pridgeon does not recall any specific meals that she had during her two week trip to France, save for a fish dinner that she had at the Chateau Bonnieux on Friday evening, June 9, 2000. Ms. Pridgeon does not recall eating any chicken (a food often considered as a source for transmittal of the Campylobacter Jejuni bacteria) but she testified at her deposition that she could have eaten chicken when she was in France. Ms. Pridgeon and Dr. Kra returned home to New York aboard American Airlines flights on June 13, 2000. The couple took a flight on American Airlines from Nice to Paris, during the course of which they ate nothing, and thereafter boarded American Airlines Flight 121 for the return flight from Charles de Gaulle Airport in Paris to John F. Kennedy International Airport in New York. Ms. Pridgeon was seated in the middle of the aircraft in economy class section. She was offered a meal about two hours into the flight. The options were for beef or chicken. Dr. Kra selected the beef. Ms. Pridgeon selected the chicken, which came in the form of a chicken breast heated on one plate, with some sort of a sauce on it.

Ms. Pridgeon cut into the chicken and found that it was pink. She said while that the chicken breast was pale and white meat, she did not see any blood run out of the chicken. She ate two or three bites of it and did not eat any more of it because it was pink and seemed to have a funny taste. In her words (at page 35 of her deposition testimony), "it was cold and the texture

6

was also kind of chewy and just didn't taste good to me like chicken". Despite Ms. Pridgeon's concerns about the food, she did not call a flight attendant over and does not recall making any comment to the flight attendant about the meal. She did mention the fact that the chicken tasted funny to Dr. Kra, who told her not to eat it. She did not eat anything else aboard the flight and did not feel ill after arriving home that evening or the next day, June 14, 2000.

Ms. Pridgeon said that she first began to feel ill on Thursday morning, June 15, 2000. She ran a low grade fever, about 100°, and developed diarrhea and vomiting shortly around mid-morning that day. Her problems got worse the whole day and she complained of numerous bouts of diarrhea and vomiting. Her fever went up to 103°. She took Tylenol and began having pains in knees and ankles around 4:00 p.m. on that afternoon. She called Dr. Kra, who said that it sounded like she had salmonella poisoning. Dr. Kra's recommendation was that she take Tylenol and drink fluids. She fell asleep that evening and woke up on the morning of Friday, June 16, 2000 with no more diarrhea, no more vomiting and no pain in her ankles and knees. Her fever had declined to approximately 100°.

While Ms. Pridgeon felt tired over the next few days, she did manage to go to the hairdresser, to go out to dinner with Dr. Kra and his daughters on Sunday, June 18, 2000, and to go for an MRI for her spine on Tuesday, June 20, 2000.[7] Ms. Pridgeon drove herself to and from the doctor's office for the MRI and did not have any further intestinal upset, vomiting or pains in her knees and ankles.

---

[7] Ms. Pridgeon had prior surgery in 1997 to remove an Intermedulary Cavernous Hemangioma from her neck and was monitored by physicians following her surgery.

On June 21, 2000, a Wednesday, Ms. Pridgeon had severe pain again in her ankles and knees. She visited Dr. Roth, a friend of Dr. Kra's, and complained of her pain. Dr. Roth thought the complaints may be something related to arthritis. On the evening of June 21, 2000, she took a warm bath to help alleviate the pain in her feet and knees.

When she woke up on the morning of June 22, 2000, Ms. Pridgeon was in severe pain and Dr. Kra took her to the emergency room at St. Raphael's Hospital in New Haven, Connecticut, where Dr. Kra is affiliated. She was given Demerol, a pain killing medication, and sent back home. On Friday morning, June 23, 2000, she fell while attempting to get out of her bed to go to the shower. She was unable to move her legs and Dr. Kra called an ambulance which took her to the emergency room at St. Raphael's. By the time she arrived at the hospital, she was unable to move her arms or legs. She was treated at that time by Dr. Hasbani, a neurologist who had previously seen her for her neck condition, Dr. Grabhour, a radiologist who performed a spinal tap, and Dr. Bloomgarten, a neurosurgeon who ordered MRI examinations. Ms. Pridgeon was admitted to St. Raphael's in the intensive care unit on Friday, June 23, 2000, and she remained there until July 12, 2000, a period of 19 days. During her period in the intensive care unit, her limbs were paralyzed and she was unable to move her hands, arms, head or legs, although she was able to breathe on her own without the need of a respirator.

