# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ********************************* | : | |
| LOLITA PRIDGEON | : | |
| | : | |
| Plaintiff | : | DOCKET NO. |
| | : | 3: 02 CV1032 WWE |
| VS. | : | |
| | : | |
| AMERICAN AIRLINES, ET AL. | : | OCTOBER 22, 2004 |
| | : | |
| Defendants | : | |
| ********************************* | | |

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Lolita Pridgeon, the plaintiff in this action, hereby submits this Memorandum of Law

in support of her Opposition to Motion for Summary Judgment of even date.  Ms. Pridgeon

suffered serious, disabling and lift-altering injuries as a result of consuming a meal tainted

with *campylobacter jejuni* [1] aboard the defendant air carrier's Flight 121 from Paris, France

to New York, New York on June 13, 2000.  As a result of consuming the *campylobacter*

*jejuni* infected chicken, Ms. Pridgeon became seriously ill in the days immediately following

---

[1] *Campylobacter jejuni* is a small spiral shaped bacteria and, according to the Center for Disease Control
("CDC"), is one of the most common bacterial causes of diarrheal illness in the United States.  It is most
commonly found to exist in undercooked poultry and is the most prevalent known cause of Guillain-Barre
Syndrome.  Deposition of Dr. Kevin Cahill, p. 61, lines 17-19; See also Exhibit G attached to moving affidavit
of Michael J. Holland.

**ORAL ARGUMENT REQUESTED**

the flight.  Ms. Pridgeon was hospitalized and placed in the Intensive Care Unit at the Hospital of St. Raphael in New Haven, Connecticut.  She was ultimately diagnosed with Guillain-Barre Syndrome ("Guillain-Barre")[2].  The Guillain-Barre paralyzed Ms. Pridgeon from the neck down.  She temporarily lost the use of her legs and arms.  She was forced to undergo intensive rehabilitation and she continues to suffer from the debilitating effects of the Guillain-Barre to this day.

---

[2] According to the CDC, Guillain-Barre "occurs when a person's immune system is 'triggered' to attack the body's own nerves, and it can lead to paralysis that lasts several weeks and usually requires intensive care…As many as 40% percent of Guillain-Barre…cases in this country may be triggered by campylobacteriosis." See Exhibit G attached to moving affidavit of Michael J. Holland;  See also Deposition of Dr. Kevin Cahill, p. 62, line 6.

## SUMMARY OF THE CASE

The plaintiff, Lolita Pridgeon, brings this action pursuant to the provisions of the Warsaw Convention.  On June 13, 2000, the defendant air carrier served Ms. Lolita Pridgeon a meal of Chicken Rosemary that was infected with a dangerous and sometimes deadly bacterium known as *campylobacter jejuni*.  As a result of ingesting the tainted chicken, Ms. Pridgeon became seriously ill.  Ms. Pridgeon filed this civil action seeking lawful compensation from the defendant for the injuries and damages that she has suffered as a result of her illness.  The defendant has filed a Motion for Summary Judgment arguing that the service of tainted chicken is not an "accident" for purposes of Warsaw Convention liability.  The defendant, in an effort to limit its liability exposure, also requests that the court hold, as a matter of law, that it took "all necessary measures" to prevent the harm that it caused Ms. Pridgeon to suffer.

Several courts in the Second Circuit have held that the service of an in-flight meal or beverage which results in harm to a passenger (such as foodborne illness) is an "accident" for the purposes of Warsaw Convention liability.  Furthermore, the expert witnesses that Ms. Pridgeon has disclosed in connection with this case support the conclusion that her illness was caused by the defendant's service of campylobacter jejuni infected chicken on June 13,

2000.  Finally, the defendant has not provided the court with adequate proof to sustain its burden of proving that it took "all necessary measures" to prevent the harm that it caused to Ms. Pridgeon.

Accordingly, the court should deny the defendant's Motion for Summary Judgment and deny the defendant's request to limit the amount of recoverable damages under the Warsaw Convention and IATA Intercarrier Agreement.

## FACTS RELEVANT TO A DISPOSITION OF THE MOTION

As asserted by the defendant air carrier, the facts that are relevant to a disposition of the defendant's motion are straightforward and undisputed.  The defendant, however, has not provided the court with all of the relevant facts upon which its decision on the motion should be made.  In fact, the defendant seeks to have the court focus on several facts that its own experts have testified are irrelevant to the legal issues now before the court.[3]

Ms. Lolita Pridgeon and her partner, Dr. Sigmund Kra, traveled on vacation in France between May 31 and June 13, 2000[4].  Ms. Pridgeon was in good health throughout the trip.  On the morning of June 13, she and Dr. Kra flew from Nice to Paris.  They had a layover of

---

[3] A Local Rule 56(a) 2 Statement and a Statement of Disputed Issues of Material Fact are submitted herewith in support of this opposition.

[4] Except where noted, all relevant facts are drawn from the Defendant's statement of undisputed facts, the Disputed Issues of Material Fact, the affidavits of Lolita Pridgeon, Dr. Siegfried Kra and Dr. Marjorie Golden and the depositions of Lolita Pridgeon, Dr. Marjorie Golden, Dr. Kevin Cahill, Dr. Jerome Block, Dale Norgard and Andrea Pratt.

several hours in Paris.  Ms. Pridgeon and Dr. Kra then boarded the defendant's Flight 121 to

fly from Paris to New York.  During the flight, the defendant carrier served Ms. Pridgeon

with an individually prepared dish of Chicken Rosemary which was tainted with c. jejuni.

After eating several bites of the tainted chicken, Ms. Pridgeon realized that the chicken was

cold, pink and undercooked.  She showed the chicken to Dr. Kra, who advised her not to eat

it.  She discarded it and ate nothing else on board the flight.  Two days following the flight,

on June 15, 2000, Ms. Pridgeon became very ill with the classic symptoms of c. jejuni

induced gastroenteritis (or campylobacteriosis).[5]   Ms. Pridgeon's gastrointestinal symptoms

ultimately subsided but they were replaced with significant pain in the feet, legs and ankles

over the several days after Flight 121.

On June 23, 2000, Ms. Pridgeon collapsed when she attempted to get out of bed and

she was transported by ambulance to the Emergency Department at The Hospital of St.

Raphael in New Haven, Connecticut.  Ms. Pridgeon was admitted to the Intensive Care Unit

at St. Raphael's Hospital and was noted to be quadriplegic.  She was ultimately diagnosed

with tGuillain-Barre Syndrome, probably triggered by c. jejuni, but numerous tests were

ordered to rule out other possible causes.  These orders included one for a stool sample, but

no sample could be obtained for several days. By that time, the results of other tests were

---

[5] According to the CDC, "[m]ost people who become ill with campylobacteriosis get diarrhea, cramping, abdominal pain and fever within 2 to 5 days after exposure to the organism.  The diarrhea may be bloody and can be accompanied by nausea and vomiting." *Id*.

obtained and the other possible causes of her GBS had been ruled out.  In addition, due to an

initial weak positive test for Lyme disease, she had been placed on doxycycline, an

antibiotic. Since doxycylcine is also effective in treating c. jejuni, it would not have been

possible to find c. jejuni in a stool sample by the time one could have been obtained,

especially since c. jejuni is known to be rapidly excreted from the body.[6]  Ultimately,

neuromuscular testing by Dr. JonathanGoldstein, a nerve conduction study specialist at Yale

University, confirmed that she had an AMAN strain or pattern of GBS.  The AMAN strain or

pattern of GBS has been which has been closely linked in he medical literature to c. jejuni.[7]

While in the ICU, Ms. Pridgeon experienced severe pain throughout her entire body

and she was treated with Nuerontin.  After several weeks in the ICU, Ms. Pridgeon was

transferred to the Intensive Rehabilitation Unit where she was involved in extensive therapy

and rehabilitation for approximately three months.  Upon discharge from the Intensive

Rehabilitation Unit, Ms. Pridgeon received home care services from the Connecticut VNA.

Ms. Pridgeon suffers greatly from the after effects of the GBS.  In the several months

following her discharge, she was typically confined to a wheelchair.  She could not walk

without the assistance of heavy leg braces, crutches and a walker.  She continues to use

braces on both legs and will often use a cane to assist in her walking.  She must wear orthotic

[6] See "Clinical etc."
[7] See AMAN GBS

boots at night while she sleeps. She still must use a shower bench as she is unable to stand in the shower. She continues to have problems with the feeling in her hands because of the neurological deficits caused by the GBS.

