UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LOLITA PRIDGEON,

        Plaintiff,

VS.

AMERICAN AIRLINES,

        Defendant.

Docket No.

3:02 CV 1032 WWE

REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

ORAL ARGUMENT NOT REQUESTED

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT.............................................................................................2

ARGUMENT .........................................................................................................................3

I.      THE IRREFUTABLE MEDICAL FACTS ESTABLISH THAT
PLAINTIFF DID NOT SUSTAIN AN ACCIDENT ..................................................3

II.     PLAINTIFF HAS FAILED TO MEET HER BURDEN OF
PROVING AN ACCIDENT UNDER ARTICLE 17
OF THE WARSAW CONVENTION ..........................................................................6

III.    PLAINTIFF'S OWN CONDUCT BELIES THE CLAIM THAT
THE MEAL SERVED TO HER ABOARD AMERICAN
AIRLINES FLIGHT 121 HAD ANYTHING TO DO WITH
HER ILLNESS ..........................................................................................................14

IV.    AMERICAN AIRLINES IS ENTITLED TO LIMIT ITS
LIABILITY TO 100,000 SDRS BASED ON THE "ALL NECESSARY
MEASURES" DEFENSE ...........................................................................................15

V.     DRS. BLOCK AND CAHILL HAVE BEEN PROPERLY
LISTED AS EXPERT WITNESSES..........................................................................20

CONCLUSION ....................................................................................................................21

## TABLE OF AUTHORITIES

**CASES:**                                                          **PAGE**

*Verdesca v. American Airlines*, 2000 WL 1538704
 (N.D. Tex. Oct. 17, 2000) ...............................................................................................16

*Vildex, S.A.I.C. v. United Airlines*, 1996 WL 733081 (E.D.N.Y. 1996) ...........................16

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987) .............................................4

## STATUTES

Fed.R.Civ.P. 26(a)(2) .........................................................................................................20

## PRELIMINARY STATEMENT

Defendant American Airlines respectfully submits this Reply Memorandum of Law in support of its motion for summary judgment.

The fatal flaw in plaintiff's case is encapsulated in plaintiff's opening paragraph of her brief in opposition to the motion for summary judgment: her claim that she consumed a meal tainted with the Campylobacter Jejuni bacteria while a passenger aboard American Airlines flight 121 from Paris to New York on June 13, 2000. There is no proof that the meal was tainted or that plaintiff got Campylobacter Jejuni from that meal. No other passenger who travelled on American Airlines flights between France and the United States for the entire month of June became ill from eating the Chicken Rosemary meal served aboard those flights. There was no evidence, as conceded by plaintiff's own expert infectious disease specialist, that the chicken meal was the source of plaintiff's illness. There is no mention of the chicken meal in the extensive medical records complied over plaintiff's hospitalization for four months at St. Raphael's Hospital. The discharge diagnosis from Ms. Pridgeon's own treating doctors, Dr. Hasbani, a neurologist and Dr. O'Brien, a physiatrist, failed to conclude that she even had Campylobacter Jejuni. *See* discharge diagnoses of Dr. Hasbani and Dr. O'Brien dated June 23, 2000 and October 10, 2000, annexed as Exhibits "A" and "B" to Reply Affidavit of Michael J. Holland sworn to November 4, 2004. Plaintiff's own infectious disease expert, Dr. Marjorie Golden, concedes that only 40% of Guillain-Barre Syndrome cases are caused by Campylobacter Jejuni. Since plaintiff cannot even prove that she had Campylobacter Jejuni,

plaintiff has failed to demonstrate that she sustained an accident on board the aircraft under Article 17 of the Warsaw Convention, a pre-requisite for liability.

## ARGUMENT

### I.

### THE IRREFUTABLE MEDICAL FACTS ESTABLISH THAT PLAINTIFF DID NOT SUSTAIN AN ACCIDENT

The medical records of St. Raphael's Hospital for plaintiff's four months hospitalization from June through October of 2000 made no mention of the meal that plaintiff consumed on American Airlines. The medical records are completely devoid of any connection between the meal plaintiff ate on the American Airlines flight, Campylobacter Jejuni and Guillain-Barre Syndrome. It was only at the time that this lawsuit was initiated, shortly before the two year statute of limitations under Article 29 of the Warsaw Convention, that any attempt was made to "blame" American Airlines for plaintiff's unfortunate contracting of Guillain-Barre Syndrome. None of the plaintiff's treating physicians, Drs. Goldstein, Hasbani and O'Brien, all of whom timely submitted expert reports in this case, ever mention the meal that plaintiff consumed aboard the American Airlines flight as a potential source of her illness.

