UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


LOLITA PRIDGEON,

                Docket No.

        Plaintiff,

                3:02 CV 1032 WWE

VS.

AMERICAN AIRLINES,

        Defendant.




REPLY TO SUPPLEMENTAL MEMORANDUM OF LAW




ORAL ARGUMENT NOT REQUESTED

**PRELIMINARY STATEMENT**

Defendant American Airlines, Inc., as moving party on a motion for summary judgment filed with the Court on April 4, 2004, respectfully submits this reply to the supplemental memorandum of law filed by plaintiff on November 30, 2004. While the filing of such a supplemental memorandum of law is not authorized in either the local District Court Rules or Federal Rules of Civil Procedure, and the supplemental memorandum of law appears to raise no new issues, American Airlines respectfully submits this memorandum to briefly respond to the contentions made by plaintiff in her attempt to defeat summary judgment in this case.

**I.**

**PLAINTIFF HAS FAILED TO PROVE
AN ACCIDENT**

It is axiomatic that plaintiff must prove an "accident" in order for her to recover under the Warsaw Convention, plaintiff's only remedy against the defendant airline. As the Supreme Court held in *Air France v. Saks*, 470 U.S. 392 (1985), a passenger can recover against the airline for an "accident" only if the injury is caused by an "unexpected or unusual event or happening that is external to the passenger". *Saks*, 470 U.S. at 405. The Supreme Court in *Saks* held that it is the cause of the injury that must satisfy the definition of an "accident" rather than the occurrence of an injury. *See also, Olympic Airways v. Husain*, 540 U.S. 124 S.Ct. 1221 at 1226 (2004). In order to recover against the airline, a plaintiff must

2

prove there was some link in the chain of causation that was unusual or an unexpected event external to the passenger. *Husain*, 124 S.Ct. at 1227.

Plaintiff has failed to prove an accident. While she asserts at page 9 of her supplemental memorandum of law that the unusual or unexpected event was that plaintiff was served "with a meal tainted with dangerous bacteria", that claim is not supported by any of the extensive medical records complied during plaintiff's four month stay at St. Raphael's Hospital. There is absolutely no proof in this case that the meal served to Ms. Pridgeon was "tainted with dangerous bacteria." Plaintiff retains the burden of proving an "accident", i.e., of supporting her claim made in the Amended Complaint that she was served a meal tainted with dangerous bacteria. Plaintiff's own expert concedes that there are only two tests to prove plaintiff even had Campylobacter Jejuni: by a stool sample or serological evidence. It is undisputed that neither of those medical tests were performed.

Plaintiff's testimony at page 35 of her deposition that "because it [the chicken] was pink . . . it was cold and the texture was also kind of chewy and just didn't taste good to me like chicken . . ." (Pridgeon deposition, p. 35, lines 6, 12-13) does not satisfy plaintiff's burden of proving an accident. Such testimony does not establish that the meal was tainted with a dangerous bacteria.

## II.

## DR. GOLDEN'S TESTIMONY AND REPORT
## DO NOT ESTABLISH THAT THE PLAINTIFF
## SUSTAINED AN "ACCIDENT" UNDER
## ARTICLE 17 OF THE WARSAW CONVENTION

The sole basis for the claim of an "accident" is the report of plaintiff's late-designated expert, Dr. Golden, who bases her conclusion solely on her reading of the plaintiff's deposition. While Dr. Golden treated plaintiff briefly on the 4th of July weekend in 2000, she never asked Ms. Pridgeon about the source of her illness and Dr. Golden's treatment records (as are all of the medical records from St. Raphael's Hospital) are conspicuously devoid of any reference to any meal served by American Airlines to the plaintiff aboard flight 121 on June 13, 2000 as having anything to do with the plaintiff's illness. Nor did plaintiff ever bring to the attention of American Airlines this supposed "bad meal", "tainted with dangerous bacteria" which she was supposedly served by the airline. Plaintiff's failure to bring this severe life threatening health situation to the attention of American Airlines until such time as she filed her Complaint shortly before the expiration of the two year statute of limitations highlights the absolute lack of merit in this claim.

