UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LOLITA PRIDGEON,

          Plaintiff,

VS.

AMERICAN AIRLINES,

          Defendant.

Docket No.

3:02 CV 1032 GLG

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO EXCLUDE TESTIMONY AND REPORT
OF PLAINTIFF'S EXPERT DR. MARJORIE GOLDEN**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................................i

PRELIMINARY STATEMENT ....................................................................................... 1

RELEVANT FACTS ....................................................................................................... 1

*Plaintiff's Chicken Rosemary Meal* ........................................................................ 1

*Plaintiff's Testimony of the Onset of Her Illness* .................................................. 3

*Plaintiff's Medical Records* ................................................................................... 4

*Dr. Golden's Report and Testimony* ...................................................................... 7

ARGUMENT .................................................................................................................. 8

I.      EXPERT TESTIMONY MAY PROPERLY BE EXCLUDED WHEN
        THE EXPERT'S OPINION IS UNRELIABLE AND BASED ON
        INADEQUATE DATA AND UNSUPPORTED FACTS ................................. 8

II.     DR. GOLDEN'S EXPERT OPINION LACKS THE INDICIA OF
        RELIABILITY REQUIRED UNDER *DAUBERT* AND MUST BE
        EXCLUDED ............................................................................................... 10

        1.   Dr. Golden's Expert Report And Opinions Are Not Based
             Upon Sufficient Facts Or Data.................................................... 10

        2.   Dr. Golden Failed To "Rule Out" Other Causes As Is
             Required When Conducting A Differential Diagnosis ............... 13

        3.   Dr. Golden Has Not Reliably Applied A Differential
             Diagnosis To The Facts Of This Case ........................................ 16

CONCLUSION............................................................................................................... 17

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE**

*Amorgianos v. National Railroad*, 303 F.3d 256 (2d Cir. 2002) ................................................9, 10

*Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ............................................9

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ......................................................................9

*Glastetter v. Novartis Pharmaceuticals Corp.*,
252 F.3d 986 (8th Cir. 2001) ...........................................................................................................13

*In re Agent Orange Prod. Liability Litigation*,
611 F. Supp. 1223 (E.D.N.Y. 1985) ...............................................................................................10

*Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999) .............................................................9

*Lopez v. Wyeth-Ayerst Labs*, No. C94-4054 CW, 1996 WL 784566
(N.D. Cal. Dec. 13, 1996) .......................................................................................................n5, 16

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) .........................................................13

*Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45 (D. Conn. 2004).................................10

*Westberry v. Gislaved Gummiu AB*, 178 F.3d 257 (4th Cir. 1999) ...............................................13

*Wills v. American Hess*, No. 98 Civ. 7126 (RPP),
2002 WL 140542 (S.D.N.Y. Jan. 31, 2002) ....................................................................................9

*Zuchowicz v. United States*, 140 F.3d 381 (2d Cir. 1998) ..............................................................8

**FEDERAL RULES**

Fed. R. Evid. 702 ..............................................................................................................................8

## PRELIMINARY STATEMENT

Defendant American Airlines, Inc., by and through its attorneys, the Law Offices of Paul A. Lange and Condon & Forsyth, LLP, hereby submits this Memorandum of Law in support if its motion to strike the expert report and opinion of plaintiff's infectious disease expert, Dr. Marjorie P. Golden, and to preclude Dr. Golden from testifying at trial regarding the cause of plaintiff's illness.

## RELEVANT FACTS

Plaintiff commenced this action in May of 2002 against American Airlines ("American") for personal injuries arising from her diagnosis with Guillain-Barre Syndrome ("GBS") in June 2000. Plaintiff claims that her condition was caused by an in-flight meal served on American Flight No. 121 from Charles de Gaulle Airport in Paris, France to John F. Kennedy International Airport in New York on June 13, 2000. *See* Plaintiff's Amended Complaint, attached as Exhibit "A" to the Affidavit of Michael J. Holland, executed April 8, 2005 ("Holland Aff.").

In support of her claims, plaintiff has submitted the report of an infectious disease expert, Dr. Marjorie P. Golden, which states that "[b]ased on [her] review of the medical record and Ms. Pridgeon's deposition," "it is reasonable to conclude that Ms. Pridgeon's Guillain-Barre syndrome was caused by infection with *Campylobacter jejuni*, acquired through the ingestion of undercooked chicken on her flight home from France." *See* Report of Dr. Marjorie P. Golden, dated May 19, 2004 ("Golden Report"), attached as Exhibit "B" to the Holland Aff.

