**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ********************************* | : | |
| LOLITA PRIDGEON | : | |
| Plaintiff | : | DOCKET NO. |
| | : | 3: 02 CV1032 WWE |
| VS. | : | |
| | : | |
| AMERICAN AIRLINES, ET AL. | : | May 4, 2005 |
| | : | |
| Defendants | : | |
| ********************************* | | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO EXCLUDE TESTIMONY AND REPORT OF**
**PLAINTIFF'S EXPERT DR. MARJORIE GOLDEN**

ORAL ARGUMENT REQUESTED

**PRELIMINARY STATEMENT**

Lolita Pridgeon, the plaintiff in this action, hereby submits this Memorandum of Law in support of her opposition to American Airlines' Motion to Exclude Testimony and Report of Plaintiff's Expert Dr. Marjorie Golden. Ms. Pridgeon commenced this action against American Airlines, Inc. seeking recovery for personal injuries caused by its service of an undercooked chicken dish on American Airlines flight 121 from Paris, France to New York, New York on June 13, 2000. The improperly prepared chicken caused Ms. Pridgeon to become violently ill with campylobacter jejuni ("*c. jejuni*") gastroenteritis, which then triggered the development of Guillian-Barré Syndrome ("GBS"). GBS is a serious life-threatening illness. The plaintiff has been left with serious residual deficits in her legs and hands.

**SUMMARY OF THE CASE**

Ms. Lolita Pridgeon and her companion, Dr. Siegfried Kra were passengers on American Airlines flight 121 between Paris, France and New York, New York on June 13, 2000.[1] When the flight crew offered her a choice of a beef or chicken entree, she chose the chicken meal and was given an individually wrapped dish of Chicken Rosemary. After eating several bites, she realized that the remainder of the chicken was cold, pink and undercooked. She showed the chicken to Dr. Kra, who advised her not to eat it. She discarded it and ate nothing else on board the flight. Two

---

[1] Accept where otherwise note, all facts are drawn from the depositions of Lolita Pridgeon and Dr. Majorie Golden.

days later, on June 15th, she became ill with the classic symptoms of *c. jejuni* gastroenteritis; elevated temperature, vomiting and bloody diarrhea and pains in her knees, ankles and feet. On the morning of June 23rd, Ms. Pridgeon attempted to get out of bed and could not stand. She was taken by ambulance to the Hospital of St. Raphael. By the time she was examined in the emergency department, she was unable to move her arms or legs.

Ms. Pridgeon was diagnosed with GBS, probably triggered by *c. jejuni*. Numerous tests were ordered to rule out other possible causes. Neuromuscular testing by Dr. Goldstein, a nerve condition study specialist at Yale University, confirmed that Ms. Pridgeon had the AMAN strain or pattern of GBS. *See* Medical Report of Dr. Jonathan Goldstein dated March 14, 2001, attached as Exhibit A. The AMAN strain or pattern of GBS has been closely linked in medical literature to *c. jejuni*. S. Kuwabara, et al., *Does Campylobacter jejuni infection elicit "demyelinating" Gullian-Barré syndrome?* 63(3) NEUROLOGY 529 (2004), attached as Exhibit B.

Ms. Pridgeon was transferred from the acute care section to the rehabilitative section of St. Raphael's on July 23rd and remained in the rehabilitative section until October 10th. Her home required remodeling to allow the use of a wheelchair and additional safety equipment to assist her in her daily activities. While she was able to regain her ability to walk, she still requires braces to walk and orthotics in her shoes. In addition, she continues to have numbness and some weakness in her hands. As a result her physical disability, Ms. Pridgeon has been unable to

return to work as a medical transcriptionist. Ms. Pridgeon's medical bills to date are in excess of $250,0000, and she will continue to need assistive devices for the foreseeable future.