Ms. Pridgeon was diagnosed with Guillain-Barre Syndrome, an inflammatory disorder of the nerves outside the brain and spinal cord. It is a rare disease resulting in rapidly acquired paralysis of the limbs. About 50% of the cases occur shortly after a viral or bacteria infection

8

such as a sore throat or diarrhea.    See http://www.guillian-barre.com/preview.html.[8]
Campylobacter is an infectious disease caused by bacteria.    While many different kinds of
infections can cause diarrhea, doctors look for bacterial causes of diarrhea by asking a
laboratory to cultivate a sample of stool from the ill person.    Diagnosis of Campylobacter
requires        special        laboratory        culture        procedures.        *See*
http://www.cdc.gov/ncidvd/dbmd/diseaseinfor/campylobacter_g.com[9] (website for Center of
Disease Control).

The physicians treating Ms. Pridgeon at St. Raphael's Hospital did not tell her how she
had contracted this disease.    The presence of Campylobacter Jejuni bacteria in the body is
usually confirmed by taking a stool sample.    While the medical records from St. Raphael's
indicate that a stool sample was requested, it is unclear as to whether this test was ever done and
plaintiff testified that she had no recollection of a stool sample being taken.    In any event, there
is no evidence in the hospital records of the results of the stool sample test.

Prior to the filing of this lawsuit in May of 2002, neither plaintiff nor her attorney,
who she first consulted in August of 2001, made any written complaint to American Airlines.
The lawsuit in this case was filed in May of 2002, one month prior to the expiry of the two
year statute of limitations under Article 29 of the Warsaw Convention.    The extensive
medical records complied at St. Raphael's during plaintiff's hospitalization make no

---

[8]    Website information is attached to the moving affidavit of Michael J. Holland sworn to April 5, 2004
as Exhibit "H".

[9]    Website information is attached to the moving affidavit of Michael J. Holland sworn to April 5, 2004
as Exhibit "G".

reference to any foods served to plaintiff aboard American Airlines Flight 121 on June 13, 2000 as having anything to do with her illness. The affidavits of Dr. Cahill and Dr. Block, an infectious and parasitic disease specialist and a neurologist, whose affidavits are submitted in support of the within motion, opine that the only way to serologically confirm Campylobacter Jejuni is to find the bacteria in a stool sample taken from the ill person. No such serological evidence is present in this case.

The affidavit of Dale Norgard, the Senior Analyst for Risk Management for American Airlines, dated January 9, 2004 and submitted in support of the motion, confirm that while Chicken Rosemary was one of the entrees offered as a main dish aboard American Airlines Flight 121 on June 13, 2000, a review of American Airlines' complaint records for the entire month of June 2000, during which American Airlines flew daily flights from France to the United States, revealed that American Airlines did not receive any complaints from any other passengers for food poisoning as a result of any meal served aboard any of American Airlines' flights during that month.

The declaration submitted in support of the within motion from Laurent Faye of Gate Gourmet in France, the catering company which provided American Airlines with the food served aboard Flight 121 on June 13, 2000, confirms the method by which the chickens are stored and frozen following their purchase from Pourshins, a food wholesaler. The chickens are cooked and frozen in The Netherlands and trucked to Pourshins in England in refrigerated vehicles, where they remain frozen when they are purchased by Gate Gourmet from Pourshins. After the meals are purchased by Gate Gourmet, they are trucked to Gate Gourmet's Paris

10

facilities where they remain in a freezer until one day before they are used on American Airlines' flights. The chickens are then taken in refrigerated vehicles to the flights, heated by the cabin crew, and served to the passengers. *See* Faye declaration, paras. 6-8.

The chickens used by American Airlines on their flights from Paris to New York were purchased from one of two sources, Delta Dailyfoods (no longer in business) and Marfo Martinair Foods. A declaration dated March 3, 2004 from Matrix de Vries, the Sales and Export Manager for Marfo Martinair Foods, also submitted in support of the within motion, states in detail the methodology by which these chickens are cooked so as to avoid any potential health problems with undercooking.