Ms. Pridgeon has disclosed Dr. Marjorie Golden[8], a physician board certified in infectious diseases, as an expert witness in this case. Dr. Golden was actually involved in treating Ms. Pridgeon at St. Raphael's Hospital in July 2000. Further, Dr. Golden gave a sworn deposition in this case on August 26, 2004. It is Dr. Golden's opinion, based upon a reasonable degree of medical certainty, that Ms. Pridgeon's Guillain-Barre Syndrome was caused by an infection with c. jejuni acquired through the ingestion of undercooked chicken on defendant's Flight 121. Dr. Golden bases her opinion on Ms. Pridgeon's undisputed testimony, her treatment of Ms. Pridgeon, her exhaustive review of Ms. Pridgeon's medical records, her experience as a physician board certified in infectious diseases and her research, review and understanding of the relevant medical literature.

The parties agree on most of the basic facts here. The defendant's own consulting expert, Dr. Jerome Block admitted in deposition, that he has no reason to disagree that Ms. Pridgeon was served undercooked, cold chicken on board Flight 121. He further testified

---

[8] Dr. Golden is the only physician in this case who has been board certified in the specialty of infectious diseases. The defendant asserts in its papers that Dr. Kevin Cahill is an "infectious disease specialist". However, Dr. Cahill did admit at his deposition that he was not board certified in infectious diseases. Deposition of Dr. Kevin Cahill, p. 24-5 (24-5; 1-15)

that he agrees she had gastroenteritis and that it triggered her GBS.  The only known form of gastroenteritis linked to GBS is c. jejuni.  Dr. Block agrees that if he assumes Ms. Pridgeon ingested c. jejuni from the meal served to her on board Flight 121, he would agree with Dr. Golden's professional opinion that the chicken she ate caused her c. jejuni infection and resulted in the development of GBS.

The parties further agree that approximately two days after her return from France Ms. Pridgeon developed a high temperature, vomiting, severe diarrhea and pains in her legs and feet.  *Defendant's Statement of Facts*.  The time period of ingesting the contaminated chicken and the onset of symptoms are consistent with c. jejuni gastroenteritis.  *See Dr. Golden's report dated May 12, 2004* ; *see CDC Campylobacter Infections* attached to Attorney Holland's affidavit; "*Campylobacter: Low Profile Bug is Food Poisoning Leader*, Hingley, Audrey, FDA Consumer Magazine, September-October, 1999, p 1.

C. jejuni is known to infect the majority of chicken sold for consumption. *Id*. at 2. Dr. Marjorie Golden has testified that c. jejuni is the most common cause of gastroenteritis in the United States.  *Golden depo, p??*. Her testimony is consistent with the medical and scientific literature. See *CDC Campylobacter Infections*, supra; Hingley at p 1; "*Campylobacter Species and Guillan-Barré Syndrome*, Nachamakin et al., Clinical Microbiology Reviews, July 1998, p 555, copy attached [hereinafter "Clinical Neurology article"].  Both Ms.

Pridgeon and Dr. Kra have testified that she was in good health throughout the time they were in France. *See Pridgeon depo p 28-29 and Dr. Kra's affidavit*. Ms. Pridgeon does not recall eating any chicken during her last three days in France. *Pridgeon depo p 29-30*. As noted, Dr. Golden has also testified that in her professional opinion, based on her education, training, experience and her treatment of Ms. Pridgeon, that Ms. Pridgeon contracted campylobacter jejuni gastroenteritis from eating undercooked chicken served to her on American Airlines. *See Golden depo p ??????*  The defendant has not produced any evidence that identifies any other cause for Ms. Pridgeon's gastrointestinal illness and her symptoms.

The parties also agree that Ms. Pridgeon developed Guillan-Barré Syndrome [GBS] and required extensive treatment. See *Defendant's Statement of Facts*.  There is a well documented link in the scientific and medical literature between c. jejuni and GBS, and in particular, the AMAN form of GBS[9].  *See "Does Campylobacter jejuni infection elicit 'demyelinating' Gullian-Barré Syndrome"* Kuwabara et al, Neurology, vol. 63(3) 10 August 2004, p 529-533*; see also Clinical Neurology article,, supra*.

Ms. Pridgeon's medical records from her admission to the Hospital of St. Raphael for treatment of Guillain-Barré Syndrome document the differential diagnosis process that

---

[9] The AMAN or acute motor axonal neuropathy is the less common form of GBS.

concluded her GBS was triggered by her earlier campylobacter jejuni caused illness. *See the Infectious Disease note for 6/23/2000.* The differential diagnosis process is widely accepted in the practice of medicine. *See Dr. Block's depo, p 80-81.*

In his treatment of Ms. Pridgeon, Dr. Goldstein performed neuromuscular testing and concluded that Ms. Pridgeon had the AMAN form of GBS, which is the type associated with a previous campylobacter illness. *See Dr. Goldstein's report, 3/14/01.* Dr. Jerome Block, the defendant's expert agrees that the AMAN or axonal form is the type caused by campylobacter. *Block depo p. 89-90.*

Dr. Jerome Block also testified that he agrees that the literature indicates that campylobacter jejuni is a leading cause of GBS. *See Block depo p. 96-97.* In fact, he testified that in his opinion Ms. Pridgeon's GBS was triggered by a viral gastroenteritis. *Block depo pg. 84.* Dr. Block also testified that the most common cause of campylobacter infection is food contamination, and that he is aware that chicken is often involved. *See Block depo, pg. 116.* Finally, Dr. Block testified that if he were told to assume that Ms. Pridgeon did in fact ingest campylobacter infected chicken on June 13, 2000, developed diarrhea within two to five days and then developed GBS within one to three weeks, then he would agree within a reasonable degree of medical probability that the chicken caused her GBS. *Block depo p 104-106.*

**LEGAL ARGUMENT**

**I.      SUMMARY JUDGMENT SHOULD BE DENIED AND THE COURT**

**SHOULD NOT IMPOSE A LIMIT ON MS. PRIDGEON'S LAWFUL DAMAGES**

This Court should deny the defendant's Motion for Summary Judgment because Lolita Pridgeon's injuries were caused by an "accident" under the Warsaw Convention. Furthermore, the Court should not impose a limit on Ms. Pridgeon's damages pursuant to Article 20 of the Warsaw Convention because the defendant has failed to meet its burden of proving that it took "all necessary measures" to avoid the damage that it caused Ms. Pridgeon to suffer.

The moving party in a motion for summary judgment bears the burden to establish that there are no genuine issues of material fact in dispute and that it is therefore, entitled to judgment as a matter of law. *Rule 56(c) Fed. R. Civ. P.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the evidence regarding a material fact is such that a jury could reasonably return a verdict for the nonmoving party, the dispute is genuine. *Aldrich v. Randolph Cent. School Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). The court must construe the facts in a light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court's role in considering a motion for

summary judgment is not to resolve disputed issues, but only to determine the existence of factual issues to be tried. _Knight v. United States Fire Ins. Co._, 804 F.2d 9.11 (2d Cir.1986), _cert. denied_, 480 U.S. 932 (1987). "The trial judge should not weigh the evidence to determine the truth of the matter but should only determine whether there is a genuine issue for trial." Price v. KLM-Royal Dutch Airlines, 107 F.Supp. 2d 1365, 1367 (2000) (citing Anderson at 251). "Summary Judgment is infrequently granted in negligence cases because the determination of reasonable is a question to be answered by the fact finder after trial." King v. Crossland Savings Bank, 111 F. Supp, 251, 259 (2d Cir. 1997). Moreover, summary judgment is a **"harsh remedy** to be granted only where there are no material issues of fact to be tried." Flli Moretti Cereali v. Continental Grain Co., 563 F. 2d 563, 565 (2d Cir. 1977)(emphasis added). "Doubts must be resolved and reasonable inferences drawn in favor of the opponent" to a motion for summary judgment. Travelers Indem. Co. v. M.S. Kiso Maru, 471 F. Supp. 898, 900 (S.D.N.Y. 1979).

The defendant served Lolita Pridgeon campylobacter jejuni infected chicken aboard its Flight 121 on June 13, 2000. Such an occurrence constitutes an "accident" under the Warsaw Convention. Furthermore, Ms. Pridgeon has disclosed several experts in this matter who have given medical opinions linking the _campylobacter jejuni_ infected chicken to her Guillain-Barre. As such, the defendant's motion for summary judgment should be denied.