Plaintiff's own infectious disease expert, Dr. Marjorie Golden, concedes at page 33 of her deposition (submitted as part of plaintiff's opposition to the motion for summary judgment) that there are only two ways to objectively show the presence of Campylobacter

3

Jejuni: by serological evidence or by stool sample. Dr. Golden concedes that neither of these objective medical tests was done to determine whether plaintiff had Campylobacter.

The crucial issue in this case is whether Dr. Golden's expert medical opinion that plaintiff's Guillain-Barre Syndrome was caused by Campylobacter Jejuni and that the Campylobacter Jejuni was caused by eating tainted chicken aboard American Airlines flight 121 on June 13, 2000 can be based solely on her reading of the plaintiff's deposition testimony that the chicken "was cold and the texture was also kind of chewy and just didn't taste good to me like chicken" (Pridgeon deposition, page 35).

Dr. Golden relied solely on plaintiff's own statements in her deposition about her medical history and consumption of allegedly undercooked chicken to diagnose plaintiff's infection by campylobacter. Such reliance by an expert lacks scientific veracity and should be disregarded by the court. *See Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (expert medical testimony excluded because expert merely relied on oral history provided by plaintiff).

Plaintiff's liberal use of the words "tainted chicken" overlooks one crucial factor: there is absolutely no testimony, nor any proof, that the chicken was tainted. The fact that plaintiff became ill after eating a meal on an American Airlines flight does not prove that the meal caused the plaintiff's illness. Dr. Golden conceded that the objective tests which would have drawn that connection were not done. The article from the New England School of Medicine upon which Dr. Golden relies in her report states that while 40% of Campylobacter Jejuni cases are caused by eating infected poultry, 60% of the cases come from other sources. There is no

proof that the chicken served to plaintiff was tainted and, even if it were, there was no showing that this particular chicken meal was the cause of plaintiff's illness.

Interestingly, while Campylobacteriosis is a disease which must be law be reported by mail within 12 hours "of recognition or strong suspicion" to both the Connecticut Department of Public Health and local health departments (see Physician Reportable Diseases – 2004, annexed as Exhibit "C" to the Reply Affidavit of Michael J. Holland sworn to November 4, 2004), Dr. Golden assumes that no such report was made by St. Raphael's Hospital to the State of Connecticut since there was no culture which would confirm that plaintiff had the Campylobacter Jejuni. Golden deposition, page 75. Since Dr. Golden, an infectious disease specialist at St. Raphael's Hospital, did not even report to the State of Connecticut Department of Health, as she was required to do, that Ms. Pridgeon had Campylobacter Jejuni, how can she now claim, four years later, that Ms. Pridgeon had Campylobacter Jejuni and that it was the cause of her Guillain-Barre Syndrome? The only conclusion to be drawn is that the diagnosis of Campylobacter Jejuni, which was not made by any of the doctors at the time that Ms. Pridgeon was treated for four months at St. Raphael's Hospital in June through October of 2000, is now made simply for litigation, not medical, purposes.

The central issue in this case is not, as plaintiff phrases it, whether the defendant air carrier's service of a tainted chicken meal to Ms. Pridgeon was an unexpected or unusual event or happening that is external to her (plaintiff's Memorandum in Opposition, page 13). The essential issue is whether the defendant air carrier served a tainted chicken meal to Ms. Pridgeon. There is no evidence that the Chicken Rosemary meal served to plaintiff, even if

5

considered "cold," "pink" and "chewy" as alleged by plaintiff, contained any bacteria or, more importantly, could be the source of plaintiff's affliction with Guillain-Barre Syndrome. There is no evidence whatsoever (1) that the Chicken Rosemary meal served on plaintiff's flight contained Campylobacter Jejuni bacteria; (2) that plaintiff even was infected with Campylobacter Jejuni bacteria; (3) that plaintiff's affliction with Guillain-Barre Syndrome was caused by Campylobacter Jejuni; or (4) that the source of plaintiff's purported Campylobacter Jejuni infection was indeed the Chicken Rosemary meal served to plaintiff on June 13, 2000.