Plaintiff is correct that there is no one who can rebut Ms. Pridgeon's claim that the chicken tasted "cold and chewy". That is so because Ms. Pridgeon chose not to share that observation with anyone but Dr. Kra, her significant other. She did not share it with the American Airlines' crew, nor did she ever share it verbally or in writing with American Airlines

when she arrived home, nor did she share it with her treating doctors, Dr. Roth, Dr. Goldstein, Dr. Hasbani, Dr. O'Brien, Dr. Golden, or indeed any medical personnel who treated her.

While plaintiff contends in her supplemental memorandum that the opinion of Dr. Golden, as a treating physician, is somehow entitled to more weight than those of defendant's experts, who were retained solely for this litigation, plaintiff fails to note that Dr. Golden, who saw plaintiff over the 4th of July weekend from July 1 to 4, 2000 made absolutely no mention in her treatment notes for those dates that the chicken meal served to plaintiff aboard American Airlines flight 121 on July 13, 2000 had anything to do with plaintiff's illness. Dr. Golden never expressed any opinion as to any relationship between plaintiff's illness and the food served to her aboard the American Airlines flight until nearly four years later, when she prepared her report dated May 19, 2004, two and a half months after the discovery deadline had passed for plaintiff to submit her experts' reports and six weeks after a summary judgment motion had been made by defendant American Airlines seeking dismissal of the Amended Complaint.

If Dr. Golden believed at the time she treated plaintiff at St. Raphael's Hospital from July 1 to 4, 2000, that plaintiff had Campylobacter Jejuni, she and the hospital had a legal obligation to report that fact to the Connecticut Health authorities. See Exhibit "C" to reply affidavit of Michael J. Holland, sworn to November 4, 2004. Dr. Golden candidly testified that no such report was made by St. Raphael's Hospital to the State of Connecticut since there was no culture which confirmed that the plaintiff even had Campylobacter Jejuni. See Dr. Golden deposition, page 75.

5

While plaintiff makes much of the fact that her illness precluded her from reporting this incident to American Airlines until such time as she filed her lawsuit shortly before the expiration of the two year statute of limitations in May of 2002, this overlooks the fact that Ms. Pridgeon resided at all times with her significant other, Dr. Siegfried Kra, a cardiologist affiliated with Yale Medical School.[1]  Clearly when it was in Dr. Kra's interest to write a letter making a claim on behalf of his significant other, Ms. Pridgeon, he did so.  See letter of September 27, 2000 from Dr. Kra to Dr. Federico, requesting additional coverage for medical treatment for Ms. Pridgeon.  A copy of this letter is annexed hereto as Exhibit "A".  The notion that plaintiff was simply too ill to make a complaint to American Airlines from June 13, 2000, the time she was served the meal on board the flight, until she filed a lawsuit on May 15, 2002, begs credulity, particularly when plaintiff lived with a doctor, when plaintiff's significant other had professional connections with the other doctors who treated her, and when her illness did not preclude her from retaining able counsel in August of 2001 to bring this lawsuit on her behalf.

---

[1]    Most of the other doctors who treated plaintiff are likewise affiliated with Yale Medical School, i.e., Dr. John O'Brien, who interned at Yale University, Dr. Golden, the plaintiff's infectious disease specialist who was an Assistant Clinical Professor of Medicine at Yale University School of Medicine, Dr. Moshe Hasbani, who was an Assistant Clinical Professor of Neurology at Yale University School of Medicine from 1988 to 1991 and Dr. Jonathan Goldstein, who is currently the Director of Clinical Services in the Department of Neurology at the Yale New Haven Medical Center.

## III.

## AMERICAN AIRLINES HAS TAKEN ALL
## NECESSARY MEASURES TO PREVENT
## THIS LOSS

Defendant American Airlines has outlined at pages 17 through 19 of its reply memorandum of law the steps it took to prevent any passengers from getting ill from the food served aboard its flights. Likewise, the affidavits of Matrix de Vries of Marfo and Laurent Faye of Gate Gourmet submitted in support of the motion for summary judgment attest to the steps taken by American Airlines' caterers to cook, preserve and safeguard the food prior to its service of passengers. Obviously, no one is going to be able to go back four years later and determine what was done in a particular case, particularly when no report of any incident was made at the time of its occurrence.