### *Plaintiff's Chicken Rosemary Meal*

Plaintiff and her friend, Dr. Siegfried Kra, took a two week vacation in France, departing from New York on May 31, 2000 and returning on June 13, 2000. *See* Transcript of Deposition of Lolita Pridgeon, conducted December 18, 2003, at 21 ("Pridgeon Tr.") (Copy attached as Exhibit "C" to the Holland Aff.). Plaintiff and Dr. Kra traveled throughout France, staying at a friend's

apartment in Paris from June 1-3, 2000 and thereafter at chateaus and inns through June 13, 2000. Pridgeon Tr. at 23-28. Plaintiff does not recall having eaten chicken in France, but could have done so. *Id.* at 28.

Plaintiff and Dr. Kra returned together to New York on American Flight No. 121 on June 13, 2000. *Id.* at 29-32; Amended Complaint, ¶ 5. Approximately two hours after the flight departed, plaintiff ordered an in-flight meal of Chicken Rosemary, which was served heated and consisted of a chicken breast of pale white meat. Pridgeon Tr. at 33. Plaintiff cut into the chicken, which was pink, and ate two or three bites. *Id.* at 34-35. Plaintiff did not see any blood run out of the chicken. *Id.* The chicken seemed to have a funny taste in that "it was cold and the texture was also kind of chewy and just didn't taste good to me like chicken". *Id.* at 35. Plaintiff told Dr. Kra about the chicken, and he advised her not to eat it. *Id.* at 35-36.

Plaintiff, however, did not complain to the flight attendant about the content of the meal, nor did she ever make an oral or written complaint to American. *Id.* at 35, 92-92. American did not receive any complaints from any passengers for food poisoning as a result of any meals served aboard any American flights from Paris to the United States in June of 2000. *See* Affidavit of Dale Norgard, Senior Analyst in Risk Management for America, executed January 9, 2004, ¶¶ 4-5 (copy attached to the Holland Aff. as Exhibit "K"). Gate Gourmet, American's catering service, also did not receive any complaint from plaintiff or any other passenger concerning the Chicken Rosemary entrée which was served in the economy class sections aboard American Airlines' flights during the month of June, 2000. Affidavit of Laurent Faye, sworn to January 9, 2004, ¶¶ 3, 4 (copy attached to the Holland Aff. as Exhibit "J").

2

*Plaintiff's Testimony of the Onset of Her Illness*

Plaintiff returned to her home in Woodbridge, Connecticut on the evening of June 13, 2000 and felt fine until mid-morning of Thursday, June 15, 2000. Pridgeon Tr. at 40. Plaintiff felt no illness on her first full day back in the United States, June 14, 2000. *Id.* at 39. She does not recall what she ate on June 14, 2000. *Id.* at 40.

Plaintiff developed a low grade fever, diarrhea and vomiting which lasted throughout the late morning, afternoon and early evening hours of June 15, 2000. *Id.* at 41–43. She also experienced severe joint pains in her knees and ankles in the afternoon of June 15, 2000. *Id.* at 43-44. When plaintiff woke up on Friday, June 16, 2000, the diarrhea and vomiting had stopped and she did not have any intestinal problems or vomiting thereafter. *Id.* at 52 to 57. The pains in plaintiff's knees and ankles had subsided by Friday, June 16, 2000. *Id.* at 58.

While plaintiff felt tired over the next few days between June 16, 2000 and June 20, 2000, she experienced no diarrhea, vomiting or pain in her ankles and knees. *Id.* at 48-57. On Saturday, June 17, 2000, plaintiff went to purchase a new vacuum cleaner and experienced weakness in her legs and arms. *Id.* at 51. The pains in plaintiff's knees and ankles returned on Wednesday, June 21, 2000. *Id.* at 58. Plaintiff saw Dr. Stanley Roth, a friend of Dr. Kra's, on that day and complained of pain in her feet and knees. Dr. Roth noted in his records that one week prior, plaintiff had severe diarrhea followed by pain in her lower back and both knees. *See* Diagnostic Evaluation of Dr. Roth, dated June 21, 2000 ("Roth Evaluation"), Exhibit "L" to the Holland Aff. Plaintiff took warm baths to alleviate the symptoms. Pridgeon Tr. at 59-63.

Plaintiff woke up with severe pain in her feet and knees on Thursday, June 22, 2000. Dr. Kra took her to the emergency room at St. Raphael's Hospital at 7:30 a.m. that morning for treatment. *Id.* at 63-64. The Emergency Room records describe plaintiff as having had diarrhea,

fever, and painful joints one week prior to admission (June 15, 2000), which subsided 2 days later. *See* Emergency Room Records, dated June 22, 2000 ("ER Records") (Exhibit "M" to Holland Aff.); Deposition Transcript of Dr. Golden, conducted August 26, 2004, at 60-61 ("Golden Tr."); Dr. Golden's Summary of Medical Records, attached as Exhibit "U" to the Holland Aff. ("Golden Summary"). Plaintiff was discharged that evening. Pridgeon Tr. at 65.