## LEGAL ARGUMENT

### DR. GOLDEN'S EXPERT OPINION AND REPORT ARE RELIABLE AND PROPERLY ADMISSIBLE UNDER THE FEDERAL RULES OF EVIDENCE

Federal Rule of Evidence 702 provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Whether or not to admit expert testimony is within the broad discretion of the trial court. *Turrentine v. Bell Canada,* NO. 98-7942, 1999 U.S. App. LEXIS 7765, *2-3 (2d Cir. 1999), *cert. denied,* 1999 U.S. LEXIS 7855 (1999). The district court must perform a gatekeeping role and assess whether each proposed expert's testimony is relevant, reliable, and otherwise satisfies Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589-90 (1993).

The Supreme Court has set forth four non-exclusive criteria to assist in assessing reliability: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and

(4) whether there is general acceptance within the relevant scientific community.  *Daubert,* 509 U.S. at 593-94.  Depending upon the nature of the issue in the case, all four factors may not be pertinent in assessing reliability.  *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999).  Furthermore, although a court may find a flaw in the expert's reasoning, an expert should only be excluded if the flaw is large enough that the expert lacks good grounds for her conclusion.  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

The federal rules have a liberal admissibility standard and courts recognize that typically a vigorous cross-examination, the presentation of contrary evidence, and instruction on the burden of proof are the appropriate means for attacking expert testimony.  *Daubert*, 509 U.S. at 596.

    1.    <u>Dr. Golden's expert report and opinions are based upon sufficient facts and data.</u>

Dr. Golden specializes in infectious diseases and was the infectious disease consultant for Ms. Pridgeon while she was in the intensive care unit at the Hospital of St. Raphael.  *See* Medical Report of Dr. Marjorie Golden dated May 19, 2004, attached as Exhibit C.  Dr. Golden assessed whether the plaintiff had GBS and the possible infectious triggers for her GBS.  (Deposition of Dr. Marjorie Golden at 11, 30, attached as Exhibit D).  In Dr. Golden's expert opinion, Ms. Pridgeon suffers from GBS, induced by *c. jejuni* which was "acquired through the ingestion of undercooked chicken on her flight home from France."  *See* Golden Report at 2.

An expert opinion which is based upon care and treatment of a plaintiff, review of the plaintiff's medical history, the expert's training and experience, the use of the differential diagnosis analysis, and references various scientific and medical studies or treatises is sufficiently reliable to be admitted at trial. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). In developing her expert opinion, Dr. Golden relied upon her treatment of Ms. Pridgeon while she was in the hospital, her review of Ms. Pridgeon's medical records, a transcript of Ms. Pridgeon's deposition testimony, her training, experience and specialty in infectious diseases, information from the Center for Disease Control website, and numerous medical articles. (Golden Dep. at 17-19, 29).

Ms. Pridgeon was diagnosed with GBS[2] triggered by *c. jejuni* based upon the symptoms for which she presented and was treated, including diarrhea, high fever, arthritis, and weakness. (Golden Dep. at 33, 59). GBS is characterized by "rapidly evolving symmetrical limb weakness, loss of tendon reflexes, absent or mild sensory signs, and variable autonomic dysfunctions." Angelika F. Hahn, *Guillain-Barré syndrome*, 352 THE LANCET 635 (1998), attached as Exhibit E. *C. jejuni* is a bacteria often found in food which leads to foodborne illnesses. Symptoms of *c. jejuni* infection include diarrhea, fever, and abdominal cramping. Sean F. Altekruse, et al., *Campylobacter jejuni- An Emerging Foodborne Pathogen*, 5:1 EMERGING INFECTIOUS DISEASES

---

[2] The diagnosis of GBS is not in dispute, only the cause. Defendant's Memorandum of Law in Support of Defendant's Motion to Exclude Testimony and Report of Plaintiff's Expert Dr. Marjorie Golden dated April 8, 2005 at 13.