The Fourth Amended Scheduling Order, agreed to by the parties and so ordered by the Court on February 25, 2004 (a copy of which is annexed to the moving affidavit of Michael J. Holland sworn to April 5, 2004 as Exhibit "E"), provides in pertinent part at paragraph 7 as follows:

> Plaintiff intends to call expert witnesses at trial. Plaintiff will designate all trial experts and provide opposing counsel with reports from retained experts pursuant to Fed.R.Civ.P. 26(a)(2) by February 29, 2004. Depositions of any such experts will be completed by May 15, 2004.

Plaintiff has never furnished to defendant any expert reports as required by paragraph 7 of the Fourth Amended Scheduling Order. Accordingly, plaintiff should be estopped from submitting any expert reports in opposition to this motion for summary judgment. Following the Court ordered settlement conference in this matter before the Honorable William I. Garfinkel, United States Magistrate Judge, on March 15, 2004, American Airlines immediately

11

wrote to plaintiff and advised plaintiff that she had failed to submit any expert reports in the form required by Rule 26(a) of the Federal Rules of Civil Procedure. Defendant requested, in accordance with the Fourth Amended Scheduling Order, that plaintiff confirm that the only expert reports submitted were earlier reports of Dr. John O'Brien, a physiatrist, and Dr. Hasbani, a neurologist who had treated Ms. Pridgeon both before June 2000 for another injury and subsequent to plaintiff's return to the United States on June 13, 2000. No response was received to that letter, a copy of which is annexed to the moving affidavit of Michael J. Holland sworn to April 5, 2004 as Exhibit "E". None of plaintiff's earlier doctors' reports connect the food served to plaintiff aboard American Airlines Flight 121 on June 13, 2000 to her Guillain-Barre Syndrome. Plaintiff has not submitted any medical proof which would connect the alleged tainted food that she ate aboard American Airlines Flight No. 121 on June 13, 2000 to her illness.

There are no facts to support plaintiff claims that her contracting Guillain-Barre Syndrome was the result of an "accident" which occurred on board the aircraft so as to trigger American Airlines' liability under Article 17 of the Warsaw Convention. Moreover, even if this Court concludes that there was an "accident", American Airlines is entitled to limit its damages to the sum of 100,000 SDRs (approximately $148,473) based on the "all necessary measures" defense contained under Article 20 of the Warsaw Convention, which defense has been preserved by American Airlines' adaptation of the IATA Intercarrier Agreement and Measures Implementing the IATA Intercarrier Agreement. American Airlines' adherence to these two intercarrier agreements are codified at American Airlines' Passenger Rule Tariff 55, a copy of

which has been provided to the Court as part of the discovery proceedings and a copy of which

is annexed hereto as Exhibit "A".

**ARGUMENT**

**I.**

**THE WARSAW CONVENTION EXCLUSIVELY
GOVERNS THE RIGHTS AND LIABILITIES OF THE PARTIES**

The rights and liabilities of the parties to this action are exclusively governed by the

terms of the Warsaw Convention.  As a treaty of the United States, the Convention supersedes

state law and policy and is the supreme law of the land.  *See* U.S. Const. art. VI, cl. 2; *El Al*

*Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155 (1999); *Air France v. Saks*, 470 U.S. 392 (1985).

Article 1 (1) of the Convention provides that it applies "to all international transportation

of persons, baggage, or goods performed by aircraft for hire."  49 U.S.C. § 40105 note.  *See*

Warsaw Convention, art. 1.  "International transportation" is defined in Article 1(2) as:

> any transportation in which, according to the contract made by
> the parties, the place of departure and the place of destination,
> whether or not there be a break in the transportation or a
> transshipment, are situated either within the territories of two
> High Contracting Parties, or within the territory of a single High
> Contracting Party, if there is an agreed stopping place within a
> territory subject to the sovereignty, suzerainty, mandate or
> authority of another power, even though that power is not a party
> to this convention.

Warsaw Convention, Art. 1(2).

Although plaintiff has not retained her passenger ticket, the transportation involved here was "international transportation" within the meaning of Article 1(2) of the Warsaw Convention because the places of departure and destination (New York) were situated "within the territory of a single High Contracting Party," the United States,[10] and there was an "agreed stopping place[s]" in another country – France.   There is no dispute that the incident alleged in the Amended Complaint occurred on American Airlines Flight 121, a Paris-New York flight.