In addition, the defendant has failed to provide this court with persuasive proof to meet its burden of proving that it took "all necessary measures" to avoid the damage that was caused to Ms. Pridgeon. Several genuine issues of material fact exist as to whether the defendant took "all necessary measures". Accordingly, the court should deny the defendant's request to have the court limit the compensatory damages recoverable under the Warsaw Convention and IAIA Intercarrier Agreement.

## II.  THE WARSAW CONVENTION AND THE INTERNATIONAL AIR TRANSPORT ASSOCIATION INTERCARRIER AGREEMENT GOVERN THIS CASE

Article 1 of the Warsaw Convention provides that it "shall apply to all international transportation of persons . . . for hire."[10]  Article 17 further provides that a "carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the **accident** which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." *Id*. (emphasis added). After a plaintiff establishes a prima facie case of liability under Article 17 by showing that the injury was caused by an "accident," the air carrier then must prove under Article 20 provides that it had taken "**all necessary measures to avoid the damage or that it was impossible for [the airline] to take such measures.**" *Id.*,

---

[10] 49 Stat. 3000, T.S. No. 876 (1934), reprinted at Note following 49 U.S.C.S. § 40105.

Article 20(1) (emphasis added).  "Thus, Article 17 creates a **presumption of air carrier liability** and shifts the burden to the air carrier to prove lack of negligence under Article 20." *Olympic Airways v. Husain*, 540 U.S. ___, 124 S.Ct. 1221, 1225, fn. 5 (2004)(emphasis added).

Since Flight 121 was bound to New York, New York from Paris, France at the time that Ms. Pridgeon ingested the tainted meal, her claim for compensatory damages arising out of her foodborne illness is governed by the Warsaw Convention.  In addition, the defendant admits that it is now bound by the terms of the International Air Transport Association Intercarrier Agreement on Passenger Liability ("IATA Agreement") and the Agreement on Measures to Implement the IATA Intercarrier Agreement by virtue of its filing an International Passenger Rules Tariff Rule 55(B) with the United States Department of Transportation.  See Defendant's Memorandum in Support of Summary Judgment, p. 22.  As such, the defendant is legally responsible to Ms. Pridgeon for her damages that do not exceed 100,000 SDRs.  In addition, since the defendant's representatives have admitted that the defendant does not have any proof of the precautionary measures that it took to attempt to prevent Ms. Pridgeon's harm, it is also legally responsible for the full extent of Ms. Pridgeon's legal damages.

III.    **LOLITA PRIDGEON'S INJURIES AND LOSSES WERE SUSTAINED AS THE RESULT OF AN "ACCIDENT" UNDER THE WARSAW CONVENTION**

**A.**    Illness caused by contaminated food served by an air carrier is an "accident" for purposes of the Warsaw Convention.

Article 17 of the Warsaw Convention states, in pertinent part, that, "[t]he carrier shall be liable for damage sustained in the event of…bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft..."  The defendant concedes that Ms. Pridgeon suffered a bodily injury here.  See *Defendant's Memorandum at p. 4*.  Accordingly, pursuant to Article 17, the defendant air carrier is presumptively liable if Ms. Pridgeon can prove that her Guillain-Barre illness and related damages were caused by an "accident" which occurred while she was on board Flight 121 on June 13, 2000.  *Eastern Airlines v. Floyd*, 449 U.S. 530, 535-36 (1991).

The United States Supreme Court has held for purposes of defining liability under Article 17 that an "accident" refers to an "unexpected or unusual event or happening that is external to the passenger."  *Air France v. Saks*, 470 U.S. 392, 405 (1985).  It is the cause of the injury- rather than the occurrence of the injury- that must satisfy the definition of "accident." *Id*. at 399.  The passenger need only establish that some link in the chain of causation was an unusual or unexpected event external to the passenger to prove an "accident." *Id*. at 406.  The Supreme Court has emphasized that the definition of "accident" "should be flexibly applied after assessment of all the circumstances surrounding a

passenger's injuries." *Id.* at 405. "The larger the role of the airline in the causal chain, and the greater the knowledge and involvement of its personnel and operations in bringing about the harmful event, the more likely it is that liability will be found." *Fulop v. Malev Hungarian Airlines*, 175 F. Supp. 2d 651 (2001)

The central question then in the case at bar is whether the defendant air carrier's service of a tainted chicken meal to Ms. Pridgeon was "an unexpected or unusual event or happening that is external" to her. Several courts in the Second Circuit addressing injuries arising out of the service of in-flight meals to passengers have held that the injuries were sustained as the result of an "accident" for purposes of Article 17 liability.

In *Scala v. American Airlines*, 249 F. Supp.2d 176 (E.D. Conn. 2003), the plaintiff brought suit against an airline alleging that he was mistakenly served an alcoholic beverage aboard an international flight and that he suffered a heart related injury as a result of consuming the beverage. The defendant air carrier moved to dismiss the plaintiff's complaint pursuant to Fed.R.Civ.P. 12(c). It claimed that the mistaken service of an alcoholic beverage to the plaintiff was not an "accident" within the meaning of Article 17. The court denied the motion to dismiss and held that the mistaken service of alcohol "was an 'unexpected' and perhaps 'unusual' event." Id. at 179. The court reasoned that the plaintiff "expected to receive the beverage he ordered and it is presumably not common for the airline

to mistakenly provide alcoholic beverages to those who do not desire them." Id. at 179. "The substitution of an alcoholic beverage for the non-alcoholic beverage Scala ordered was also 'external' to Scala in the sense that it was a mix-up presumably done by a flight attendant." Id. at 179-180. "While Scala's physical reaction to the event was obviously wholly internal, the accident was the drink substitution, not the heart ailment." Id. at 180.

When Ms. Pridgeon ordered her Chicken Rosemary meal while on board Flight 121, she certainly did not expect that she would be served chicken that was infected with *campylobacter jejuni*. Hopefully, it is not common for the defendant to serve such tainted chicken. The "accident" here was the service of the infected chicken by the flight crew of Flight 121. It can hardly be argued that such an event was not unexpected or unusual. Furthermore, the service of the tainted meal was "external" to Ms. Pridgeon in that it was performed by the flight crew. As more fully set out below, it was the tainted chicken that caused Ms. Pridgeon to become ill.

Similarly, in *Rhodes v. American Airlines*, 1996 WL 108897 (E.D.N.Y. 1996), the defendant airline had served the plaintiff an in-flight meal consisting of fish which contained a fishbone. The plaintiff suffered injury when he ingested the fishbone while consuming the meal. The defendant air carrier (the same air carrier as the defendant in this case) moved for summary judgment arguing that the Warsaw Convention's statute of limitations applied

because their service of the in-flight meal containing a fishbone to the plaintiff was an

"accident" under Article 17.  The court agreed with the air carrier.  Noting that the definition

of "accident" must be "flexibly applied", the court held that the service on an in-flight meal

that contained a fishbone was an "accident" for the purposes of Article 17.  *Id.*

In *Bousso v. Iberia Airlines*, 1998 U.S. Dist. LEXIS 3939 (S.D.N.Y. 1998), the

defendant carrier served the plaintiff an in-flight meal containing a foreign object.  The

plaintiff was injured and filed a civil action seeking damages.  The defendant air carrier

moved for summary judgment based upon the Warsaw Convention's statute of limitations

arguing that the service of an in-flight meal containing a foreign object is an "accident" under

Article 17.  The court noted that the "[t]he Second Circuit…interprets the term 'accident'

broadly…" *Id. at 4*.  It granted the defendant's motion for summary judgment and held that

"[a] passenger biting into a foreign object present in an in-flight meal is an 'unexpected' and

'unusual occurrence' that is external to [the passenger].  [The passenger's] injury clearly

arises from an inappropriate or unintended happenstance that occurred during the operation

of a flight, specifically service of an in-flight meal" *Id. at 4.  See also Halmos v. Pan*

*American World Airways*, 727 F. Supp. 122 (S.D.N.Y. 1989) (food poisoning caused by

"accident"); *Fishman v. Delta Air Lines, Inc.*, 132 F.3d 138 (2d Cir. 1998) (stewardess

scalding a child with hot compress an "accident"); *Gonzalez v. TACA, Int'l Airlines*, No. Civ.

A. No. 91-0175, 1992 WL 142399 at *2 (E.D.La. June 18, 1992) (serving passenger a beverage containing a small piece of plastic an "accident"); Diaz Lugo v. American Airlines, Inc., 686 F.Supp. 373 (D.P.R.1988)(spilling coffee onto passenger's lap was accident: "When a person boards a plane, he does not expect that a cup of coffee will spill on his lap. The usual operation of an airplane does not require passenger to be spilled with hot coffee.")