## II.

### PLAINTIFF HAS FAILED TO MEET HER BURDEN OF PROVING AN ACCIDENT UNDER ARTICLE 17 OF THE WARSAW CONVENTION

Dr. Marjorie Golden, plaintiff's infectious disease expert, concluded that there are certain medical tests that determine the presence of Campylobacter Jejuni. One would be a stool culture which was ordered but never done. Golden deposition, page 31, lines 8-13. A stool culture would be a definitive way to show Campylobacter Jejuni (page 32, lines 6-15). Likewise, serologic tests that look for the presence of the antibody containing Campylobacter Jejuni were not ordered in this case. Golden deposition, page 33, lines 1-8. Dr. Golden agreed there was no serological evidence and no stool culture test to show that Ms. Pridgeon had Campylobacter Jejuni. Golden deposition, page 33, lines 4-8.

Dr. Golden's diagnosis of Campylobacter Jejuni is based on her reading of Ms. Pridgeon's deposition testimony[1] and her history of diarrhea with high fever and arthritis. Dr. Golden agreed that there was nothing in the medical records to indicate that the cause of the plaintiff's bloody diarrhea was the chicken meal that the plaintiff consumed on the American Airlines flight. Golden deposition, page 33, lines 16-20.

While doctors usually perform tests to confirm what patients tell them, in this case no medical tests were performed. Golden deposition, page 79, lines 22-79, line 2, and Dr. Golden agrees that Campylobacter Jejuni was not detected in the plaintiff. Golden deposition, page 96, lines 16-17. In fact, Dr. Golden said that she didn't disagree with much of what Dr. Cahill, defendant's expert, says in his report. Golden deposition, page 98, lines 13-15.

Dr. Golden's report concedes that up to 40% of Guillain-Barre Syndrome may be triggered by Campylobacter Jejuni. *See* Dr. Golden's report, page 2. That leaves 60% of Guillain-Barre Syndrome to be accounted for from other sources other than Campylobacter Jejuni. Since plaintiff cannot even prove that she had Campylobacter Jejuni, she cannot prove that if she had Campylobacter Jejuni, it was caused by the meal served to her on the American Airlines flight and that Campylobacter Jejuni resulted in the Guillain-Barre Syndrome.

None of the medical tests which would have proved that the chicken was tainted were conducted. Plaintiff never mentioned that the chicken was tainted to any of her treating physicians and indeed did not even notify American Airlines that she claimed to have eaten a contaminated meal at anytime before she filed her lawsuit in May of 2002, shortly before the

---

[1] Dr. Golden never discussed with the patient how she had gotten ill. Golden deposition, pages 34, 39.

7

two years statute of limitations expired.  As Dr. Cahill noted at page 46 of his deposition

testimony, submitted as part of plaintiff's opposition to the summary judgment motion:

> But I remember feeling at the time that I read this that it was
> very similar to other sort of speculations that, as I put in my
> letter, that the physician originally believed that she was most
> definitely, this is all speculation and it may have been valid
> speculation of the cause of the problem but it was all
> speculation, no one bothered to confirm anything, and I think
> Dr. Golden's letter here basically says the same thing; that
> she presumes or is likely induced by or it is reasonable to
> conclude and I just don't find, you know, if you're going to
> associate this with a specific meal or a specific diagnosis.
>
> I, think there's something seriously lacking here in the whole
> medical management almost of the patient, wherein the
> testing did not confirm the cause.  So I think Dr. Golden is
> basically saying in her way that she thinks this is there but I
> don't know that she saying more than that.

Dr. Block's opinion was to the same effect.  While agreeing that Ms. Pridgeon has

Guillain-Barre Syndrome,

> [t]he patient believes that she had undercooked chicken and
> that was source of the Campylobacter infection.  I don't
> know that that has been proved.  I saw nothing in the records
> to prove that she had Campylobacter.  People thought about
> it, but it was not proved.  And even if it had been proved that
> it was Campylobacter, I don't know that it can be proved that
> she developed the infection because of the American Airlines
> meal . . . Now when I read over the records compiled by the
> doctors contemporaneously with her illness, before any
> lawsuit is started and a doctor puts down that she had
> diarrhea three weeks before, June 3rd and another doctor puts
> down that she had diarrhea two weeks before, June 9th, you
> have to wonder about the accuracy of the statement that it
> occurred on June 15th. Now if it did occur on June 15th, I
> still remain uncertain that was caused by the reportedly
> undercooked chicken.