Plaintiff's reliance on *Manufacturers Hanover Trust Company v. Alitalia Airlines*, 429 F.Supp. 964 (S.D.N.Y. 1977) is misplaced. "All necessary measures" cannot be read with strict literality but must rather be construed to mean "all reasonable measures". *Manufacturers Hanover Trust Company*, 429 F.Supp. at 967.

> In short, Article 20 requires of defendant proof, not of a surfeit of preventatives, but rather, of an undertaking embracing all precautions that in sum are appropriate to the risk, i.e., measures reasonably available to defendant and reasonably calculated, in cumulation, to prevent the subject loss. Such construction finds implicit support in the few precedents squarely on point, . . .

*Manufacturers Hanover Trust Company*, 429 F.Supp. at 967.

American Airlines took all reasonable measures before the flight of June 21, 2000 to make sure that its food served to all passengers was properly prepared and stowed. Plaintiff's argument that after the lawsuit was filed, American should have gone back and interviewed crewmembers with respect to a complaint which was never even reported to the airline is ludicrous. Plaintiff fails to mention any prudent measures that any airline could have taken to prevent this loss. The steps taken by American Airlines to safeguard its food served to passengers aboard its flight, when viewed cumulatively, satisfy the "all necessary measures" test of Article 20 of the Warsaw Convention. Plaintiff has not suggested what measures American Airlines could have taken and did not take to prevent the loss. The plaintiff's suggestion that American Airlines should have taken steps after the loss such as interviewing witnesses has absolutely nothing to do with actions taken to avoid the injury to plaintiff.

Any attribution of plaintiff's injury to food served aboard the American Airlines flight 121 on June 13, 2000 is pure speculation. Indeed, a review of plaintiff's extensive medical records, which are excerpted in part as Exhibits "A" to "D" to plaintiff's supplemental memorandum of law, suggest another plausible source for the injury to Ms. Pridgeon: that she somehow came into contact with animal feces contaminated with Campylobacter bacteria. It is well-known from the Center for Disease Control (CDC) website that contact with animal feces is a source of Campylobacter bacteria. The plaintiff's hospital records (Exhibit "A" to supplemental memorandum of law) indicates that plaintiff has dogs at her house and that one of her dogs had a self-limited diarrhea illness three weeks ago. The second page of that same note indicates that Campylobacter Jejuni is a frequent cause of traveler's diarrhea and is also

8

frequently known to cause diarrhea illness in pets. The CDC website goes on to state that birds are known to be the carriers of Campylobacter Jejuni because they have the ideal body temperature. In fact, the medical records from St. Raphael's, Exhibit "B" to plaintiff's supplemental memorandum of law indicate that the plaintiff "lives in Woodbridge – wooded area (+) ticks on dogs this spring; two dead birds in yard in last ___ ___. Two dogs/two cats all healthy – one dog with diarrhea with three weeks ago". While it is certainly not for American Airlines to speculate on what caused plaintiff's diarrhea, neither can her expert's report relying solely on plaintiff's deposition testimony, and making no reference to the medical records referred to herein, serve as the basis for a conclusion that the plaintiff sustained an "accident" as the result of anything that occurred while she was a passenger aboard American Airlines flight 121 on June 13, 2000.

## CONCLUSION

The motion for summary judgment should be granted and the Amended Complaint dismissed. Alternatively, the Court should enter an Order limiting American Airlines' liability, if any, to a sum not in excess of 100,000 SDRs.

Dated: New York, New York
       December 9, 2004

Law Offices of Paul A. Lange

By_____
Alison L. McKay
Bar No. CT 22260
alm@lopal.com
80 Ferry Boulevard
Stratford, Connecticut 06615-6079

9

(203) 375-7724
(203) 375-9397 (fax)

- and -

CONDON & FORSYTH LLP

By _____
  Michael J. Holland
Bar No. CT 22894
mholland@condonlaw.com
685 Third Avenue
New York, New York  10017
(212) 894-6740
(212) 370-4482 (fax)
Attorneys for Defendant
AMERICAN AIRLINES, INC.