On June 23, 2000, a Friday morning, plaintiff fell while getting out of her bed to go to the shower. *Id.* at 66. Plaintiff was unable to move her legs and she was transported by an ambulance to St. Raphael's Hospital. *Id.* at 68.

*Plaintiff's Medical Records*

Plaintiff was admitted to the intensive care unit at St. Raphael's Hospital on June 23, 2000 where she remained until July 12, 2000. *See* Discharge Summaries of Drs. Hasbani and O'Brien, attached as Exhibits "S" and "T" to the Holland Aff.; Pridgeon Tr. at 70. She thereafter was moved to the intensive rehabilitation unit at St. Raphael's Hospital, where she remained until October 9, 2000. *See* Discharge Summary of Dr. O'Brien, dated October 10, 2000; Pridgeon Tr. at 72.

The medical records reflect that plaintiff had experienced diarrhea, fever and joint pain on June 15, 2000, with some records indicating the onset of diarrhea as early as June 13, 2000. *See* Roth Evaluation (diarrhea and pain in knees occurring one week ago, i.e., June 14, 2000); ER Records (diarrhea, fever and joint pain occurring one week ago, i.e., June 15, 2000); Rheumatology Evaluation, Progress Notes, dated June 22, 2000 (Exhibit "N" to Holland Aff.) (diarrhea, knee pain and fever one week ago, i.e., June 15, 2000); Neurology Consult by Dr. Hasbani, dated June 23, 2000 (Exhibit "O" to Holland Aff.) (diarrhea starting June 13, 2000 with onset of joint pain 3 days later); Resident Progress Notes, dated June 23, 2000 (Exhibit "P" to Holland Aff.) (diarrhea two weeks prior and joint pain June 16, 2000); Infectious Disease Consult, Dr. Martinello, dated

4

June 23, 2000 (Exhibit "Q" to Holland Aff.) (diarrhea on June 15, 2000 and fatigue and achy on June 21, 2000); *see also* Golden Summary (Exhibit "U" to Holland Aff.) (identifying dates of symptoms from records).

Plaintiff also testified that she experienced diarrhea, fever and severe joint pain on June 15, 2000. Pridegon Tr. at 41-43. In addition, she recalls weakness in her arms and legs on June 17, 2000 when she went to purchase a vacuum. *Id.* at 51.

Plaintiff originally tested positive for Lyme Disease at St. Raphael's Hospital. See Pridgeon Tr. at 88; Golden Tr. at 79. Lyme Disease can be a cause of GBS. Golden Tr. at 79. Plaintiff was retested with the Western Blot and that test came back negative for Lyme Disease. *Id.* at 88; see Dr. Hasbani Discharge Summary, at 3. Other potential sources of GBS identified in the medical records include CMV, HIV, *Campylobacter* infection (possibly from plaintiff's sick pets), travellers diarrhea, and West Nile virus from dead birds on plaintiff's property. *See* Martinello Consult (Exhibit "Q" to Holland Aff.); Infectious Disease Consult, Attending (Dr. Brett-Smith) (Exhibit "R" to Holland Aff.) (discussing possible West Nile connection); *see also* Golden Tr. at 68 (discussing other triggers of GBS).

The medical records (particularly the Infectious Disease consult records) do not identify any specific meal that plaintiff consumed, including the in-flight meal on American Flight 121, as a potential source of *Campylobacter* infection. *See* Golden Tr. at 21-22, 33, 48-49; Report of Dr. Jerome M. Block dated January 31, 2004, at 2 ("Block Report") at 4 (Exhibit "E" to the Holland Aff.); *see also* Exhibits "L"-"T" to Holland Aff. None of plaintiff's treating physicians ever mention the meal that plaintiff consumed aboard the American flight as a potential source of her illness. *Id.*

There are only two ways to objectively prove the presence of *Campylobacter jejuni* (*"Campylobacter"*): by serological evidence or by stool sample. *See* Golden Tr. at 33; Deposition Transcript of Dr. Jerome M. Block, conducted May 27, 2004 January 31, 2004, at 107-09 ("Block Tr.") (Exhibit "G" to the Holland Aff.); Deposition Transcript of Dr. Kevin M. Cahill, conducted September 27, 2004 at 18-19, 58-60 ("Cahill Tr.") (Exhibit "H" to Holland Aff.). Neither of these objective medical tests was done to determine whether plaintiff was infected with *Campylobacter*. Golden Tr. at 32-33; Block Report at 3; Report of Dr. Kevin M. Cahill, at 1("Cahill Report") (Exhibit "F" to the Holland Aff.). While a stool test of plaintiff was ordered, no cultures were obtained. Golden Tr. at 32-33; Cahill Tr. at 58-60. Accordingly, all three doctors agree that plaintiff's medical records do not reflect that *Campylobacter* was ever isolated in plaintiff or confirm that *Campylobacter* was the cause of plaintiff's GBS.