(1999), attached as Exhibit F.  At least 30% to 40% of GBS patients suffer from a preceding *c. jejuni* infection.  *See* Ban Mishu Allos, *Association between Campylobacter Infection and Guillain-Barré Syndrome*, 176 (Supp 2) THE JOURNAL OF INFECTIOUS DISEASES S125, S127 (1997), attached as Exhibit G.  *C. jejuni* infections are the leading cause of bacterial gastroenteritis in the United States.  Altekruse, supra, at 1-2; *see also* Hahn, *supra*, at 635 (*c. jejuni* is the most frequent antecedent pathogen to GBS).  In addition, when GBS is triggered by *c. jejuni* more severe neurologic damages may result than when a patient's GBS is caused by another trigger.  Allos, *supra*, at S126.  The plaintiff displayed symptoms for both a *c. jejuni* infection and GBS.

      Dr. Golden reached her opinion that Ms. Pridgeon acquired *c. jejuni* from eating undercooked[3] chicken which she was served while aboard American Airlines flight 121 based upon her review of Ms. Pridgeon's deposition testimony and the strong connection between poultry and *c. jejuni*.  (Golden Dep. at 34, 43, 44).  In fact, between 88% and 98% of all retail chicken meat contains *c. jejuni* organisms.  (Golden Dep. at 65); *see also* Altekruse, *supra*, at 6 (98% of retail chicken meat is contaminated with *c. jejuni*).  The consumption of undercooked poultry is the leading risk factor for *c. jejuni*.  Altekruse, *supra*, at 7.  According to the Center for Disease Control's website, *c. jejuni* can only be eliminated by cooking the chicken to an internal

---

[3] Undercooked in this context refers to chicken which is not cooked to an internal temperature of 170 degrees Fahrenheit.  (Golden Dep. at 49).

temperature of 170 degrees Fahrenheit.  Allos, *supra*, at 49.  Accordingly, there is ample data to support Dr. Golden's opinion.

The defendant asserts that because Dr. Golden's opinion is not based upon the determination of *c. jejuni* via a stool culture or serological evidence, her opinion is unreliable.  However, stool cultures or serological tests are not the only methods for forming a reliable opinion that a patient's GBS was caused by *c. jejuni*.  In fact, obtaining culture confirmation of an association with GBS and *c. jejuni* can be difficult because patients often pass *c. jejuni* from their system by the time their GBS symptoms appear.  *See* Allos, *supra,* at S126.  As a result, while a positive culture is helpful in confirming a diagnosis, a negative stool culture certainly does not rule out a diagnosis of *c. jejuni* infection.  (Golden Dep. at 96).

Another method for diagnosing and determining the cause of an illness is the differential diagnosis method.  Differential diagnosis is a reliable method, widely accepted by the medical community.  *See Perkins v. Origin Medsystems, Inc.* 299 F.  Supp. 2d 45, 57 (D. Conn. 2004); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758 (3d Cir. 1994).  As discussed in detail in Subsection 2 below, Dr. Golden utilized the differential diagnosis method in diagnosing and treating the plaintiff and developing her expert opinion as to the cause of the plaintiff's GBS.  Accordingly, the lack of a stool culture or serological test does not render Dr. Golden's opinion unreliable.

The defendant further attacks Dr. Golden's opinion on the basis that the onset of the plaintiff's GBS symptoms were less than the median time for the onset of GBS symptoms. While Dr. Golden acknowledged that the timing between the plaintiff's infection with *c. jejuni* from consuming the chicken on American Airlines flight 121 and the onset of her GBS symptoms did not fit the typical timing for the onset of symptoms, she emphasized that the median time frame is just that; a median. (Golden Dep. at 59). There will always be cases which fall outside the median time frame. (Golden Dep. at 73). Simply because the onset of symptoms does not fall within the median time frame does not render the opinion or diagnosis invalid or unreliable. In any event, criticisms of Dr. Golden's opinion go to the weight, not the admissibility of Dr. Golden's testimony and is better explored on cross-examination. *See McCullock*, 61 F.3d at 1044.

Dr. Golden relied upon a substantial amount of facts and data when developing her expert opinion and report, including the treatment of the plaintiff, the plaintiff's medical records, the plaintiff's deposition testimony, and her own research. Accordingly, Dr. Golden's expert opinion and report are based upon sufficient facts and data to admit them pursuant to Federal Rule of Evidence 702.