Accordingly, the terms and provisions of the Warsaw Convention exclusively govern the rights and liabilities of the parties and preempt any state law claims.  *See Tseng, supra; King v. American Airlines, Inc.*, 284 F.3d 352 (2d Cir. 2002); *In re Air Disaster at Lockerbie, Scotland on December 21, 1988*, 928 F.2d 1267 (2d Cir.), *cert. denied*, 502 U.S. 920 (1991); *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164 (2d Cir. 1997); *Fishman v. Delta Air Lines, Inc.*, 938 F. Supp. 228 (S.D.N.Y. 1996), *aff'd*, 132 F.3d 138 (2d Cir. 1998); *Scala v. American Airlines*, 249 F.Supp. 2d 176, 178 (E.D. Conn. 2003) ("The parties are in agreement that Article 17 of the Warsaw Convention is applicable to Scala's claim and provides the exclusive means of any relief").  In short,

> a passenger whose injuries fall within the scope of the Warsaw Convention is either entitled to recovery under the Convention or not at all.

*Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003).

---

[10]     The United States and France are both High Contracting Parties to the Warsaw Convention.  *See* U.S. Department of State, *Treaties in Force* at 342 (2003).

## II.

### PLAINTIFF'S INJURIES WERE NOT CAUSED BY AN "ACCIDENT" WITHIN THE MEANING OF ARTICLE 17 OF THE WARSAW CONVENTION

The Convention's cause of action for personal injury is set forth in Article 17. *See Olympic Airways v. Husain*, 540 U.S. ___, 124 S.Ct. 1221 (Feb. 24, 2004). Article 17 defines an airline's liability for passenger personal injury as follows:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the *accident which caused the damage* so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking. (emphasis added)

To recover for bodily injury, the Convention requires a passenger to show that an "accident" within the meaning of Article 17 proximately caused her injuries – the *sine qua non* for the imposition of liability. *See Tseng*, 119 S. Ct. at 673.

Article 17 provides that the carrier is liable for damages sustained in the event of the wounding of a passenger or for any bodily injury sustained by the passenger if the "accident" which caused the damage took place on board the aircraft or during the course of any of the operations of embarking or disembarking. See *Air France v. Saks*, 470 U.S. 392 (1985): *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530 (1991); *Olympic Airways v. Husain*, 540 U.S.___, 124 S.Ct. 1221 (Feb. 24, 2004).

In order for plaintiff to successfully recover in this case, she must show that there was an "accident" which "took place on board the aircraft" and that she sustained a "bodily injury" as a result of that "accident". It is clear based upon the factual and serological evidence that the

plaintiff's injuries were not the result of an "accident", as that term has been defined by cases interpreting Article 17 of the Warsaw Convention.

The leading case interpreting the term "accident" as used in Article 17 of the Warsaw Convention is *Air France v. Saks*, 470 U.S. 392 (1985). The *Saks* case involved a claim by a passenger who sustained an ear injury during an otherwise normal aircraft landing following a 12 hour flight from Paris to Los Angeles. After landing, the plaintiff felt "severe pressure and pain" in her left ear, which allegedly began after the aircraft descended into Los Angeles. The plaintiff's ear pain continued after landing but the plaintiff did not inform any airline personnel of her condition. Five days later, plaintiff consulted a doctor who concluded that she had become permanently deaf in her left ear. The Supreme Court stated the "narrow issue presented is whether respondent can meet this burden [of showing an accident] by showing that the injury was caused by the normal operation of the aircraft pressurization system". *Saks*, 470 U.S. at 396. The Court held that there was no accident under Article 17 and dismissed the Complaint, finding that a passenger's injury is an "accident" only if the injury is caused by "an unexpected or unusual event or happening that is external to the passenger". *Saks*, 470 U.S. at 405. The Supreme Court emphasized that it is the cause of the injury that must satisfy the definition of an accident rather than the occurrence of the injury alone. *Saks*, 470 U.S. at 399. In short, not every identifiable incident or occurrence during a flight is an accident within the meaning of Article 17 even if the incident gives rise to an injury. *See, e.g.,* those cases which have held that a heart attack caused by a passenger's internal condition is not an "accident" within the meaning of Article 17 of the Convention.

16