The usual operation of an airplane does not require that passengers be served with in-flight meals tainted with dangerous bacteria. The fact that the defendant did serve Ms. Pridgeon with a meal tainted with dangerous bacteria was "unexpected" and "unusual". This situation is no different from the facts underlying the holdings in the other cases cited herein. There is no reasonable factual distinction that can be drawn between the service of a meal with a fish bone or other foreign object or the mistaken service of an alcoholic beverage and the service of campylobacter tainted chicken.

B.     The contaminated chicken served Ms. Pridgeon on board American Airlines Flight 121 caused her to become ill with a *campylobacter jejuni* infection and as a consequence, she developed Guillain-Barre.

Dr. Marjorie Golden has been disclosed as Ms. Pridgeon's expert in the field of infectious diseases. Dr. Golden is board certified in the field of infectious diseases.[11] She was one of several physicians who treated Ms. Pridgeon for her illness. Dr. Golden has

---

[11] Neither Dr. Block nor Dr. Cahill are board certified in infectious diseases.

reviewed all of the relevant information in this matter and has performed independent

research regarding the relation between the ingestion of campylobacter jejuni and Guillain-

Barre.  In her report dated May 19, 2004, Dr. Golden gives her opinion that.  Dr. Golden was

deposed on August 26, 2004, Dr. Golden further explained her opinions at her deposition.

[cite]

Ms. Pridgeon disclosed Dr. Moshe Hasbani, a neurologist, on May 21, 2003.  She

disclosed Dr. Jonathan Goldstein, an EMG specialist, on May 21, 2003.  She disclosed Dr.

John O'Brien on June 18, 2003.  See Exhibits E-G, attached to Affidavit of Timothy

O'Keefe.  All of these experts will provide information which forms a further basis of Ms.

Pridgeon's claim that her illness was caused by the defendant serving her the tainted chicken.

This case is quite similar to *Jaroslawicz v. Prestige Caterers, Inc.*, 2002 N.Y. App.

Div. LEXIS 2471.  In that case the plaintiff sought to recover damages against the defendant

for food poisoning which he claimed was caused by the ingestion of *campylobacter jejuni*

and developed into Guillain-Barre.  The defendant sought summary judgment claiming that

the plaintiff could not meet its burden of proving causation.  The court held that the

defendant expert's bald statement that there was "insufficient information" to conclude that

the plaintiff's illness was due to improperly cooked food, "was not adequate to meet

defendants' burden as summary judgment movants to demonstrate their prima facie

entitlement to summary judgment…" *Id.*  The plaintiff's evidence included a summary of events demonstrating the temporal relation between the plaintiff's ingestion of campylobacter, his subsequent gastrointestinal illness, his contraction of Guillain-Barre, the observations of his treating physicians and the medical opinions submitted on his behalf based upon the medical studies documenting the association between campylobacter ingestion and Guillain-Barre.  *Id.*  Ms. Pridgeon has presented the same information here.

The defendant's expert witnesses, Dr. Kevin Cahill and Dr. Jerome Block[12], obviously have opinions that are contrary to Dr. Golden's opinions.  However, that, in and of itself, hardly provides an adequate basis upon which to grant the defendant summary judgment in this matter.  The doctors all agree that Ms. Pridgeon's diagnosis of Guillian-Barre is correct.  They all agree that campylobacter jejuni is a principle cause of Guillian-Barre.  They seem to be in agreement regarding what the medical literature tells us about the known incubation periods between campylobacter jejuni ingestion and campylobacter illness and campylobacter illness and the development of Guillain-Barre.  The principle disagreement among the experts is whether it is possible to state within a reasonable degree of medical probability that Ms. Pridgeon's illness was caused by the ingestion of

---

[12] It must be noted here that the defendant has never formally disclosed Drs. Block or Cahill, or any other witnesses for that matter, as experts pursuant to Rule 26(a) (2).

campylobacter without first having a stool culture or blood testing that confirms that fact. Dr. Golden believes that is medically possible. Drs. Block and Cahill do not.

Dr. Cahill admits that he is not board certified in infectious diseases. Cahill Dep. p. 25 (8-10). He has never diagnosed a patient with Guillain-Barre. Cahill Dep. at p. 8 (20-4). He has never been involved in his life before this case in attempting to determine the cause of a person's Guillain-Barre. Cahill Dep. p. 9 (1-5). He has no knowledge on the subjects of AMAN and AIDP patterns of Guillain-Barre and can not testify as to which pattern is most closely associated with campylobacter induced Guillain-Barre Cahill Dep. p. 55 (11-19). In addition, Dr. Cahill's opinions are quite suspect given that he bases his opinions on the assumption that Ms. Pridgeon actually became ill during Flight 121 and not two days after as everyone agrees. Cahill Dep. p. 43 (16-25); 52 (11-14).

The causal relation between an injury and its later physical effects may be established by the direct opinion of a physician or by the physician's deduction by the process of eliminating causes other than the traumatic agency or by opinion based upon a hypothetical question. *Boland v. Vanderbilt*, 140 Conn. 520, 525 (1953). "One of the ways to establish a causal relationship between the particular conduct of a defendant and a plaintiff's injury is the expert's deduction, by the process of eliminating causes other than the

conduct, that the conduct was the cause of the injury." *Shegog et al. v. Zabrecky et al.*, 36

Conn. App.737, 748 (1995), *citing Boland v. Vanderbilt* at 525.

 Contrary to Dr. Block's testimony at his deposition[13], Ms. Pridgeon was tested for a

number of diseases that have been linked with GBS, including Epstein Barr and CMV; all

tests were negative. The best diagnostic test for c. jejuni known at this point is a culture from

a stool sample; however, no sample was ever obtained for Ms. Pridgeon. C. jejuni is rapidly

excreted from the body[14]. *See Clinical Neurology Article*. Since Ms. Pridgeon was being

treated with antibiotics for a possible Lyme disease (which was later ruled out), the

antibiotics most likely would have masked the presence of c. jejuni. See *Infectious Disease*

*note 6/23*. Dr. Golden has testified that while a stool sample is the ideal way to diagnose

campylobacter, it is not the only way in which to make such a diagnosis of G.B.S. *Golden*

*depo, p ???*. By the time a stool sample was available, the diagnosis had already been made

and additional testing was not required in order to treat Ms. Pridgeon as it would not have

changed the management of Ms. Pridgeon's serious illness. *Id*. at ?

---

[13] "Other viral infections might have caused the GI upset that were not considered as viruses. Epstein-Barr virus. These were never ruled out. It was thought of as food poisoning." Block depo p 83.

[14] "Isolation of C.jejuni from stool culture is the gold standard for the diagnosis of infection by this bacterium, but culture survey would underestimate the frequency of C. jejuni infection because the time between the infection and GBS onset often exceeds the duration of excretion of viable C.jejuni in stools." Kuwbara, Neurology Article, p 9 of 12 of article in form attached.

There is sufficient evidence from which a reasonable jury could find that Ms. Pridgeon was served an improperly prepared, undercooked chicken meal contaminated with c. jejuni while on board American Airlines Flight 121, and as a result became ill with c. jejuni gastroenteritis and then subsequently developed GBS. As the plaintiff has established that there is a genuine issue of material fact, the defendant's Motion for Summary Judgment should be denied.

**IV.     A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER THE DEFENDANT TOOK ALL NECESSARY MEASURES TO AVOID MS. PRIDGEON'S HARM**

> A.    The IATA Intercarrier Agreement and the Warsaw Convention provide the basis for Ms. Pridgeon's claim for compensatory damages

The liability framework under the Warsaw Convention and IATA Intercarrier Agreement is markedly different than the traditional legal framework applied to claims involving bodily injury. Under the liability scheme that applies here, a defendant air carrier is presumptively liable for the damages suffered by a claimant that do not exceed 100,000 (or approximately $148,000). In addition, the defendant carrier is legally responsible for the damages that exceed 100,000 SDRs if it cannot meet its burden of proving that it took "all necessary measures" to avoid the harm suffered by the claimant. Furthermore, the defendant carrier must provide "persuasive proof" that it took "all necessary measures" to avoid the

harm suffered.  The defendant has failed to meet its burden here.  There is absolutely no

basis, at this juncture in the case, upon which to order that Ms. Pridgeon's damages be

limited to 100,000 SDRs[15].  Accordingly, the defendant air carrier's request for such an order

must be denied.