Block deposition, page 77, line 6 to page 78, line 10.

     All of the experts agree that the scientifically reliable diagnostic test for Campylobacter Jejuni is a culture from a stool sample (plaintiff's Memorandum in Opposition, page 19). All parties also agree that no sample was ever taken from Ms. Pridgeon. The key issue in this case then is whether a stool sample or serological evidence, such as blood tests, is the only way to make a diagnosis of Guillain-Barre Syndrome. Drs. Block and Cahill have testified that it is; Dr. Golden's testimony is that she can diagnose Campylobacter Jejuni based on reading a deposition transcript of the plaintiff's testimony that the chicken tasted "cold" and "kind of chewy". It is respectfully submitted that Dr. Golden's opinion is speculation and in the absence of objective tests for determining an illness, her opinion cannot form the basis for a claim that plaintiff sustained an "accident" within the meaning of Article 17 of the Warsaw Convention[2].

     While plaintiff criticizes Dr. Cahill's testimony concerning the onset of plaintiff's illness (see Memorandum in Opposition, page 18), Dr. Cahill's testimony is entirely consistent with the medical records produced by plaintiff in this case and in particular, the diagnostic evaluation by Stanley Roth, M.D., who saw Ms. Pridgeon at the request of Dr. Kra, plaintiff's partner, on June 21, 2000. Dr. Roth's diagnostic evaluation, dated June 21, 2000, is annexed as Exhibit "D" to the Reply Affidavit of Michael J. Holland sworn to November 4, 2004 and states in pertinent part as follows:

---

[2]    Ironically, Dr. Golden, who treated Ms. Pridgeon over the holiday weekend period July 1-5, 2000 at St. Raphael's Hospital, never mentions the chicken meal in her treatment notes as a potential source of Campylobacter.

9

> " – one week ago [June 13] returned from France – got
> severe diarrhea – several hours later got severe diarrhea c
> [with] blood streaks – then hours p [post] onset got severe
> pain in low back and both knees.  Got better then awoke
> today with pain in both lower legs – knee and limbs – severe.
> Also low back – moderate.  Joints worse sitting or lying.  No
> swelling notes.  Had normal bm [bowel movement] today".[3]

Dr. Cahill's testimony is also consistent with the plaintiff's medical records as contained in the neurology consultation on June 23 at St. Raphael's.

> 39 yowf [white female] . . . who on 6/13 starting having
> severe diarrhea upon from returning from Paris.  Previously
> also in St. Thomas.

See neurology consultation notes, Exhibit "E" to the Reply Affidavit of Michael J. Holland sworn to November 4, 2004.

Dr. Block pointed out that the medical records list various dates on which Ms. Pridgeon claimed to have the onset of diarrhea arranging from as early as June 9 until June 16.  *See* Dr. Block deposition, pages 69 to 71.  Even Dr. Golden appears to have been confused by the difference between the dates that appear in the contemporaneous medical records and the version of the facts sworn to by plaintiff in her deposition testimony.

Dr. Golden testified says that based on her review of the deposition testimony and the medical records, Ms. Pridgeon's vomiting and diarrhea began on June 15, 2000 (Golden deposition, page 52, line 21 to page 53, line 6) and ended on June 17, 2000, two days later.

---

[3]       No stool sample was ever taken from plaintiff at St. Raphael's Hospital.  All of the experts have concluded that a stool sample was one of the two methods (serological evidence being the other) of confirming the presence of Campylobacter Jejuni in plaintiff.

However, Dr. Golden agreed that based on Ms. Pridgeon's own deposition testimony, she had diarrhea for about a ten hour period and that it resolved on the evening of June 15, 2000 (Golden deposition, page 53, lines 12 to page 54, line 7).

There is also a crucial failure of proof on the issue of the onset of Guillain-Barre Syndrome. Dr. Golden testified, based on her review of the medical literature, that the typical timing for onset of Guillain-Barre Syndrome after Campylobacter infection was ten days to three weeks. Golden deposition, page 59, line 16.