To: Timothy L. O'Keefe, Esq.
  Attorneys for Plaintiff
  Kenny, O'Keefe & Usseglio, P.C.
  21 Oak Street
  Hartford, CT  06106
  (860) 246-2700

EXHIBIT "A"

Case 3:02-cv-01032-WIG   Document 69   Filed 12/09/2004   Page 12 of 14

John Federico,M.D.
Senior Medical Director
PHS Health Plans
120 Hawley Lane
Trumbull, CT. 06611

September 27, 2000

Dear Doctor Federico:

        Lolita Pridgion is my significant other   who is
38 years old and is a patient  at St.Raphael Hospital in
the rehabilitation center.She   was an  active self
sufficient young until that dreaded day in June.
        She is suffering from  a rare disease called
Gulliam Barre. Her illness started suddenly and without
warning she became a quadriplegic over night.
        Lita still has a on going illness and is
improving slowly with expert help of the staff of St.
Raphael Hospital under the guidance of Dr. O"Brien, Dr.
Hasbani and Dr Roth, her primary physician.
        She receives daily three hours of physical
therapy to reteach her how to walk,to be able to transfer
from the wheel chair to the bathroom.She needs twenty four
hour care as she is totally disabled.Her food has to be
cut to small pieced lest she cannot maneuver the special
utensils.
        Lita is in the process of improving but needs
more time in the hospital to receive the adequate
physical therapy which she cannot possible get at
home.Each day she  is being trained to  walk  on the
parallel bars wearing braces to her hips.with the two  or
more expert physical therapist in attendace.
        I watched this delicate   young women who lost 30
pounds due to her illness look like a little bird in a
cage as she has to be transferred  from wheel chair to her
bed.
        It would be a  crime to interrupt her treatment on
this on going illness. As you know Guillianm Barre
afflicts 1/100,000 people and she is improving with daily
therapy she is receiving for her strengthening her muscles -
to prevent atrophy and contracture and  making it possible
for this young women to return to active self sufficient
life.This extensive expert therapy cannot be possibly  be

given  at home. It can only be given in in  supervised
facility  as she is receiving now  at St, Raphael
Hospital.
          Interrupting her progress at this time when she is
not ready for discharge would be like prematurely stopping
antibiotics for a endocrinologist.
          Interrupting her daily three hour physical
therapy in a person who is benefiting enormously from the
treatment of Guilliam Barre , the only treatment we have,
would restart her recovery and may cause her recovery to
become frozen and she will not walk again,or return to a
useful life.
          She is due for discharge on OCt 9. I  beseech
to open your hearts to give this  young women more time in
the hospital.We all are doctors and our prime raison
d'etre is to help the patient.PHS was formed by people
like me who for the prime purpose to give care.
          Please don't interrupt her treatment now---when she
is improving daily and needs further care.
          Some patients are lucky and the paralysis caused by
Guilliam Barre leaves in a few weeks, but there are no
guidelines on quickly recovery takes place, but it should
not be retarted by interrupting her treatment when she is
improving daily .

          Give her a chance  to return to a normal life by
making it possible for  the rehabilitation to continue
with the excellent care at St. Raphael Hospital she is
receiving.
          PHS is a proud exemplary managed care run  by moral
ethical physicals, started by  doctors like myself, whose
only concern is the care of the patient. Please don't
disappoint  us  now when  you are needed the most.


     Cordially yours,


     Siegfried J.Kra,M.D.FACP
     Clinical Associate Professor Yale School of Medicine
     Adjunct assistant Professor Baylor Medical College
     Director of Diagnostic Cardiology

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                              ) ss.:
COUNTY OF NEW YORK  )

        Mary Ann Rooney, being duly sworn, deposes and says that deponent is not a party to the action, is over 18 years of age and resides in Queens, New York. That on December 9, 2004, deponent served by Federal Express, Priority Overnight Delivery the within Reply to Supplemental Memorandum of Law upon:

> Timothy L. O'Keefe, Esq.
> Kenny, O'Keefe & Usseglio, P.C.
> 21 Oak Street
> Hartford, Connecticut 06106

which is the address designated by said attorneys for service of documents.

Mary Ann Rooney

Sworn to before me this
9th day of December, 2004

Notary Public

MICHAEL J. HOLLAND
Notary Public, State of New York
No. 41-4501283
Qualified in Nassau County
Commission Expires August 31, 2005