Plaintiff was diagnosed at St. Raphael's Hospital with GBS. *See, e.g.,* Discharge Summaries of Drs. Hasbani and O'Brien (Exhibits "S" and "T" to the Holland Aff.). The Discharge Summary prepared by Dr. O'Brien diagnoses plaintiff with GBS, then Lyme Disease and removal of spinal tumor in 1997. *See* O'Brien Discharge Summary, Exhibit "T" to Holland Aff. Dr. Hasbani, plaintiff's attending physician, also prepared a Discharge Summary which diagnoses plaintiff with GBS and summarizes her symptoms and course of treatment. Neither of the summaries mentions any infection with *Campylobacter* bacteria or plaintiff's consumption of any specific food that could have been a causative agent of her GBS. *See* Exhibits "S' and "T" to the Holland Aff.

Campylobacteriosis is a disease which must be law be reported by mail within 12 hours "of recognition or strong suspicion" to both the Connecticut Department of Public Health and local health departments (*see* Physician Reportable Diseases – 2004, Exhibit "V" to the Holland Aff.).

No such report was made by St. Raphael's Hospital or Dr. Golden to the State of Connecticut as Dr. Golden testified there was no culture which would confirm that plaintiff had the *Campylobacter*. Golden Tr. at 75.

### Dr. Golden's Report and Testimony

Dr. Golden report states that she relies on the medical records and plaintiff's deposition testimony as the basis for her opinion that plaintiff consumed undercooked[1] chicken containing *Campylobacter*, which then caused her GBS. *See* Golden Report at ¶ 4. Dr. Golden conceded at her deposition that there is no reference in Ms. Pridgeon's medical records to her illness being attributed to any food she ate on American Airlines flight 121 on June 13, 2000 (Golden Tr. at 21, 33, 48-49) and her only basis for reaching this conclusion was from her reading of Ms. Pridgeon's deposition testimony.   Golden Tr. at 34, 52.   Other than Lyme's Disease and *Campylobacter* infection, Dr. Golden's report does not address other potential triggers or sources of plaintiff's GBS. *See* Golden Report; Golden Tr. at 44-47.

Dr. Golden advises that the most common cause of gastroenteritis in the United States is *Campylobacter*, and that most people who get sick from this bacteria develop diarrhea, abdominal pain and fever within 2-5 days of ingesting the organism.  Golden Report at ¶ 6.  Her report states that epidemiologically, most cases of *Campylobacter* infection are associated with the handling of or eating of raw/uncooked poultry, and that the infectious dose (the number of organisms necessary to cause illness) is relatively small.  *Id.*  Dr. Golden obtained much of this information from the CDC website.  Golden Tr. at 65.  Dr. Golden states that approximately one in every 1,000 reported *Campylobacter* cases leads to GBS and, in the United States, up to 40% of the cases of GBS may be caused by infection with this bacteria.  Golden Report at ¶ 6.  60% of the cases are caused by other

sources, and she estimates 15%-20% being idiopathic.  Golden Tr. at 68.  Dr. Golden, citing to an

article from the New England School of Medicine, states that the median interval from the onset of

infection symptoms, such as diarrhea, to the onset of GBS is nine (9) days.  Golden Report at ¶ 7.

Dr. Golden's report concludes that the "time course of plaintiff's diarrheal illness is

consistent with the incubation period for campylobacter and her neurological symptoms," which

according to Dr. Golden occurred approximately 7 days after the diarrhea resolved.  Golden Report,

at ¶ 7.  Dr. Golden has testified that the typical timing for the onset of GBS following infection with

*Campylobacter* is 10 days to three weeks.  Golden Tr. at 59.  She also testified that many foods can

carry *Campylobacter* bacteria, including eggs.  *Id.* at 46-47.

## ARGUMENT

### I

### EXPERT TESTIMONY MAY PROPERLY BE EXCLUDED WHEN THE EXPERT'S OPINION IS UNRELIABLE AND BASED ON INADEQUATE DATA AND UNSUPPORTED FACTS

The admissibility of expert testimony is governed by the Federal Rules of Evidence.