### 2. Dr. Golden properly conducted a differential diagnosis.

In addition to the facts and data set forth above, Dr. Golden further developed her expert opinion and report using the "differential diagnosis" method.  Differential diagnosis is the scientific technique utilized to identify the cause of a medical problem by "listing possible causes, then eliminating all causes but one."  *McCullock*, 61 F.3d at 1044.  Differential diagnosis is a standard method for identifying the cause of a medical problem.  *Perkins,* 299 F. Supp. 2d at 57; *Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313, 320 (D. Conn. 2002).  Differential diagnosis is a reliable method for proving causation.  *Perkins*, 299 F. Supp. 2d at 57; *see also Plourde v. Gladstone*, 190 F. Supp. 2d 708, 722 (D. Vt. 2002), *aff'd* 2003 U.S. App. LEXIS 13207 (2d Cir. 2003)(permitting an expert to testify whose opinion was based upon a differential diagnosis); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 758 (differential diagnosis is "a technique that has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results").  The differential diagnosis method clearly satisfies the *Daubert* factors for reliability, including that it is a technique that has been tested, subject to peer review, and is accepted by the medical community.

Furthermore, when applying the differential diagnosis method, an expert is not required to eliminate all potential causes of a medical problem before developing an opinion.  *Green v. McAllister Bros., Inc.*, 02 Civ. 7588, 2005 U.S. Dist. LEXIS 4816, *40 (S.D.N.Y. March 25,

2005). Rather, "[d]isputes as to the strength of [an expert's] credentials, faults in [the] use of differential [diagnosis] as a methodology, or lack of textual authority for [an] opinion, go to the weight, not the admissibility of [an expert's] testimony." *McCullock*, 61 F.3d at 1044; *see also Green*, 2005 U.S. Dist. LEXIS at *40 (criticism of an expert's failure to rule out all possible causes goes to the weight, not admissibility of the evidence).

As is required in a reliable differential diagnosis, Dr. Golden considered numerous possible causes for the plaintiff's GBS and eliminated all but *c. jejuni*. Dr. Golden considered the possibility that the plaintiff's GBS was triggered by Lyme Disease. The plaintiff was tested for Lyme Disease and the test was negative[4]. Golden Report at 1-2. Dr. Golden also considered the fact that the plaintiff had been traveling outside of the United States. She discounted the notion that the plaintiff had caught a "traveler's infection" because infections caught while traveling which trigger GBS typically commence with upper respiratory infections, followed by gastroenteritis, and the plaintiff presented no upper respiratory problems. (Golden Dep. at 22-23). Rheumatologic causes were also considered. *See* June 25, 2000 notes by Rheumatologist consult, attached as Exhibit H. However, a rheumatological origin was discounted because the plaintiff had no prior history of arthritis, rash, anemia, leucopenia, Raynaud's, or kidney disease. *Id.* HIV was further considered. However, this too was discounted because the plaintiff presented no HIV

---

[4] While the plaintiff's initial Lyme serology came back a low positive, the more reliable Western Blot test came back negative. (Golden Dep. at 21, 95); Golden Report at 1-2.

risk factors. *See* June 24, 2000 notes from attending physician, attached as Exhibit I. Dr. Golden considered all of these possible causes of GBS and determined that *c. jejuni* was the most likely cause of the plaintiff's GBS.

Dr. Golden further based her analysis upon the plaintiff's statement that she consumed undercooked chicken shortly before displaying symptoms of *c. jejuni* and the strong connection between poultry and *c. jejuni*. As discussed above, Dr. Golden extensively researched the connection between undercooked chicken and *c. jejuni*. In addition, she has no reason to doubt the plaintiff's statement that she consumed undercooked chicken.[5] Dr. Golden was also aware of a note by her colleague, Dr. Brett-Smith, indicating a possible connection between dead birds found on the plaintiff's property and West Nile virus and GBS. Dr. Golden conducted a literature search and found no connection and, thus, discounted this as a cause too. (Golden Dep. at 45).