     The Warsaw Convention provides a very liberal standard for defining when

compensatory damages are due an injured claimant.  Under Article 17 of the Warsaw

Convention, "the carrier is liable for damage sustained in the event of…bodily injury

suffered by a passenger, if the accident which caused the damage so sustained took place on

board the aircraft…"  As outlined in Section III of this brief, Ms. Pridgeon suffered a bodily

injury as a result of an accident which took place aboard the defendant carrier's aircraft on

June 13, 2000.  Under Article 17 of the Warsaw Convention, the defendant is liable for the

damage that Ms. Pridgeon has sustained.

     Historically, courts have been forced to impose an onerous and arbitrary cap on the

damages suffered by international air passengers.  Under Article 22(1) of the Warsaw

Convention, "[t]he liability of the carrier for each passenger is limited to 125,000 francs" or

---

[15] Limiting Ms. Pridgeon's damages at approximately $148,000 would be grossly inadequate given the severity of her injuries and their life-altering impact on her physically, emotionally and professionally.  To date, Ms. Pridgeon has incurred medical expenses totaling  $253,304.55 as a result of her illness and she continues to incur expenses.  This figure obviously does not address Ms. Pridgeon's significant non-economic losses including her permanent impairment and disfigurement, pain and mental suffering and the significant impairment on her ability to enjoy the full spectrum of life's activities.

the equivalent of approximately $10,000.00. That cap was adjusted upward in 1966 by the Montreal Agreement, which was an agreement among many carriers to raise the damages cap to $75,000.00. Furthermore, air carriers have taken advantage of their ability under Article 20(1) of the Warsaw Convention to avoid legal responsibility altogether in cases involving bodily harm and death by attempting to prove that "all necessary measures" were taken to avoid the damage.

Fortunately for the victims of serious bodily injury occurring aboard international flights, on July 31, 1996, a series of agreements ("the IATA Agreement) were filed with the United States Department of Transportation for approval to address the inequities contained within the airline liability scheme. At the time, the IATA Agreement was hailed by United States Secretary of Transportation Federico Pena as a "culmination of a twenty-five year effort to eliminate the egregiously unfair Warsaw limits on air carrier liability."[16] All major international air carriers, including the defendant, have agreed to implement the provisions of the IATA Agreement. Under the IATA Agreement, the onerous damages caps under Article 22 of the Warsaw Convention are waived for all claims falling under Article 17 in favor of the damages law of the passenger's domicile. The IATA Agreement also provides that the air carriers will waive their ability to rely on any Article 20 defense to all passenger claims

---

[16] News Release of U.S. Secretary of Transportation Federico Pena, August 1, 1996.

that do not exceed a threshold of 100,000 SDRs.  The carriers, however, maintain the right to interpose the affirmative "all necessary measures" defense under Article 20(1).  [NEED SOME CITATIONS HERE]

In applying for approval of the IATA Agreement, the air carriers made it clear that the "all necessary measures" defense would be rarely invoked.  The International Air Transport Association has explained that "except in the ***rare case*** of a major claim where a carrier invokes the right to prove that it had taken all necessary measures to avoid the damage or that it was impossible for them to take such measures, Warsaw Convention Article 20.1, or seeks to establish contributory negligence by an injured passenger, Warsaw Convention Article 21, ***the proposed regime would leave only the issue of recoverable compensatory damages*** to be resolved in passenger claims." [17]  The IATA Agreement retains the benefit of the liberal liability standard under the Warsaw Convention without the detriment of an artificial and inadequate damages cap.  In essence, it provides for a form of strict or absolute liability on the part of the air carrier for all damages claims that do not exceed 100,000 SDRs and provides that the air carrier continues to bear the burden of proof in connection with the Article 20(1) defense for all damages suffered over 100,000 SDRs.

---

[17] Application of the International Air Transport Association for Approval of Agreement, Antitrust Immunity and Related Exempted Relief, Docket OST-95-232 filed before the Department of Transportation, Washington D.C. on July 31, 1996 (emphasis added)..

The defendant has admitted that it is now subject to the more fair and just provisions of the IATA Agreement. On February 14, 1997, the Department of Transportation made effective the defendant's amended passenger liability tariff for travel to and from the United States. *See Response to Request for Admission No. 2.* Rule 55A(B)(1)(A) of defendant's International Passenger Rules and Fares Tariff regarding "Laws and Provisions Applicable" to the "Liability of Carriers" states in part that "(a) The carrier shall not invoke the limitation of liability in Article 22(a) of the [Warsaw] Convention as to any claim for recoverable compensatory damages arising under Article 17 of the Convention." *See Response to Request for Admission No. 4.* Rule 55A(B)(1)(B) further provides that "(b) The carrier shall not avail itself of any defense under Article 20(a) of the Convention with respect to that portion of such claim which does not exceed 100,000 Special Drawing Rights (SDR)." *See Response to Request for Admission No. 5.* Moreover, Rule 55(C)(B) provides that "(d) The carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the law of the domicile or permanent residence of the passenger." *See Response to Request for Admission No. 6.* To the extent that Ms. Pridgeon can prove to the trier of fact that her damages have been suffered as a result of an "accident" on board Flight 121, as that term has been interpreted by our courts, she is entitled to money damages equal to 100,000 SDRs. The defendant did, however, reserve its right to

invoke an Article 20(1) defense to that portion of Ms. Pridgeon's claim which exceeds

100,000 SDRs.[18]

      b. The defendant is not entitled as a matter of law to an order limiting damages

      The defendant has not satisfied its burden of proving that there is no genuine issue of

material fact related to its Article 20(1) defense in this case.  Furthermore, it has not provided

the court with any credible evidence to support its claim that it is entitled to a judgment as a

matter of law on the issue of whether it took "all necessary measures" to avoid Ms.

Pridgeon's harm.  In fact, in direct contravention to its legal claim, the defendant has

admitted that it has no absolutely proof of the measures and precautions that were taken back

in June 2000 to prevent Ms. Pridgeon's serious illness.

      Article 20 (1) of the Warsaw Convention provides that a "carrier shall not be liable if

he proves that he and his agents have taken **all necessary measures** to avoid the damage or

that it was impossible for him or them to take such measures."[19]  "The burden rests on the

defendant's shoulders to prove that all necessary measures had been taken to avoid the

damage."  <u>Vildex v. United Airlines</u>, 1996 U.S. Dist. LEXIS 20297, at *13 (S.D.N.Y. Dec.

10, 1996) [citation omitted].  Moreover, the defendant must provide "persuasive proof" that it

took "all necessary measures" to prevent the loss at the time.  <u>Manufacturers Hanover Trust</u>

---

[18] Exhibit A attached to defendant's Motion for Summary Judgment.
[19] 49 Stat. 3000, T.S. No. 876 (1934), reprinted at Note following 49 U.S.C.S. § 40105 [emphasis added]

Co. v. Alitalia Airlines, 429 F.Supp. 964, 967 (1977) [citations omitted].  It has been

recognized, however, "that the phrase 'all necessary measures' cannot be read too strictly but

must of necessity be construed to mean 'all reasonable measures.'"  Vildex at *13 (citing

Manufacturers Hanover Trust Co., 429 F.Supp. at 967).  "Under this 'all reasonable

measures' standard, the defendant must provide proof of an undertaking embracing all

precautions that in sum are appropriate to the risk, i.e. measures reasonably available to

defendant and reasonably calculated, in cumulation, to prevent the subject loss."  Id.  "The

failure to take any particular precaution that might have prevented the loss does not

necessarily prevent the carrier from relying on this defense."  Verdesca v. American Airlines,

2000 U.S. Dist. LEXIS 15476, *10 (N.D. Tx Oct. 17, 2000).[20]  "Nor, on the other hand, may

a carrier escape liability under Article 20 . . . by demonstrating no more than its recourse to

some – as opposed to all – reasonable measures."  Manufacturers Hanover Trust Co., 429

F.Supp. at 967.

Moreover, a carrier may not escape liability under Article 20 by merely stating that it

is not industry practice or the standard of care to take such measures.  As explained by the

court in Manufacturers Hanover Trust Co., "it is perhaps enough to note the following

observations from Judge Learned Hand:

---

[20] All unpublished cases are attached hereto as Exhibit __.