Dr. Golden also recalled reading about the "vacuum cleaner" incident testified to by plaintiff at page 51 of her deposition when Ms. Pridgeon said that she felt a vacuum cleaner she purchased on June 17, 2000 was heavy and hard to push and that she had a weakness. Dr. Golden conceded that weakness in the limbs is one of the findings with Guillain-Barre Syndrome and that a finding of weakness in the limbs as early as June 17 would not fit within the typical timing of the onset of Guillain-Barre Syndrome. Golden deposition, page 58, line 25 to page 59, line 21.

The onset of pain in her back and legs, which Ms. Pridgeon testified began on June 17, 2000 (Pridgeon deposition, pages 50-52) and which Dr. Golden conceded is one of the symptoms of Guillain-Barre Syndrome, is totally inconsistent with plaintiff's vomiting and diarrhea on June 15, 2000, claimed to be caused by Campylobacter.

Dr. Golden testified that the usual interval from the onset of diarrhea to the time of neurological disease was nine days. Dr. Golden conceded that based on the vacuum cleaner testimony of plaintiff, her onset of Guillain-Barre Syndrome was well before the nine days

11

median time (indeed, it was only some two days later) leading to the inexorable conclusion that the gastrointestinal upset was caused by something consumed by Ms. Pridgeon well before her flight on American Airlines on June 13, 2000.

All of the medical records in this case from St. Raphael's Hospital are consistent. There were no tests conducted to show Campylobacter Jejuni and the time line in the hospital records is inconsistent with plaintiff's claim that she got Campylobacter Jejuni by eating a meal aboard American Airlines flight on June 13, 2000. Not only has plaintiff failed to prove that there was anything abnormal in the food served to her aboard the American Airlines flight, her own medical records are inconsistent with her having gotten Campylobacter Jejuni aboard the flight on June 13, 2000. The first time that any doctor drew any connection between the plaintiff's illness and the food on the American Airlines flight was in opposition to the summary judgment motion, some four years after the alleged incident occurred, when Dr. Golden submitted her report in this case on May 21, 2004, more than sixty days after the time set for plaintiff to submit her expert witness reports pursuant to the Fourth Amended Scheduling Order dated February 25, 2004 and some six weeks after this motion for summary judgment motion was filed. A copy of the Fourth Amended Scheduling Order is attached to the Reply Affidavit of Michael J. Holland sworn to November 4, 2004 as Exhibit "F".

Neither Dr. Hasbani, plaintiff's treating physician at St. Raphael's Hospital, nor Dr. O'Brien, the physiatrist who treated Ms. Pridgeon at the rehabilitation facility at St. Raphael's Hospital, support the position now being asserted in this lawsuit. Dr. Hasbani's discharge diagnosis, dated June 23, 2000 lists her primary diagnosis as Guillain-Barre syndrome, status

post resection of C4 cavernous hemangioma and cervical disc herniation.  See discharge summary annexed as Exhibit "A" to Holland Reply Affidavit.  Dr. Hasbani made no diagnosis of Campylobacter Jejuni.

When Ms. Pridgeon was discharged from the St. Raphael's rehabilitation facility on October 10, 2000, Dr. O'Brien, her rehabilitation specialist who has been listed as an expert in this case, listed three discharge diagnoses:  1) Guillain-Barre Syndrome; 2) Lyme Disease; 3) removal of spinal cord tumor in 1997.  *See* discharge diagnosis from Dr. O'Brien, Exhibit "B" to Holland Reply Affidavit[4].

Dr. Jonathan Goldstein, identified as a nerve conduction study specialist, did not submit any expert report in this case.  The only paper that he has prepared is attached as Exhibit "M" to the affidavit of plaintiff's counsel.  His paper makes absolutely no mention of Campylobacter Jejuni and states simply "there is electro-diagnostic evidence for a severe motor axonal neuropathy.  This c/w [consistent with] AMAN form of GBS which has a slower recovery rate and may be incomplete".  Contrary to the impression which is created in the plaintiff's opposition, Dr. Goldstein makes no findings as to whether plaintiff has Campylobacter Jejuni.  His report is consistent with all of the other medical records in that it makes absolutely no mention of the meal served to plaintiff aboard the American Airlines flight as having anything to do with her illness.