Rule 702, entitled "Testimony By Experts," which states:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

"[W]here expert testimony's factual basis, data, principles, methods or their application

are called sufficiently into question, 'the trial judge must ensure that any and all scientific

---

[1] Dr. Golden testified that she used the terms "undercooked" and "uncooked" interchangeably in her report.  Golden Tr. at 51.

testimony or evidence is not only relevant, but reliable.'" *See Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (*citing Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)); *see also Zuchowicz v. United States*, 140 F.3d 381 (2d Cir. 1998); *Wills v. American Hess*, No. 98 Civ. 7126 (RPP), 2002 WL 140542 (S.D.N.Y. Jan. 31, 2002) ('[i]in every case, to be admissible, an expert's opinion must be based on scientifically reliable methods subject to the requirements of Rule 702…").

In performing its "gatekeeping role", the district court may consider factors such as (1) whether a theory or technique can be and has been tested; (2) whether it has been subject to peer review and publication; (3) whether the technique has a known or potential rate of error and whether there are standards controlling the technique's operation; (4) and whether a particular technique or theory has been generally accepted in the scientific community. *Amorgianos v. National Railroad*, 303 F.3d 256, 266 (2d Cir. 2002). The Court is to assess whether the "reasoning or methodology underlying the testimony is scientifically valid" and whether the "reasoning and methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-94.

The *Daubert* objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. As stated by the Supreme Court in *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997):

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion.

"Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266-67.

## II

### DR. GOLDEN'S EXPERT OPINION LACKS THE INDICIA OF RELIABILITY REQUIRED UNDER *DAUBERT* AND MUST BE EXCLUDED

For an expert's opinion to be admissible, the testimony (1) must be based upon sufficient facts or data; (2) must be the product of reliable principles and methods; and (3) the expert must have applied the principles and methodology reliably to the facts of the case. *See Amorgianos*, 3030 F.3d at 267 (expert's methodology, facts underlying the opinion and the link between the facts and the conclusion must be reliable); *Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45, 43 (D. Conn. 2004) (for expert's report to be admissible, all three components of reliability analysis must be met).

### 1. Dr. Golden's Expert Report And Opinions Are Not Based Upon Sufficient Facts Or Data

Dr. Golden bases her report on self-serving, speculative statements made by plaintiff at her deposition regarding the appearance of plaintiff's in-flight chicken meal in 2000. While *patient statements* to a treating physician may be relied on when corroborated by medical records, a physical examination and medical tests (see *In re Agent Orange Prod. Liability Litig.*, 611 F. Supp 1223, 1246 (E.D.N.Y. 1985), plaintiff's statement about the chicken served on American flight 121 *was never made to a treating physician or appeared in any medical record*. It was not made until she was deposed in December 2003, some three and a half years after the flight[2].

---

[2]     The medical records also are devoid of any statements by *Dr. Kra* who traveled with plaintiff and whom she also advised that the chicken was pink and did not taste right. Dr. Kra advised her not to continue eating the chicken.

Indeed, there is no reference whatsoever in any of the medical records to plaintiff's illness being attributable to any food she consumed, and specifically to any food consumed aboard her return flight on June 13, 2000. *See* Golden Tr. at 21, 34, 48-49; *see also* Exhibits "L"-"T" to Holland Aff. (various medical records). The allegation of tainted chicken only arose when this lawsuit was commenced, nearly two years after the flight occurred.

Moreover, while there is speculation in the medical records that plaintiff's GBS was secondary to *Campylobacter* infection, the standard medical procedure to determine the presence of *Campylobacter* is a stool culture, which was not done in this case. Golden Tr. at 31-33; Block Tr. at 76-77, 107-09; Cahill Tr. at 58-60. Antibody tests, the other scientifically accepted method for determining the presence of *Campylobacter*, also were not ordered. *Id.* Thus, as Dr. Golden readily admits, there is *no stool culture or serological evidence whatsoever* in the medical records that establishes that plaintiff even had *Campylobacter* bacteria in her system, or that anything she ate contained this bacteria and caused her illness. *Id.* at 32-33, 48-49.

There also is no evidence in plaintiff's medical records establishing that she consumed any tainted or undercooked meals. Golden Tr. at 33, 48-49. Dr. Golden admits that she relies solely on plaintiff's deposition testimony (and not the medical record as her Report states) to conclude that Ms. Prigeon's in-flight meal contained *Campylobacter* and was the source of plaintiff's GBS. *Id.* at 34. 52. Notably, Dr. Golden is the only doctor out of plaintiff's treating physicians to identify the in-flight meal at the source of plaintiff's speculative *Campylobacter* infection and ensuing GBS.