The defendant asserts that the chicken served to the plaintiff while on board American Airlines flight 121 should not be "ruled in" as a source of the plaintiff's GBS because there is no serological test or stool culture identifying the bacteria that caused the plaintiff's GBS. As discussed above, serological tests and stool cultures are not the only methods for identifying the

---

[5] The defendant criticizes Dr. Golden's reliance upon the plaintiff's statement that she consumed undercooked chicken shortly before developing her *c. jejuni* infection and GBS since the plaintiff never mentioned this consumption while she was in the hospital. However, Dr. Golden finds this to be insignificant. "When I saw her, she was literally writing in pain. It wouldn't surprise me that she omitted really what she probably thought was an irrelevant detail. . . . In my experience, people omit details from their medical history unintentionally all of the time." (Golden Dep. at 24-25).

cause of a patient's GBS. Differential diagnosis, which is widely accepted and routinely used by the medical community, is another reliable method for establishing a diagnosis and determining the cause of an illness. *See McCullock*, 61 F.3d at 1044. Since *c. jejuni* is the leading cause of GBS and the consumption of undercooked chicken is the leading cause of *c. jejuni* infection, considering *c. jejuni* as the cause of a patient's GBS and the consumption of uncooked chicken as the cause of a patient's *c. jejuni* infection as part of a differential diagnosis is natural. *See* Hahn, *supra*, at 635; Altekruse, *supra*, at 7. In fact, given the established connections between poultry and *c. jejuni* and *c. jejuni* and GBS, a differential diagnosis for the cause of GBS which failed to consider the consumption of undercooked chicken would arguably be severely flawed.

       The defendant further attacks Dr. Golden's report citing the fact that no other passengers reported an illness from food consumed on American Airlines flight 121. However, sporadic cases of *c. jejuni* infection are not unusual. (Golden Dep. at 74). In fact, most cases of *c. jejuni* are sporadic because the level of susceptibility to *c. jejuni* varies greatly from person to person. Altekruse, *supra*, at 4; (Golden Dep. at 74). Several people could eat the same contaminated food and not all become sick. (Golden Dep. at 74). In addition, the gastroenteritis caused by *c. jejuni* can be self limiting and thus, people treat themselves and do not report an illness. *Id.*

       Finally, disputes as to faults in the application of the differential diagnosis methodology go to the weight, not the admissibility, of an expert's testimony. *McCullock*, 61 F.3d at 1044.

Typically a vigorous cross-examination, the presentation of contrary evidence, and instruction on the burden of proof are the appropriate means for attacking expert testimony, not exclusion of the expert testimony. *Daubert*, 509 U.S. at 596. Dr. Golden clearly developed her opinion on the basis of substantial data and properly applied the method of differential diagnosis. The defendant's arguments to the contrary are more proper in the context of cross-examination than the exclusion of Dr. Golden's testimony and report.

## **CONCLUSION**

For the foregoing reasons, the plaintiff, Lolita Pridgeon, respectfully requests that the defendant, America Airlines', Motion to Strike Expert Report and Opinion of Dr. Marjorie Golden be denied and the plaintiff's Opposition thereto be sustained.

Dated:  Hartford, Connecticut
        May 4, 2005

                                        PLAINTIFF,
                                        LOLITA PRIDGEON


                                        BY:_____
                                            Timothy L. O'Keefe, Esq.
                                            Kenny, O'Keefe & Usseglio, P.C.
                                            21 Oak Street
                                            Hartford, CT 06106
                                            Telephone No.: (860) 246-2700
                                            Federal Bar No. ct15005
                                            tokeefe@kou-law.com

-15-

**CERTIFICATE OF SERVICE**

    This is to certify that the foregoing Opposition was mailed, postage prepaid, on May 4, 2005 to the following:

Michael J. Holland, Esq.
Condon & Forsyth, LLP
685 Third Avenue
New York, NY 10017
(212) 894-6740

Alison L. McKay, Esq.
Law Offices of Paul Lange
80 Ferry Boulevard
Stratford, CT 06615-6079
(203) 375-7724

                                                                      _____
                                                                       Timothy L. O'Keefe