> There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves.  ***  Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices.  It never may set its own tests, however persuasive be its usages.  Courts must in the end say what is required ***.  The T. J. Hooper, 60 F.21d 737, 740 (2d. Cir. 1932)."

429 F.Supp. at 968.  In the Manufacturers case, the plaintiff brought suit against Alitalia Airlines for the loss of a shipment of bank notes.  The parties agreed that Articles 18 and 20 of the Warsaw Convention operate in tandem "to establish a presumption of carrier liability, in the event of a loss within the Convention's terms, that, in the present context, may be rebutted only by defendant's persuasive proof that it took 'all necessary measures' to prevent the loss at issue."  Id. at 967.

The Manufacturers case was tried to the court.  In it decision the court noted that while Alitalia "did undertake a number of measures, each intrinsically reasonable, to secure high-value cargo held in its custody," the precautions taken "would be, predictably enough, likely unavailing in the circumstance of an armed robbery . . . [and] to preserve against such eventuality more could – and should – have been done."  Id. at 968.  The court noted that the position of the guard was not secure, that restrictions on access to the building might have discouraged robbery and that a silent alarm system should have been installed.  Id.  The court, however, cautioned that it could not say "that such precautions would necessarily have

averted the loss upon which the instant suit is based." <u>Id.</u>  Moreover, the court was not impressed with Alitalia's argument that this was the first armed robbery it had ever experienced and that it had shipped sixteen consignments of currency over eighteen months without incident.  <u>Id.</u>  Accordingly, because the court found that Alitalia did not take all necessary measures to avoid the harm suffered, it granted judgment in favor of the plaintiff.

While the <u>Manufacturers</u> case did not involve a motion for summary judgment, there are several District Court cases that are similar to the case at bar in which the courts denied such motions, holding that whether the carrier took all necessary measures to avoid the damage as set forth in Article 20 (1) was a **fact-based** determination.  These cases hold that in the context of a motion for summary judgment, if the non-movant provides contrary evidence on the Article 20 defense, **whether any "precautions were 'reasonable' is for a jury to decide**." <u>Verdesca</u> at *11 [emphasis added].  Moreover, in opposition to such a motion, the non-movant need only "come forward with relevant proof – affidavits, documents, admissions, etc. – sufficient to raise a triable issue of fact." <u>Id.</u> at *10.

For example, in <u>Vildex</u>, the plaintiff brought suit against United Airlines to recover the value of gold cargo stolen while in custody of the carrier's employees.  United Airlines did not dispute that the cargo was stolen while under its control, but did assert Article 20 (1) as an affirmative defense.  In its motion for summary judgment, the plaintiff claimed that

United Airlines took inadequate security measures because its employees were unarmed and its truck was unlocked, and further cited newspaper articles that reported security deficiencies.  <u>See</u> 1996 U.S. Dist. LEXIS 20297 at * 14.  Moreover, the plaintiff claimed that United Airlines was the only international carrier operating at Ezeiza airport that did not employ an officially charted government entity to transfer cargo to its airplanes.  <u>Id.</u> at *15.

In opposition to the motion for summary judgment, United Airlines argued that the use of arms by its employees was unnecessary since the area in which the robbery occurred was secured by other armed personnel, that the airline was prohibited from arming its own personnel and that armored car service was unavailable at the time of the robbery.  <u>Id.</u> at *16. United Airlines further asserted that its level of security met Federal Aviation Administration standards and relied on previous uneventful shipments to support its position that security was adequate.  <u>Id.</u> at *16-17.  In reviewing both parties' claims, the court held that "[w]hether United took all necessary measures to avoid the damage is a **fact-based determination**."  <u>Id.</u> at *18 [emphasis added].  The court reasoned that "[b]ecause the parties have presented a dispute as to what security measures were taken, which measures were available, and which measures were appropriate, summary judgment as a matter of law is inappropriate."  <u>Id.</u>  As such, the court denied the plaintiff's motion for summary judgment with respect to United Airlines' affirmative defense of Article 20 (1).

Likewise, in <u>Verdesca</u>, a wrongful death action, the plaintiff filed a motion for summary judgment on American Airlines' affirmative defense of Article 20 (1).  In that case, the plaintiff's wife died after falling while disembarking off the plane on a portable stairway.  2000 U.S. Dist. LEXIS 15476 at *1-2.  The plaintiff claimed there was no American Airlines agent stationed at the base of the stairway to respond to any passengers having difficulties or requesting assistance.  The court viewed the summary judgment evidence in a light most favorable to the non-movant, American Airlines, and found "other precautions were taken to ensure the safety of passengers while disembarking the aircraft."  <u>Id.</u> at *10.  The court noted that the evidence showed that "passengers were notified that they would deplane using a ramp stand instead of a jetway . . . Assistance was provided for anyone who asked for help…Passengers were instructed to use care while exiting the aircraft."  <u>Id.</u> at *10-11.  However, despite this evidence, the court held that "[w]hether these precautions were 'reasonable' is for a jury to decide."  <u>Id.</u> at *11.  The court further noted that despite the plaintiff's allegation, the evidence showed that there were two American agents at the bottom of the ramp stand.  As such, the court denied the motion for summary judgment, explaining that "there are genuine issues of material fact as to whether agents were stationed at the base of the stairway or 'too busy' to notice" the plaintiff's decedent.  <u>Id.</u>

In the present case, the defendant argues in its motion for summary judgment, without providing any evidence, that "the facts in this case clearly demonstrate that American Airlines took 'all necessary measures' to prevent the alleged incident and its liability is therefore limited to 100,000 SDRs." See Defendant's Brief at 21. The defendant further incorrectly contends that "[t]here is no evidence that American Airlines did anything wrong with respect to providing food service to plaintiff aboard American Airlines Flight 121 on June 13, 2000 or that American failed to take any steps it should have taken in the service of meals to plaintiff." Id. at 23-24. These bald statements demonstrate the defendant's failure to recognize that it has the burden of providing persuasive proof that it took all necessary measures. Rather than discussing or even listing what measures it specifically took to prevent the plaintiff's severe damages, the defendant attempts to misdirect the Court's attention to a number of red herrings.

First, the defendant argues that the plaintiff never complained about the tainted food until the filing of this lawsuit twenty-three months after her flight. Id. at 24. This is entirely irrelevant to the question of whether the defendant took all necessary measures to prevent the Ms. Pridgeon's harm. Moreover, this argument completely ignores the extremely severe and debilitating nature of Ms. Pridgeon's battle with Guillain-Barre and her inability to even

make a complaint during that time period.[21]  Second, the defendant claims that there is no

evidence that any of the chicken served to Ms. Pridgeon was in any way tainted.  Id.  This

statement completely ignores the sworn testimony from both Ms. Pridgeon and Dr. Kra that

the chicken meal served to Ms. Pridgeon on Flight 121 was under cooked, cold and pink.

See Pridgeon Affidavit at ¶ **; Kra Affidavit at ¶ **.  Third, the defendant argues that the

---

[21] Ms. Pridgeon suffered the following injuries as a result of the defendant's service of a tainted chicken meal on Flight 121 on June 13, 2000:  Guillain-Barre Syndrome, quadriparesis secondary to Guillain-Barre Syndrome, severe bilateral pain in her feet and knees, fever, diarrhea and gastrointestinal distress, pain in joints, back pain, distal neuropathy of the median ulnar branches of both upper extremities, fracture of third metatarsal of the left foot, fracture of the proximal left fibula, weakness in upper extremities, weakness in facial musculature, loss of reflexes, insomnia, severe anxiety and fear.  Approximately two days after her flight, on June 15, 2000, Ms. Pridgeon became violently ill.  Her symptoms included vomiting, diarrhea, fever and pain in her legs and low back.  The symptoms resolved within a couple of days, leaving her very weak and tired.  The symptoms returned in approximately six days and after two days she lost the ability to move her legs.  Ms. Pridgeon gradually became a quadriplegic over the next seven or eight days.  She did retain her ability to breathe on her own, and some ability to move her head, but otherwise was completely helpless.  *Pridgeon Depo pgs 70-72.* In addition to being completely helpless, she was in excruciating pain; severe nerve pain very often accompanies GBS.  A number of different pain medications were tried, including a Demerol pump, but were not successful in treating her pain. *Dr. Golden's notes 7-2-00.*  It was not until she began receiving a high dose of Neurontin that the pain was controlled and she could get some rest.  *Dr. Hasbani's discharge note 7-12-00.*  Ms. Pridgeon required a home health aide and skilled nursing care for four hours a day, seven days a week for approximately two months.  Although the skilled nursing care was reduced and eventually determined to be unnecessary, she continued to require and receive services from the VNA until September 29, 2002.  She also continued her physical and occupational therapy on an outpatient basis until December, 2002.  She still continues a home exercise program.  *Pridgeon Depo. pg 79.* Ms. Pridgeon suffered excruciating physical pain, both during the initial infection and during the acute phase of the GBS.  Her rehabilitation program and her subsequent exercise programs and physical therapy have also been uncomfortable.  She will continue to experience pain from the residual effects of the disease, as well as from her physical therapy and exercise programs. In order to walk at all, she must wear leg braces.  Wearing the braces rubs the skin on her legs and she must take great care not to develop blisters or skin breakdown. While the physical pain was severe, the onset and course of GBS is terrifying.  Neither the patient nor her doctors could know how severe the paralysis would be, whether she would lose the ability to breathe or swallow on her own and have to be placed on a ventilator, or how long it would last. The hospital records of her stay in the intensive care unit contains a number of notes from the pastoral care counselor documenting Ms. Pridgeon's emotional state and her concern over her uncertain future.  Her continuing recovery is long and gradual and there is no assurance that she will ever make a full recovery and be able to resume her normal activities.