There is no showing that the chicken was not cooked or that normal procedures were deviated from in the preparation of food.  Plaintiff's injury was not the result of something

13

unusual or expected in the operation of the aircraft. Regrettably, plaintiff contracted Guillain-Barre Syndrome. However, there is no medical evidence which establishes that the source of plaintiff's Guillain-Barre Syndrome was a Campylobacter infection, and no evidence that the source of any Campylobacter infection was the meal served to plaintiff aboard the American Airlines flight. Plaintiff's failure to meet her burden of proving an "accident" within the meaning of the Warsaw Convention warrants dismissal of the amended Complaint.

### III.

### PLAINTIFF'S OWN CONDUCT BELIES THE CLAIM THAT THE MEAL SERVED TO HER ABOARD AMERICAN AIRLINES FLIGHT 121 HAD ANYTHING TO DO WITH HER ILLNESS

Plaintiff made no verbal or written complaint to American Airlines about the food which she now claims to have been tainted until she filed suit on May 15, 2002, some 23 months after the incident. While plaintiff was undoubtedly seriously ill as a result of contracting Guillain-Barre Syndrome, she was discharged from St. Raphael's in November of 2000. Neither she nor her partner, a physician with whom she resided at all relevant times, made any complaint to American Airlines until the lawsuit was filed shortly before the expiration of the two year statute of limitations. Ms. Pridgeon's illness did not prevent her from retaining counsel to pursue this case in August of 2001 (Pridgeon deposition, page 95). Even after plaintiff retained counsel, no complaint was made to American Airlines until this lawsuit was filed in May of 2002. Dr. Kra, a physician, not only failed to bring this incident to the attention of American

---

[4]    Dr. Golden disagrees with Dr. O'Brien's discharge diagnosis. Golden deposition, page 15, lines 13-17.

14

Airlines or the Connecticut Public Health authorities but he also threw away records evidencing the restaurants that the couple had eaten at during their trip to France and their passenger tickets (Pridgeon deposition, pages 30, 106), actions which are inconsistent with a belief that there was any basis for a valid claim against American Airlines in this case.

While plaintiff argues that American Airlines did not even attempt to determine by batch or lot number the origin of the chicken served to Ms. Pridgeon, the deposition testimony of Andrea Pratt, the Food and Beverage Manager for American Airlines, was that this step could not be successfully taken due to the passage of time. Pratt deposition, page 16. The chicken could have been traced if plaintiff had made a timely complaint but, for reasons best known to herself, plaintiff chose not to bring this incident to the attention of American Airlines from the time of her flight on June 13, 2000 until she filed a lawsuit against American Airlines some 23 months later, on May 15, 2002, shortly prior to the expiration of the statute of limitations under the Warsaw Convention.

## IV.

### AMERICAN AIRLINES IS ENTITLED TO LIMIT ITS LIABILITY TO 100,000 SDRS BASED ON THE "ALL NECESSARY MEASURES" DEFENSE

No one else aboard the American Airlines flight on June 13, 2000, or for that matter, any other person who travelled on any American Airlines flight from France to the United States during the entire month of June, 2000 made any complaint for food poisoning as a result of eating the Chicken Rosemary meal.

15

Plaintiff argues that American Airlines should have interviewed crewmembers in June of 2002, two years after the unreported incident allegedly occurred, to determine whether any of the crewmembers recalled serving a meal to Ms. Pridgeon.  While plaintiff erroneously claims that American Airlines never identified the crewmembers (the crewmembers were identified in answers to interrogatories filed by American Airlines on June 24, 2003, a copy of which is annexed to the Reply Affidavit of Michael J. Holland sworn to November 4, 2004 as Exhibit "G"), it is nonsensical to argue that an airline should have gone back two years *after* an incident which had *never been reported* to it to inquire whether any of its crewmembers recalled a perfectly normal occurrence in which no passenger lodged a complaint about the food service.  As Ms. Pratt plainly testified, there was no need to interview the crewmembers because they had no report of an incident (Pratt deposition, page 12, lines 20-22).

All of the cases dealing with the "all necessary measures" defense have talked about reasonable measures *before* the loss occurs.  *See, e.g., Verdesca v. American Airlines*, 2000 WL 1538704 (N.D. Tex. Oct. 17, 2000).  Plaintiff refers to steps that should have been taken by the defendant two years *after* the accident occurred, when American Airlines first discovered that plaintiff was even making a claim.  This is clearly not the purpose of the all necessary measures defense.