The timeline of plaintiff's onset of GBS is even more telling of the unreliability of Dr. Golden's opinion. There is evidence in plaintiff's medical records that she had diarrhea on June

13, 2000 – the date she flew.[3]  *See* Neurological Consult of Dr. Hasbani (Holland Aff, Exhibit "O").  Plaintiff also testified that she had severe joint pain on June 15, 2000 (Pridgeon Tr. at 43-44) and several medical records likewise reflect severe joint pain as early as June 14-15, 2000.  *See* Roth Evaluation (knee pain followed diarrhea on June 14, 2000); ER Records (diarrhea, fever and joint pain occurring one week ago, i.e., June 15, 2000); Rheumatology Evaluation (Exhibit "N" to Holland Aff.) (diarrhea, knee pain and fever one week ago, i.e., June 15, 2000).

Indeed, Dr. Golden admitted at her deposition that Dr. Hasbani's progress notes from June 23, 2000 imply that plaintiff had joint pain 3 days after diarrhea on June 13, 2000, which means that GBS symptoms started as early as June 16, 2000.  *See* Golden Tr. at 58, 61-62; Hasbani Consult (plaintiff's diarrhea began June 13, 2000, followed three days later by joint pain in knee and ankles).  Plaintiff also testified that she felt weakness on June 17, 2000 when she had purchased a new vacuum.  Pridgeon Tr. at 51.  Dr. Golden conceded that these complaints would be symptomatic of the onset of GBS, and also are inconsistent with the parameters for incubation for GBS.  *Id.* at 51-52; 59-62 (typical incubation period of 10 days to 3 weeks).

The medical records clearly undermine Dr. Golden's opinion. The onset of GBS neurological symptoms typically occurs 10 days to 3 weeks following evidence of *Campylobacter* infection (i.e., diarrhea).  Assuming plaintiff had diarrhea on June 15, 2000 (which would fall within the 2-5 period that it takes for *Campylobacter* to manifest itself), then plaintiff should not have experienced joint pain until June 25, 2000.[4]  However, the records

---

[3] Plaintiff testified that her diarrhea lasted approximately 10 hours and subsided by June 16, 2000.  Pridgeon Tr. at 47-48.  However, the duration of illness from *Campylobacter* infection is 2-10 days.  *See* Article from National Guideline Clearinghouse, titled "*Diagnosis and management of foodborne illnesses: a primer for physicians and other health care professionals,*" Exhibit "W" to Holland Aff.

[4] While Dr. Block estimated an incubation period of 1-2 weeks and Dr. Golden also reported a 9-day median, plaintiff's neurological symptoms still arose before June 22, 2000.

indicate that plaintiff suffered GBS symptoms well before this date. It is thus pure conjecture for Dr. Golden to assume that chicken consumed on June 13, 2000 (none of which is ever mentioned in the contemporaneous medical records) was the source of an unproven *Campylobacter* infection and ensuing GBS. No one disputes the diagnosis of plaintiff's GBS, or that GBS may be caused by infection with *Campylobacter* bacteria. However, Dr. Golden's analysis of the medical records does not support her conclusion that plaintiff's consumption of the in-flight chicken meal on June 13, 2000 is the source of any *Campylobacter* and plaintiff's subsequent development of GBS.

## 2. Dr. Golden Failed To "Rule Out" Other Causes As Is Required When Conducting A Differential Diagnosis

Dr. Golden did not properly conduct a "differential diagnosis" to reach her opinion that the source of plaintiff's GBS had to be the in-flight meal served on American Flight 121. "Differential diagnosis" refers to a "scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummiu AB*, 178 F.3d 257, 262 (4th Cir. 1999). In performing a differential diagnosis,

> a physician begins by "ruling in" all scientifically plausible causes of the plaintiff's injury. The physician then "rules out" the least plausible causes of injury until the most likely cause remains. The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiff's injury.

*Glastetter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986, 989 (8th Cir. 2001); *see McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (differential diagnosis requires "listing possible causes, then eliminating all causes but one"). Courts may exclude medical opinions about causation that are based on differential diagnosis where the expert fails to produce scientifically convincing evidence that supports "ruling in" a specific cause of the illness. For example, in *Glastetter v. Novartis Pharmaceuticals Corp.*, the Eighth Circuit excluded a medical

opinion that a drug known as Parlodel caused plaintiff's stroke. 252 F.3d at 989. Plaintiff's experts had opined that Parlodel causes arteries to constrict (vasoconstriction) and such constriction results in elevated blood pressure, which is a known risk factor for strokes. While the experts' chain of reasoning seemed sound, its major premise remained unproven because plaintiff's experts did not present "scientifically convincing evidence" that Parlodel causes vasoconstriction. *Id.* Thus, plaintiff's experts lacked a proper basis for ruling in Parlodel as a potential cause in the first place.