absence of complaints of illness made by any other passengers somehow demonstrates that it took all necessary measures to prevent Ms. Pridgeon's illness.  Id.  That argument, of course, completely ignores the court's admonition in the Manufacturers case regarding Alitalia's position that the subject incident was the first armed robbery it had experienced and that it had shipped sixteen consignments of currency over eighteen months without incident.  See 429 F.Supp. at 968.  In other words, whether or not another passenger on Flight 121 became ill or reported becoming ill is irrelevant to the issue of whether the defendant took adequate measures to prevent Ms. Pridgeon's harm.  In addition, this argument demonstrates the defendant's lack of understanding of the rarity of the onset of Guillain-Barre and the fact that a number of people could have ingested *campylobacter jejuni* on Flight 121 and not have become ill at all; much less contract Guillain-Barre as a result.[22]

Finally, the defendant inappropriately claims that "there is no seriological [sic] evidence to confirm the presence of Campylobacter Jejuni" and the absence of such "completely undermines the claim that there was anything abnormal or unusual in the food served by American Airlines to the plaintiff."  See Defendant's Brief at 24.  This statement in and of itself is somewhat misleading in that it implies that there was actually proper testing

---

[22] GBS is "a rare disorder; its frequency is about 1 to 2 cases in every 100,000 people per year."  Neurology Channel, "Guillain-Barre Syndrome."  A copy is attached to the Affidavit of Timothy O'Keefe, Esq.

done on Ms. Pridgeon that could actually confirm the presence of Campylobacter Jejuni.[23]

No such testing was ever done. However, according to Dr. Golden, it is not scientifically

necessary to have serological testing or a stool culture to draw the medical connection from

the tainted chicken meal that the defendant served to Ms. Prodgeon on June 13, 2000 to her

Guillain-Barre illness. Golden Depo at p. 76 (15-21). The defendant simply chooses to

completely ignore the sworn expert opinion of Dr. Golden. Moreover, the defendant fails to

explain how the claimed lack of serological evidence of *campylobacter jejuni* helps it to meet

its burden of proving that it took all necessary measures to prevent Ms. Pridgeon's harm (and

the plaintiff is at a loss as to how this is relevant to the defendant's purported measures <u>prior</u>

to serving Ms. Pridgeon with a tainted chicken meal). [24]

---

[23] {As Ms. Pridgeon testified and as the medical records demonstrate, no stool sample was ever collected from Ms. Pridgeon. <u>See</u> Footnote 6.[CHECK ON THIS TO MAKE SURE IT IS PROPERLY NUMBERED] It is well known that the "serologic studies are more sensitive but less specific than culture based methods" as "there are no standards for serologic testing for c. jejuni infection with regard to antigens used or culture values for the positivity and the sensitivity and specificity of serologic assays vary conditionally among laboratories." Kuwabara at 9. [THIS SHOULD BE FOOTNOTED]]***put this as a footnote.

[24] Serological evidence is not necessary to confirm that Ms. Pridgeon was infected with Campylobacter Jejuni in the present case. The incubation period for campylobacter jejuni caused illness is relatively short; approximately two to five days. Ms. Pridgeon does not believe she ate any other poultry and did not eat any unpasteurized cheese or other unpasteurized dairy products during her two week visit to France or the two days following her return trip. Other than the Chicken Rosemary, she did not eat anything on either the flight from Nice to Paris or Flight 121 from Paris to New York on June 13, 2000. *Pridgeon Depo pgs 28, 32-36*. She became ill within the known incubation period for campylobacter illness and she had all of the classic symptoms of campylobacter illness. Her diagnosis of AMAN GBS was based on her immediate past history of symptoms and lack of exposure to other causes of the illness. *Dr. Golden's notes for 7-1-2000*. Moreover, the most common trigger of the AMAN strain of GBS is C. jejuni, found in raw or undercooked poultry. <u>See</u> "NYT on Toxic Chicken 10/20/97" and "Campylobacter: Low-Profile Bug is Food Poisoning Leader" attached to the Affidavit of Timothy O'Keefe, Esq.

On August 13, 2004, two senior employees were deposed and were asked questions related to the defendant's claim that it took "all necessary measures" to prevent the harm that they caused to Ms. Pridgeon. The defendant produced Dale Norgard, a senior analyst in risk management, and Amanda Pratt, the regional manager in food and beverage operations, to testify on its behalf. Neither of these witnesses was able to provide any credible evidence to support the defendant's claim that it took "all necessary measures" to prevent Ms. Pridgeon's harm. In fact, both witnesses were forced to admit that they had no information whatsoever concerning the precautionary measures that were taken by the defendant to prevent the service of the *campylobacter* tainted meal to Ms. Pridgeon.

Mr. Norgard testified that he was now the person in charge of investigating the claims being made by Ms. Pridgeon and that he would be in the best position to testify as to the facts discovered during the defendant's investigation. Norgard Depo at p. 8 (2-5). He testified that the defendant has done an investigation of this claim and that he is fully familiar with the investigation. Id. at p. 9 (7-10). He admitted that the members of the flight crew were never interviewed by the defendant in connection with the investigation and that the defendant has never attempted to identify or contact the members of the flight crew. Id. p. 10-14 (14-25; 1-19; 14-18; 13-25; 1-2). When the individual members of the flight crew were actually

identified for Mr. Norgard, he was forced to admit that he did not know any of them, he had never interviewed them, they had never given statements and they were never asked to produce affidavits in support of the defendant's claims.  Id. at p. 14-15 (3-25; 1-16).  He testified that the defendant had certain standards regarding the preparation of in-flight meals. Id. at p. 17-18 (23-25; 1-6).  He was forced to admit, however, that even though the crew members would be in the best position to determine if the defendant's standards were followed; those people have not been contacted.  Id. at p. 18 (7-14).  He further admitted that it would be "important" to have the information from the person that actually served the meal to Ms. Pridgeon to determine if the defendant's own food preparation standards were followed.  Id. at p. 18 (15-18).

Mr. Norgard further testified that there is no dispute that Ms. Pridgeon was served chicken on Flight 121.  Id. at p. 18 (19-24)[25]  He testified that he was not aware of anybody who would testify that Ms. Pridgeon was not, in fact, served the chicken meal on Flight 121. Id. at p. 29 (3-7).  He was not aware of anybody that would testify that Ms. Pridgeon did not consume a portion of the chicken meal.  Id. at p. 29 (15-19).  He further testified that he has not seen or heard anything that would lead him to believe that the chicken served to Ms. Pridgeon was not under cooked, cold and pink.  Id. at p. 30-31 (24-25; 1-2); p. 33 (13-19).