> The defendant must provide proof of an undertaking embracing all precautions that in some are appropriate to the risk, i.e., measurers reasonable available to defendant and reasonably calculated in accumulation, to *prevent the subject loss*.

*Vildex, S.A.I.C. v. United Airlines*, 1996 WL 733081 (E.D.N.Y. 1996) (emphasis added).

16

Ms. Pratt, the Regional Manager in Food and Beverage for American Airlines, who is responsible for the caterers in Europe who cater American Airlines flights, testified extensively as to the steps that were taken by American Airlines in order to ensure that the airline did not serve any contaminated food to its passengers. She testified that there was no file in the American Airlines' catering department because no complaint had been made at the time of the occurrence (Pratt deposition, page 7, line 21).

Ms. Pratt confirmed that it was Marfo that had supplied the product to Gate Gourmet (page 8, lines 20-22) and that she could have traced the lot number of the chicken back if there was a timely report of the incident. While it would be impossible to trace the lot number now (page 16, lines 14-20), American Airlines is able to trace lot numbers for food if the airline gets a timely notice of claim. American Airlines monitors how long food is kept at Gate Gourmet's facilities before being transferred onto aircraft (page 19, lines 19-24) and ensures that the food purchased from Pourchins is for a quantity that keeps the supply chain as current as possible. American Airlines conducts periodic visits to its supplier to monitor the expiration dates on the food (page 20, lines 22-25). American Airlines has a policy of not serving its customers meals whose expiration dates have passed (page 22, lines 14-17). Gate Gourmet adheres to very strict European Union standards in maintaining food (page 23, lines 8-24). If an item served by an American Airlines' food supplier does not meet American Airlines' standards, American Airlines has a process in place for sampling lab tests of items that may have been triggered for bacteria (page 27, lines 3-13). American Airlines also conducts a random sampling of entrées and, in the event of a single report of a food poisoning incident, American Airlines immediately

17

sends out samples of the entrée for lab testing.  If there is a positive reading for bacteria, the product is isolated until American Airlines confirms that the food is safe for consumption (page 27, line 25 to page 28, line 16).

The "all necessary measures" requirement is keyed to precautions taken by a carrier to prevent harm to its passengers.  In the case at bar, the affidavits prepared by the catering company and the provider of the chickens indicate all reasonable measures that were taken to prepare and safeguard the food served on American Airlines' flights.  Andrea Pratt, American Airlines' Regional Food and Beverage Manager, testified about the steps taken by American Airlines in the event that any passenger makes a complaint about the food.  However, no one made any complaints about this chicken.  Ms. Pridgeon's Complaint was made nearly two years after the occurrence, at a time when it would be impossible to trace back lot numbers or invoices for the subject meal.

Ms. Pratt also testified extensively as to the steps American Airlines takes with food service in the event there is even a single complaint of food poisoning.  In this case, since Ms. Pridgeon never told American Airlines about the incident, either verbally or in writing, there was nothing that American Airlines could have done.  American Airlines' first notice of the incident, as plaintiff conceded, was when she filed her Complaint twenty three months after the incident occurred.  Under these circumstances, there was nothing American Airlines could or should have done at that time "to prevent the subject loss".

American Airlines has met its burden of showing that it took "all necessary measures" by having the food prepared by experienced caterers, by having the food and

18

properly prepared in accordance with European Union Standards, by monitoring the length of time food is stored by its supplier, by conducting random samplings of entrées, and by having a procedure in place to promptly investigate any complaints of food poisoning. While it is impossible for American Airlines to go back and confirm that this particular chicken was sufficiently cooked, the absence of other complaints and the guidelines adhered to by the supplier of the goods and the caterer (see Affidavits Laurent Faye and Matrix de Vries submitted in support of motion for summary judgment) demonstrate the guidelines to be followed in all cases by American Airlines for catered food on its flights. It is pure speculation to assume that, somehow, one piece of chicken out of all of the chicken that was served to all of the American Airlines passengers on flights from Paris to the United States during the month of June of 2000 did not get cooked, that plaintiff consumed it, that she got Campylobacter Jejuni bacteria as a result of it, and that this Campylobacter Jejuni led to Guillain-Barre Syndrome. Plaintiff's decision not to even notify American Airlines of her claimed injuries until she filed a lawsuit shortly before the expiration of the statute of limitations does not indicate that American Airlines was in any way derelict in its duties or that it did not take all necessary measures to protect this passenger against food poisoning.