Similarly, here, Dr. Golden cannot show that the chicken served by American on flight 121 (which has not been proven to be infected with bacteria of any kind) should be "ruled in" as a source of plaintiff's GBS, when no bacteria associated with the chicken (i.e., *Campylobacter*) has been identified with "scientifically convincing evidence" as even being present in plaintiff's body. No serological test or stool culture identifies any bacteria as a cause of plaintiff's GBS. Accordingly, because there is no scientific basis to "rule in" infection with *Campylobacter* as the source of plaintiff's GBS, there likewise is no scientific basis to "rule in" plaintiff's in-flight meal as a potential source of *Campylobacter.*

Dr. Golden's report also fails to consider other potential causes of plaintiff's illness and does not "rule out" those other causes, including the idiopathic statistics of GBS cases,[5] meals that plaintiff may have consumed on her trip to France, particularly the few days prior to her return; plaintiff's exposure to dead animals on her property; and plaintiff's contact with the feces of her ill pets. *See* Infectious Disease Consults (Drs. Martinello and Brett-Smith), Exhibits "Q" and "R" to Holland Aff. (identifying other potential sources). The only other source that Dr. Golden ruled out was the original diagnosis of Lyme Disease, which subsequent serological

---

[5] *See Lopez v. Wyeth-Ayerst Labs*, No. C94-4054 CW, 1996 WL 784566 (N.D. Cal. Dec. 13, 1996) (plaintiff's expert testified 30-40% of GBS cases are idiopathic); Golden Tr. at 68 (estimating 15-20% of GBS cases have unknown causes).

testing indicated was negative. See Golden Report at ¶ 3. However, the Discharge Summary by Dr. O'Brien, plaintiff's treating physiatrist, diagnoses plaintiff with GBS and, secondarily, Lyme Disease. See Exhibit "T" to Holland Aff.

Dr. Golden cannot scientifically establish with a reasonable degree of medical certainty that plaintiff was even infected with *Campylobacter*. The medical records are simply inconclusive regarding the cause of plaintiff's GBS since no culture or serological tests were done to prove *Campylobacter* infection. The medical records further speculate as to other potential sources of bacterial or viral infection, including plaintiff's pets who had diarrhea a few weeks prior to the onset of her illness (animal feces is a known source for this bacteria) and the dead birds that were found on plaintiff's property. Golden Tr. at 44.

Dr. Golden admitted at her deposition that she did not investigate with plaintiff the extensive list of foods that could have been a source of Campylobacter (Golden Tr. at 46). Nor did she form an opinion regarding the ill pets that plaintiff was in contact with around the period she became ill. *Id.* at 47. In addition, Dr. Golden noted that her colleague, Dr. Brett-Smith, indicated a possible connection between the dead birds on plaintiff's property, which could have carried West Nile virus, and GBS. Although Dr. Golden testified that she did a literature search on this possible connection, she did not include it in her report. *Id.* at 45.

Notably absent from the medical records and Dr. Golden's own infectious disease consult records is any mention plaintiff had eaten allegedly undercooked chicken on her return flight from Paris. In fact, plaintiff admits at her deposition that she could have eaten chicken during her vacation in France, but could not recall. Pridegon Tr. at 28.

Dr. Golden also did not deem it relevant to investigate or discuss in her report the fact that no other passengers reported any illness from food consumed on American flight 121. No

other passengers became ill on the flight, and there are no records of any food poisoning complaints on any American flights from Paris to the United States in June 2000. *See* Norgard Aff. at ¶¶ 4-5. All of the American records show that this chicken meal was prepared and served in accordance with established safety procedures. *See* Declaration of Matrix de Vries, Sales & Export Manager for Marfo Martinari Foods, ¶¶ 4-6 (explaining preparation) (attached to Holland Aff. as Exhibit "I").

3.    **Dr. Golden Has Not Reliably Applied A Differential Diagnosis To The Facts Of This Case**

It is evident that, even based on the medical records and plaintiff's testimony, Dr. Golden cannot scientifically link plaintiff's in-flight chicken meal with any *Campylobacter* infection or the onset of plaintiff's GBS. A summary of the foregoing demonstrates how unreliable and speculative it is for Dr. Golden to make this connection:

- 60% of GBS cases are caused by sources other than *Campylobacter*, with a significant percent being idiopathic, meaning they have no known cause. *See* Golden Tr. at 68: Block Tr. at 84-85; *see also Lopez,* 1996 WL 784566 at *3 (plaintiff's expert testified 30-40% are idiopathic).