---

[25] Underccoked chicken is the leading known cause of campylobacter induced illness [NEED CITE HERE]

Mr. Norgard admitted at his deposition that the defendant has no information or evidence with which it can meet its burden of proving that it took "all necessary measures" to avoid serving Ms. Pridgeon a tainted piece of chicken. Mr. Norgard admitted that the Declaration of Matrix de Vries which was filed in support of the defendant's motion does not address at all the specific piece of chicken that Ms. Pridgeon was served on Flight 121. Id. at p. 35-6 (24-5; 1-3). He admits that the defendant has not produced any evidence in support of its motion that tracks the actual piece of chicken that was served to Ms. Pridgeon. Id. at p. 36 (4-9). In fact, he admits that he does not even know if the defendant has even attempted to determine the origin of the chicken served to Ms. Pridgeon. Id. p. 36 (10-14). He testified that he has no knowledge as to whether the defendant has attempted to determine where the piece of chicken that was served to Ms. Pridgeon was stored the night before it was served to her or to determine the temperature at which the chicken was stored or to determine how long it had been stored. Id. p. 36-37 (15-25; 1-4). He admitted that he has no knowledge as to how long the piece of chicken was heated before it was served to Ms. Pridgeon. Id. at p. 37 (5-9). He admitted that the defendant has not done anything to determine if the chicken that was served to Ms. Pridgeon was properly prepared before it was served. Id. at p. 39 (1-7). Moreover, when asked to describe all of the measures that the defendant took to prevent Ms. Pridgeon's harm, Mr. Norgard responded that "[t]he processing from the time it leaves the

dining unit or the catering service to the airplane is really not something I am familiar with. So it is difficult for me to answer your questions along those lines." Id. at p.34 (6-9).

Mr. Norgard testified that the only information he has concerning the measures that the defendant took to prevent Ms. Pridgeon's harm is contained within his Affidavit which was filed in support of the defendant's motion. Id. at p. 34 (12-17). However, Mr. Norgard's Affidavit contains absolutely no information concerning the defendant's preventative measures. He then deferred to Ms. Pratt to explain the measures that the defendant took to prevent Ms. Pridgeon's illness. Id. at p. 34 (10-11). He testified that Ms. Pratt is the only person who might be able to testify as to the condition of the chicken that was actually served to Ms. Pridgeon. Id. at p. 33 (8-12). He also testified that Ms. Pratt is the only person of whom he is aware that can testify as to the precautionary measures that the defendant took in connection with the meal provided to Ms. Pridgeon. Id. at p. 34 (18-23).

Similar to Mr. Norgard, Ms. Pratt was not able to provide any persuasive proof that the defendant took "all necessary measures" to avoid Ms. Pridgeon's harm. Ms. Pratt confirmed that Chicken Rosemary was served on Flight 121. Pratt Depo at p. 9 (15-18). Ms. Pratt confirmed that Marfo Martinair Foods supplied the subject chicken through Pourshins to Gate Gourmet, the caterer. Id. at p. 8 (20-22). Ms. Pratt admitted, however, that the defendant has no information concerning where the subject chicken was stored or

warehoused, the date it was actually produced or the actual lot number for the subject

chicken. Id. at p. 16 (7-20). She admitted that the defendant has no information concerning

the dates that the subject chicken was transferred from Marfo to Pourshins or from Pourshins

to Gate Gourmet. Id. at p. 18-19 (25; 1-5). Ms. Pratt admitted that she could not testify as to

how many Chicken Rosemary meals were actually boarded on Flight 121. Id. at p. 10 (10-

12). She can not testify as to how many Chicken Rosemary meals were served on Flight 121.

Id. at p. 11 (9-20). She testified that there is no information available from which it could be

concluded that anyone other than Ms. Pridgeon was actually served a chicken meal on Flight

121. Id. at p. 12 (6-17).

Ms. Pratt further testified that she could not identify the flight crew member who

actually prepared or served the chicken meal to Ms. Pridgeon. Id. at p. 13 (8-22). Ms. Pratt

testified that she could not specifically say how long the particular piece of chicken that was

ultimately served to Ms. Pridgeon was at Gate Gourmet's facility at the airport. Id. at p. 19

(20-24). Moreover, she testified that she did not know the expiration date that was assigned

to the particular chicken meal served to Ms. Pridgeon. Id. at p. 22 (6-8). She also was

unable to verify whether the expiration date for that chicken meal had expired. Id. (9-13).

Ms. Pratt further testified that it would be a violation of the defendant's policy to serve a

meal with an expired date, but also admitted that she was unable to verify whether this policy

was adhered to or violated in this particular case.  Id. at p. 23 (1-4).  In addition, Ms. Pratt

was unable to testify as to the exact temperature at which the particular chicken meal served

to Ms. Pridgeon was stored.  Id. (5-8).  She testified that there are strict standards and

specifications that must be adhered to when handling chicken meals of this sort.  Id. at p. 23

(8-24).  She testified that it was the policy of the defendant to rely on its agent, Gate

Gourmet, to adhere to those standards and specifications in preparing and storing the meals,

but was unable to testify as to whether any of those standards or specifications were followed

in the storage and preparation of Ms. Pridgeon's meal.  Id. at p. 24 (9-15;22-25).

　　　　Ms. Pratt also indicated that she did not know of anybody who would testify that Ms.

Pridgeon's chicken was not under cooked, cold and pink.  Id. at p. 25 (10-15).  She also

admitted that she does not know the temperature at which the particular chicken meal was

served to Ms. Pridgeon.  Id. at p. 26 (12-14).  Moreover, she admitted that she could not

testify whether the defendant's requirement that all or its meals be fully cooked before being

boarded on the plane was actually fulfilled in the case of Flight 121.  Id. (18-25).  Ms. Pratt

reiterated that the defendant relies on its agents to "have a process in place that is safe for

food handling."  Id. at p. 29 (8-10).  However, she admitted that it has not been determined

whether or not those food safety processes were followed in this case.  Id. (11-13).  Finally,

Ms. Pratt testified that she understood that serving under cooked chicken to a passenger

could be potentially harmful, but could not say what precautions were taken on the specific day that the chicken meal was served to Ms. Pridgeon to ensure that Ms. Pridgeon was served a safe meal.  Id. at p. 29-30 (14-16; 9-12).

The testimony of both Mr. Norgard and Ms. Pratt demonstrates that the defendant has not proved (and cannot prove) that it took all necessary measures to prevent the harm to Ms. Pridgeon.  Their testimony further makes clear that the defendant cannot identify the steps that it or any of its agents took to produce, store, prepare or serve Ms. Pridgeon's meal on June 13, 2000.

The uncontroverted evidence that this Court has to consider in opposition to the defendant's motion is provided by Ms. Pridgeon and Dr. Kra through deposition testimony and affidavits.  Ms. Pridgeon has testified, and Dr. Kra has confirmed, that she had eaten a few bites of the chicken meal, when she contemporaneously told Dr. Kra that it was cold, pink and under cooked.  See Pridgeon Depo. pgs 32-35; see also Pridgeon Affidavit at ¶ **; Kra Affidavit at ¶ **.

In seeking an order from the court limiting Ms. Pridgeon's damages, the defendant, in essence, is requesting the court to rule, as a matter of law, that it took "all necessary measures" to avoid Ms. Pridgeon's harm.  This is a form of partial summary judgment. Summary judgment is a harsh remedy to be granted only where there are no issues of

material fact [NEED TO CITE TO CASE HERE] The court should not weigh the evidence presented here to determine the truth, but, instead, it should determine whether a genuine issue of material fact exists [cite to case here]  Summary judgment is rarely granted on these issues.  [CITE TO CASES HERE].  That is congruent with the history of the International Air Transport Association and the airlines' understanding that a successful "all necessary measures" defense would be "rare".[CITE TO HISTORY OF IATA AGAIN]  The evidence presented here demonstrates that several issues of material fact remain.  Accordingly, this court should deny the defendant's request that an order enter at this juncture limiting Ms. Pridgeon's damages.  The court must allow a jury to determine whether the defendant air carrier took all necessary measures with respect to the preparation and service of Ms. Pridgeon's meal to prevent her from suffering the horrendous consequences that she did.

V.  CONCLUSION

For the reasons stated herein, this Court should deny the defendant's Motion for Summary Judgment.  Furthermore, the Court should not impose, at this juncture, a limit on Ms. Pridgeon's damages pursuant to Article 20 of the Warsaw Convention.

Dated:  Hartford, Connecticut
        October 22, 2004

Kenny, O'Keefe & Usseglio, P.C.

By_____

Timothy L. O'Keefe
Bar No. CT
tokeefe@kou-law.com
Capitol Place
21 Oak Street, Suite 208
Hartford, CT 06106

To:    Michael J. Holland, Esq.
       Condon & Forsyth, LLP
       685 Third Avenue
       New York, NY 10017
       (212) 894-6740

       Alison L. McKay, Esq.
       Law Offices of Paul Lange
       80 Ferry Boulevard
       Stratford, CT 06615-6079
       (203) 375-7724