In the event that summary judgment is not granted in favor of American Airlines for plaintiff's failure to prove an "accident" within the meaning of Article 17 of the Warsaw Convention, American Airlines is entitled to summary judgment limiting its liability to 100,000 SDRs based upon the "all necessary measures" defense of Article 20 of the Warsaw Convention.

**V.**

**DRS. BLOCK AND CAHILL
HAVE BEEN PROPERLY
LISTED AS EXPERT WITNESSES**

The omission of Drs. Cahill and Block as expert witnesses dominated under Fed.R.Civ.P. 26(a)(2) is explained by the postural position of this case.  Under the Fourth Amended Scheduling Order signed by Judge Goettel on February 25, 2004 (a copy of which is annexed to the Holland Affidavit as Exhibit "F"), plaintiff was required to designate all her trial expert witnesses by February 29, 2004 and to provide American Airlines with the experts' reports by February 29, 2004.  Defendant was to designate its expert witnesses by March 30, 2004.

February 29, 2004 came and went without plaintiff designating any expert witness who could testify that plaintiff's illness was caused by any food that she ate aboard the American Airlines flight.  Plaintiff had previously designated Dr. Hasbani, her treating neurologist, Dr. Goldstein, a neurologist who conducted an EMG study, and Dr. John O'Brien, a physiatrist, as her experts.  None of those doctors made any mention in their expert reports of the food that plaintiff consumed aboard the American Airlines flight and the role, if any, that the food played in plaintiff's Guillain-Barre Syndrome.

Following a settlement conference before Magistrate Judge Garfinkel on March 15, 2004, American Airlines moved, at the suggestion of Magistrate Judge Garfinkel, for summary

judgment. The motion included the affidavits and expert reports of Drs. Block and Cahill. Plaintiff did not designate her infectious disease specialist, Dr. Golden, until May 19, 2004, per a letter from plaintiff's counsel to defense counsel and Dr. Golden's report is dated May 21, 2004, eleven weeks after the discovery deadline cutoff and six weeks after the defendant's summary judgment motion was filed. Defendant American Airlines disclosed their experts, and submitted their Rule 26 reports, when these reports were submitted as part of American Airlines' summary judgment motion.

## CONCLUSION

The motion for summary judgment should be granted and the Amended Complaint dismissed. Alternatively, the Court should enter an Order limiting American Airlines' liability, if any, to a sum not in excess of 100,000 SDRs.

Dated: New York, New York
November 4, 2004

Law Offices of Paul A. Lange

By Alison L. McKay

Alison L. McKay
Bar No. CT 22260
alm@lopal.com
80 Ferry Boulevard
Stratford, Connecticut 06615-6079
(203) 375-7724
(203) 375-9397 (fax)

- and -

21

CONDON & FORSYTH LLP

By _____

Michael J. Holland
Bar No. CT 22894
mholland@condonlaw.com
685 Third Avenue
New York, New York  10017
(212) 894-6740
(212) 370-4482 (fax)
Attorneys for Defendant
AMERICAN AIRLINES, INC.

To:  Timothy L. O'Keefe, Esq.
     Attorneys for Plaintiff
     Kenny, O'Keefe & Usseglio, P.C.
     21 Oak Street
     Hartford, CT  06106
     (860) 246-2700

# **AFFIDAVIT OF SERVICE**

STATE OF NEW YORK    )
                             ) ss.:
COUNTY OF NEW YORK  )

        Mary Ann Rooney, being duly sworn, deposes and says that deponent is not a party to the action, is over 18 years of age and resides in Queens, New York. That on November 4, 2004, deponent served by Federal Express, Priority Overnight Delivery the within Reply Memorandum of Law in Support of Motion for Summary Judgment upon:

        Timothy L. O'Keefe, Esq.
        Kenny, O'Keefe & Usseglio, P.C.
        21 Oak Street
        Hartford, Connecticut 06106

which is the address designated by said attorneys for service of documents.


                                      Mary Ann Rooney

Sworn to before me this
4th day of November, 2004

_____
Notary Public

       **MICHAEL J. HOLLAND**
    **Notary Public, State of New York**
        **No. 41-4501283**
     **Qualified in Nassau County**
  **Commission Expires August 31, 2005**