- While *Campylobacter* infection may be a potential source of GBS in 40% of the cases, the experts agree that the standard scientific method to determine whether a person is indeed infected with *Campylobacter* is (1) through a specific blood test, and (2) through a stool culture. *See* Golden Tr. 31-33; Block Tr. at 107-109; Cahill Tr. 18-19, 58-60.

- Neither a stool culture or serological test was conducted on plaintiff, and thus, there is no scientifically reliable evidence that plaintiff had *Campylobacter* in her system.

- None of the medical records (as acknowledged by Dr. Golden) reflect any statement by plaintiff or Dr. Kra that she consumed undercooked chicken at any time prior to the onset of GBS, or that she specifically consumed such undercooked chicken on her American flight from Paris to New York. Golden Tr. at 33, 48-49, 77; *see, e.g.*, Holland Aff., Exhibits "L"-"U".

- While *any suspicion* of infection with *Campylobacter* requires a reporting to the Connecticut Department of Health and local health authorities, no such reports were ever made by St. Rafaele's Hospital or Dr. Golden. Golden Tr. at 75.

16

- Plaintiff's GBS falls outside the median time period for the onset of GBS symptoms following evidence (i.e., diarrhea) of infection with *Campylobacter*. While several medical records and plaintiff indicate that she had diarrhea on June 15, 2000, plaintiff had experienced GBS symptoms of joint pain well before the typical period of 10 days to 3 weeks.

- Other potential sources of plaintiff's onset of GBS were not "ruled out" by Dr. Golden, including exposure to pets which were ill a few weeks before the onset of her illness; the exposure to dead birds on her property; and other poultry or food that plaintiff consumed on her trip to France (which would fall within the same time frame of exposure).

- There is no evidence that the chicken meal was infected with bacteria. Plaintiff never complained about her meal to a flight attendant, or American Airlines, until commencement of this law suit, approximately 23 months after the incident.

- No other passengers on American's daily flights to and from Paris ever made a complaint about the Chicken Rosemary meal served during the entire month of June 2000.

There simply is no scientific facts or data establishing any link between plaintiff's Chicken Rosemary meal and the onset of her GBS. The analytical gaps in Dr. Golden's opinion are too great and the leaps that Dr. Golden is asking the court (and a jury) to make are based wholly on conjecture and speculation and dos not pass the reliability test set forth in *Daubert*.

## CONCLUSION

Defendant respectfully requests that this Court grant the foregoing motion in its entirety and strike the expert report and opinions of Dr. Marjorie P. Golden and preclude her from testifying about those opinions.

Dated:   New York, New York
         April 8, 2005

Law Offices of Paul A. Lange

By _Alison L. McKay_
       Alison L. McKay
Bar No. CT 22260
alm@lopal.com
80 Ferry Boulevard
Stratford, Connecticut  06615-6079
(203) 375-7724
(203) 375-9397 (facsimile)

- and -

17

CONDON & FORSYTH LLP

By_____

Michael J. Holland
Bar No. CT 22894
mholland@condonlaw.com
685 Third Avenue
New York, New York  10017
(212) 894-6740
(212) 370-4482 (facsimile)
Attorneys for Defendant
AMERICAN AIRLINES, INC.

To:  Timothy L. O'Keefe, Esq.
     Kenny, O'Keefe & Usseglio, P.C.
     Attorneys for Plaintiff
     21 Oak Street
     Hartford, CT  06106
     (860) 246-2700

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK        )
                         :  ss.:
COUNTY OF NEW YORK   )

     Tara Nyack, being duly sworn, deposes and says that deponent is not a party to the action, is over 18 years of age and resides in Bronx, New York.  That on April 8, 2005 deponent served the within **Memorandum of Law in Support of Defendant's Motion to Exclude Testimony and Report of Plaintiff's Expert Dr. Marjorie Golden** via federal express upon:

> To:  Timothy L. O'Keefe, Esq.
>      Kenny, O'Keefe & Usseglio, P.C.
>      Attorneys for Plaintiff
>      21 Oak Street
>      Hartford, CT  06106
>      (860) 246-2700

the address(es) designated by said attorney(s) for that purpose by depositing a true copy thereof enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of United States Post Office within the State of New York.

                                       _Tara Nyack_
                                            Tara Nyack

Sworn to before me this
8th day of April, 2005

_Deborah Davis_
    Notary Public

DEBORAH D. DAVIS
NOTARY PUBLIC, State of New York
No .01DA4999460
Qualified in Kings County
Commission Expires July 27, 20 06