UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LOLITA PRIDGEON,

Plaintiff,

VS.

AMERICAN AIRLINES,

Defendant.

Docket No.

3:02 CV 1032 (WWE)

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION TO PRECLUDE DEFENDANT
AMERICAN AIRLINES, INC.'S EXPERT WITNESSES**

US DISTRICT COURT
BRIDGEPORT CT

2005 MAY -6  P 4: 26

FILED

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT FACTS ............................................................................................................ 1

*Dr. Cahill's Qualifications* ............................................................................................... 1

*Dr. Cahill's Report and Opinion* ...................................................................................... 2

*Dr. Block's Report and Opinion* ....................................................................................... 3

ARGUMENT ........................................................................................................................ 5

I.      THE COURT HAS BROAD DISCRETION IN DETERMINING THE
        ADMISSIBILITY OF EXPERT TESTIMONY ..................................................... 5

II.     DR. CAHILL IS AMPLY QUALIFIED TO RENDER AN
        EXPERT OPINION RELATING TO THE CAUSE OF
        PLAINTIFF'S ILLNESS ......................................................................................... 6

III.    THE OPINIONS OF DRS. CAHILL AND BLOCK ARE SCIENTIFICALLY
        RELIABLE AS THEY ARE BASED ON METHODS REASONABLY
        RELIED ON BY EXPERTS IN THEIR FIELDS .................................................... 9

CONCLUSION ................................................................................................................... 15

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Amorgianos v. National Railroad*, 303 F.3d 256 (2d Cir. 2002) ...........................................5, 9, 10

*Becker v. National Health Prod.*, 896 F. Supp. 100 (N.D.N.Y. 1995) .........................................10

*Canino v. HRP, Inc.*, 105 F. Supp. 2d 21 (N.D.N.Y. 2000) ..................................6, 7, 8, 10

*Carroll v. Morgan*, 17 F.3d 787 (5th Cir. 1994) ............................................................9

*Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579 (1993).....................................*passim*

*Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361 (S.D.N.Y. 2003) ............................9, 14

*Green v. McCallister Bros.*, No. 02 Civ. 7588 (FM), 2005 WL 742624
(S.D.N.Y. Mar. 25, 2005) .............................................................................................6

*Hopkins v. Dow Chem. Corp.*, 33 F.3d 1116 (9th Cir. 1994) ...................................9, 10

*In re Paoli RR Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1995) ..............................................6

*Marmol v. Biro Mfg. Co.*, No 93 CV 2659 (SJ), 1997 WL 88854
(E.D.N.Y. Feb. 24, 1997) ...........................................................................................12

*Maurizio v. Goldsmith*, No. 96 Civ. 4332 (RPP), 2002 WL 535146
(S.D.N.Y. Apr. 9, 2002) ..............................................................................................15

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ..................................*passim*

*Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45 (D. Conn. 2004)................................9, 10

*Ploude v. Gladstone*, 190 F. Supp. 2d 708 (D. Vt. 2002)..................................................5

*Turrentine v. Bell Canada*, No. 98-7942, 1999 WL 220146 (2d Cir. Apr. 13, 1999) .................15

*Zuchowicz v. United States*, 140 F.3d 381 (2d Cir. 1998) ................................................5

*Zwillinger v. Garfield Slope Housing Corp.*, No. 94 -4009,
1998 WL 623589 (E.D.N.Y. Aug. 17, 1998)..............................................................6, 7

## TABLE OF AUTHORITIES (cont'd)

**PAGE**

**FEDERAL RULES**

Fed. R. Evid. 702 ...........................................................................................................................5

Fed. R. Evid. 702, Adv. Comm. Notes (2000).............................................................................5

Fed. R. Evid. 703 ...........................................................................................................................5

## PRELIMINARY STATEMENT

Defendant American Airlines, Inc., by and through its attorneys, the Law Offices of Paul A. Lange and Condon & Forsyth, LLP, hereby submits this Memorandum of Law in opposition to plaintiff's motion to preclude defendant's expert witnesses, Kevin Cahill, M.D. and Jerome Block, M.D., from testifying and offering their expert opinions relating to the cause of plaintiff's Guillain-Barre Syndrome (GBS).

## RELEVANT FACTS

### *Dr. Cahill's Qualifications*

Dr. Cahill graduated from the Cornell University Medical College in 1961, and is board-certified in Microbiology and Public Health, with a subdivision of board certification in Tropical Medicine and Infectious Diseases. *See* Transcript of Deposition of Dr. Kevin M. Cahill, conducted September 27, 2004, at 25 ("Cahill Tr.") (copy attached as Exhibit "A" to the Affidavit of Michael J. Holland, sworn to May 5, 2005 ("Holland Aff.")); *see also* Copy of Dr. Cahill's *Curriculum Vitae*, attached as Exhibit "B" to the Holland Aff.  He also holds Diplomates in Tropical Medicine and Hygiene from The Royal College of Surgeons in England and the London School of Hygiene and Tropical Medicine. *Id.*  Dr. Cahill's discipline focuses mainly on infectious and parasitic diseases. Cahill Tr. at 7.

He has been practicing medicine for over 40 years and in addition to private practice, he currently holds several noteworthy positions, including President and Director for International Health and Cooperation, New York City; Distinguished Professor & Director of the International Humanitarian Affairs Program at Fordham University; Director of the Tropical Disease Center at Lenox Hill Hospital; and Clinical Professor at New York University School of Medicine, Seton Hall University Graduate School of Medicine, and The Royal College of Surgeons in Ireland. *Id.*

1

Dr. Cahill also serves as a consultant and advisor to various organizations, including the United Nations Health Service, St. Vincent's Hospital, Catholic Relief Services, and The New York City Council. *Id.* Previous positions he has held include Senior Member of the New York City Board of Health, Chairman of the Health Planning Commission of New York State, Clinical Professor of Public Health and Preventive Medicine at the University of New Jersey, College of Medicine, and Special Assistant to the Governor for Health Affairs. *Id.*

Dr. Cahill has received numerous honorary degrees and diplomatic as well as scientific awards. He also is the author or editor of numerous medical books and over 200 research articles, including several on intestinal and parasitic infections, including articles providing medical advice to travelers. *See, e.g.,* Exhibit B at Nos. 3, 194, 214 (Medical Advice for the Traveler), 94-96 (Helminthic Infections of the Intestine, appearing in Infectious Diseases textbook), 97 (Intestinal Parasites), 152 (Protozoan Infections), and 159 (Intestinal Infections and the Traveler).

### Dr. Cahill's Expert Report and Opinion

Dr. Cahill does not dispute plaintiff's ultimate diagnosis of GBS. Cahill Tr. at 33. Rather, he disputes whether there is sufficient reliable medical evidence to support the opinion of plaintiff's expert, Dr. Marjorie Golden, that plaintiff was infected with *Campylobacter jejuni*, which then caused her GBS. Cahill Tr. at 46. Dr. Cahill's Report states that "there is no evidence of any cultures that prove Campylobacter were detected in this patient." *See* Report of Dr. Cahill, attached as Exhibit "C" to the Holland Aff. While Dr. Cahill acknowledges that a July 1, 2000 medical note by an Infectious Disease doctor states that "the current g-b syndrome was probably secondary to Campylobacter infection," he does not find any evidence in plaintiff's medical records to support this conclusion. *Id.*

Dr. Cahill agrees that *Campylobacter* is a common cause of gastrointestinal illness; however, he notes that there are many other causes of such illness and that the standard medical

procedure for proving infection with *Campylobacter* is a stool culture or serological testing. Cahill Tr. at 18-19, 22-23, 36, 58-60. It is undisputed that neither of these two standard medical procedures was used in this case. Dr. Cahill further testified that Dr. Golden's report is highly speculative regarding the cause of plaintiff's illness since "there [was] something seriously lacking here in the whole medical management of the patient, wherein the testing did not confirm the cause." Cahill Tr. at 46. He reviewed the plaintiff's extensive medical records and found nothing therein to support Dr. Golden's opinion that plaintiff's GBS was caused by *Campylobacter* infection, or could even be attributed to chicken consumed on American Airlines Flight 121. Cahill Tr. at 41, 58-59, 62-63 ("the only way to make a diagnosis [of infection from a meal] is either microbiological or serological evidence to support it"). Dr. Cahill concluded that there simply is insufficient documentation to determine with a reasonable degree of medical certainty the cause of plaintiff's GBS. Cahill Tr. at 58-59.

To form his opinion, Dr. Cahill reviewed plaintiff's medical records, relied on his over 40 years of clinical experience, his training, education, and knowledge as a practitioner and teacher, his research and knowledge of medical literature, including an article on *Campylobacter* infection, and also his knowledge from attendance at lectures. Cahill Tr. at 10-12, 13, 17, 24, 62.

### Dr. Block's Expert Report and Opinion

Dr. Block is a board-certified neurologist with over 40 years of practice and experience. He presently is Director of the Division of Neurology at Lenox Hill Hospital. *See* Deposition Transcript of Dr. Jerome Block, conducted May 27, 2004 at 8-11 ("Block Tr.") (copy attached as Exhibit "D" to the Holland Aff.) In his report, Dr. Block states that while it is apparent that plaintiff suffered from GBS with severe consequences due to axonal forms of this illness, the medical records "do not confirm that campylobacter was ever isolated or proved to be the cause of this problem. While campylobacter is known to cause this type of problem, it is speculative to declare

3

this organism was the cause when there is no laboratory proof of same." *See* Report of Jerome M. Block, M.D. at 3 (copy attached as Exhibit "E" to the Holland Aff.).

He further opines that "it is certainly highly speculative to believe that an infection with this organism was contracted by eating chicken rosemary aboard the specified American Airlines flight from Paris." *Id.* In addition, "[a]ccording to statements made by American and Gate Gourmet, there have been no further complaints registered at these sources consequent to reports of illness contracted aboard that American Airlines flight or any other American Airlines flights on which similar was served throughout the month of June of 2000." *Id.* at 3-4. While Dr. Block appreciated plaintiff's statement at her deposition that her portion of chicken seemed undercooked, Dr. Block would not accept this statement as proof that the chicken was indeed contaminated and concluded that "[i]t is highly speculative that this meal is the cause of her problems." *Id.* at 4.

In reaching his expert opinion, Dr. Block reviewed plaintiff's extensive medical records, and relied on his over 40 years of clinical experience, knowledge, and training as a practicing and teaching neurologist. Block Tr. at 86, 93-94. Dr. Block further testified at his deposition that in conducting a differential diagnosis of plaintiff's case, he concluded that the cause of plaintiff's GBS remains unknown and that it simply cannot be proven that plaintiff was infected with *Campylobacter* since no stool cultures or serological tests were taken. Block Tr. at 76-78, 81-84, 99-100, 107-09. Even if *Campylobacter* could have been isolated in plaintiff, Dr. Block stated that it could not be proven that the source of the *Campylobacter* was the chicken meal that plaintiff consumed on American Airlines Flight 121. Block Tr. at 76-78, 98, 113-15. Many other possible causes could have been the source of the bacteria, including other food consumed by plaintiff. Block Tr. at 83-84, 107-08, 113-15.

**ARGUMENT**

**I**

**THE COURT HAS BROAD DISCRETION IN DETERMINING
THE ADMISSIBILITY OF EXPERT OPINION**

A district court has considerable discretion to admit or exclude expert testimony under

Federal Rules of Evidence 702 and 703. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042

(2d Cir. 1995) (admissibility of expert testimony is left to the broad discretion of trial judge).

Under *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993), expert testimony is admissible

only if the proponent demonstrates that (1) the expert is qualified to testify competently on the

matter he or she intends to address; (2) the testimony assists the trier of fact to understand the

evidence and thus is relevant to the suit; and (3) the methodology used by the expert to reach his

or her conclusions is sufficiently reliable. *See Ploude v. Gladstone*, 190 F. Supp. 2d 708, 718

(D. Vt. 2002).

Rejection of expert testimony, however, "is the exception, rather than the rule." Fed. R.

Evid. 702, Adv. Comm. Notes (2000). Expert testimony should be permitted "if the scientific,

technical or other specialized knowledge will assist the trier of fact to understand the evidence or

to determine a fact in issue." *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998)

(*quoting* Fed. R. Evid. 702). The inquiry envisioned by Rule 702 is a flexible one, and should

accord with the liberal admissibility standards of the federal rules. *See Daubert*, 509 U.S. at

594; *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266-67 (2d Cir. 2002).

While the trial court has an obligation to screen expert testimony, it must not usurp the role of

the trier of fact when performing this "gate keeping" function. *Daubert* explicitly instructs that

"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence." *Daubert*, 509 U.S. at 596.

5

## II

## DR. CAHILL IS AMPLY QUALIFIED TO RENDER AN EXPERT OPINION RELATING TO THE CAUSE OF PLAINTIFF'S ILLNESS

Rule 702 permits opinion testimony from "a witness qualified as an expert by knowledge, skill, experience, training or education." The Second Circuit, in particular, has "construed expert qualification requirements liberally." *Zwillinger v. Garfield Slope Housing Corp.*, No. 94-4009, 1998 WL 623589, at *9 (E.D.N.Y. Aug. 17, 1998). Indeed, "[l]iberality and flexibility in evaluating qualifications of an expert should be the rule and the expert should not be required to satisfy an overly narrow test of his own qualifications." *Green v. McCallister Bros.*, No. 02 Civ. 7588 (FM), 2005 WL 742624, at *17 (S.D.N.Y. Mar. 25, 2005) (citation omitted).

Courts therefore do not bar an expert from testifying simply because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit. *Id.*; *see McCullock*, 61 F.3d at 1043 (alleged shortcomings in expert's credentials properly explored through cross-examination); *In re Paoli RR Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1995) (exclusion is improper simply because expert lacks the most specifically appropriate degree or training). In fact, the Second Circuit holds that disagreements over an expert's qualifications regarding a lack of specific training or area of expertise go to the weight, *not the admissibility*, of the expert's testimony and are appropriately addressed through cross-examination. *McCullock*, 61 F.3d at 1044.

For example, in *Canino v. HRP, Inc.*, 105 F. Supp. 2d 21 (N.D.N.Y. 2000), defendants challenged the qualifications of plaintiff's infectious disease expert based on his lack of experience diagnosing or treating patients with the particular virus at issue, known as HBSV. The court noted, however, that HBSV is an infectious disease and consequently "fell broadly within the realm of [the expert's] field of expertise." 105 F. Supp. 2d at 28. The expert did not opine on a field other than that in which he was trained. Moreover, the expert's lack of knowledge as to certain properties of

6

HBSV, such as how long it can survive outside a monkey and the smallest amount of fluid needed to infect a human, did not render him unqualified. *Id.* The court recognized that such "'quibble' with [a] proposed expert's training or knowledge on specific points may properly be explored on cross-examination at trial and thus goes to the weight and credibility of the expert's testimony, not admissibility." *Id.* (*citing McCullock*, 61 F.3d at 1043-44).

Plaintiff challenges the qualifications of Dr. Cahill to give an expert opinion and contends that although Dr. Cahill is a medical doctor with expertise in tropical diseases, he has minimal experience with *Campylobacter jejuni* infection or GBS. *See* Plaintiff's Memorandum of Law in Support of Motion to Preclude ("Plaintiff's Memo."), at 6-7. Plaintiff emphasizes Dr. Cahill's lack of involvement with GBS cases, and that he has never researched or written on *Campylobacter* infection or GBS. *Id.*

As reflected by his *curriculum vitae*, however, Dr. Cahill is highly qualified in the area of infectious diseases and while he may have specialized knowledge of tropical disease infections, that does not mean that he is not qualified to render an opinion on infection with *Campylobacter jejuni*, which clearly "falls within the realm" of his overall infectious disease expertise. *Canino*, 105 F. Supp. 2d at 28; *see McCullock*, 61 F.3d at 1043 (engineer qualified as expert despite lack of knowledge of constituents of glue fumes and lack of formal academic training in fume dispersal and air quality); *Zwillinger*, 1998 WL 623589 at *9 (admitting expert testimony although expert was not board-certified in toxicology and had limited knowledge of the special effects of 4-PC on humans).

Dr. Cahill is board-certified in Microbiology and Public Health and the subdivision of Tropical Medicine and Infectious Diseases. Cahill Tr. at 25. His main discipline is infectious and parasitic disease. *Id.* at 7. During his deposition, Dr. Cahill had no difficulty answering plaintiff's questions regarding *Campylobacter* infection. For example, Dr. Cahill opined that generally there is a three to five day incubation period between Campylobacter ingestion and onset of diarrhea or

gastrointestinal symptoms. Cahill Tr. at 14, 52. In addition, he testified that the onset of arthralgia is a "late complication" from *Campylobacter* infection, often appearing weeks after ingestion. *Id.* at 47-49. He also testified that the standard medical tests to determine *Campylobacter* infection are a stool culture and/or serological testing for antibodies. *Id.* at 20-21. In addition, he testified that had plaintiff become ill two days after the flight (as opposed to some medical records indicating illness on the date of her return flight), it may be more likely that she had ingested *Campylobacter* "but it's still...early for her to develop clinical symptoms." *Id.* at 41. In any event, he could not state whether any such infection "wasn't due to ... French cheese or milk or anything else, I just don't know and I can't tell you it's *Campylobacter* [because] no one ever did any studies to document that." *Id.*

Plaintiff's argument that Dr. Cahill is not qualified because he lacks clinical experience with GBS cases and declined to opine in detail on causes of GBS is a red herring. Dr. Cahill, in fact, is familiar with GBS and the linkage between GBS and *Campylobacter* infection, and also between GBS and vaccinations. Cahill Tr. at 23-24, 61-62. His reluctance to opine on all potential causes and variants of GBS is to be expected as GBS is a neurological disease, and he readily admits that he is not a neurologist. Cahill Tr. at 23, 53-54; *see Canino*, 105 F. Supp.2d at 28 (expert properly did not opine outside his area of expertise). In any event, any dispute regarding Dr. Cahill's qualifications is for cross-examination and impacts the weight afforded his testimony, not its admissibility. *See McCullock*, 61 F.3d at 1043-44 ("[d]isputes as the strength of his credentials...go to the weight"). Moreover, any issues as to the qualifications and opinions of any of the experts in this case, whether they be plaintiff's or defendant's experts, can be resolved at a *Daubert* hearing.

**III**

## THE OPINIONS OF DRS. CAHILL AND BLOCK ARE SCIENTIFICALLY RELIABLE AS THEY ARE BASED ON METHODS REASONABLY RELIED ON BY EXPERTS IN THEIR FIELDS

For an expert's opinion to be admissible, the testimony (1) must be based upon sufficient facts or data; (2) must be the product of reliable principles and methods; and (3) the expert must have applied the principles and methodology reliably to the facts of the case. *See Amorgianos,* 303 F.3d at 267; *Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45, 43 (D. Conn. 2004) (for expert's report to be admissible, all three components of reliability analysis must be met).

Plaintiff contends that Dr. Cahill's testimony is unreliable since it is based only on his experience, his review of plaintiff's medical records and the report prepared by Dr. Golden, and his consult of a journal article regarding infection with *Campylobacter jejuni.* Plaintiff's Memo. at 9-10. Plaintiff states that Dr. Cahill lacks knowledge regarding patterns and specific causes of GBS, that he failed to conduct independent research, provide a plausible theory for plaintiff's GBS, failed to develop and apply a reliable principle or methodology, provide any publications to support his opinion, and his opinion has not been tested or subject to any peer review. *Id.*

As a threshold matter, the case law is clear that an expert (particularly a physician) may base his opinion on experience alone, and failure to conduct testing or use supporting data is not fatal to admissibility. *See McCullock,* 61 F.3d at 1043-44 (*citing with approval Carroll v. Morgan,* 17 F.3d 787, 790 (5th Cir. 1994) (holding that a doctor was qualified to give an expert opinion on a standard of medical care based on thirty years of experience as a practicing, board-certified cardiologist and his review of the medical records); *Hopkins v. Dow Chem. Corp.*, 33 F.3d 1116, 1125 (9th Cir. 1994) (holding expert testimony admissible under Daubert where based on, *inter alia,* the doctor's clinical experience and review of the medical records)); *see also Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 368 (S.D.N.Y. 2003) ("expert may

base his opinion on experience alone"); *Becker v. National Health Prod.*, 896 F. Supp. 100, 103 (N.D.N.Y. 1995) (experts' testimony relying on clinical experience, research and review of plaintiff's medical history and hospital records was based on reliable scientific knowledge).

In fact, the alleged checklist set forth in *Daubert* for testing reliability of an expert's opinion (i.e., testing, peer review, and support in literature and studies) is not a definitive one and many courts question its relevance at all where the expert testimony is based upon experience or training, rather than methodology or technique. *Canino*, 105 F. Supp. 2d at 29; *see also Hopkins*, 33 F.3d at 1124 (testimony may be based on scientific knowledge and not necessarily "generally accepted" methodologies).    The Second Circuit agrees and expressly held that whether the expert's theories are subject to peer review and publication or general acceptance simply goes to the weight of their testimony. *McCullock*, 61 F.3d at 1042.

Arguments that the expert failed to rely on textual authority to support his or her opinion also affects the weight of the expert's testimony, not admissibility. *See Amorgianos,* 303 F.3d at 266-67; *McCullock*, 61 F.3d at 1044; *Perkins*, 299 F. Supp. 2d at 56-57 (recognizing that lack of literature or studies to support the causation opinion does not render the opinion inadmissible). Dr. Cahill, in any event, did rely on an article regarding *Campylobacter* infection from an on-line medical database commonly referred to by physicians in order to confirm the onset of symptoms from *Campylobacter*, and also his knowledge from lectures and medical literature in general. Cahill Tr. at 10-13, 17, 24, 62.

Dr. Cahill's report and deposition testimony establish a reliable basis for his opinion that there is no medical evidence to support that plaintiff's GBS was caused by *Campylobacter* infection, or even remotely by the chicken served to plaintiff on the aircraft.    Dr. Cahill, in agreement with Drs. Golden and Block, states that the standard means of confirming an infection with *Campylobacter* is a stool culture and serological testing. Outside of these two tests, he might

10

contemplate a link between *Campylobacter* and GBS if there was epidemiological evidence of an

outbreak of such infection. He testified as follows:

> Q.    Do you think it is possible to establish a causative link between Campylobacter jejuni and GBS without having either stool culture or another serological study?
>
> A.    No.
>
> * * *
>
> A.    But I don't think there would be any scientific way of confirming Campylobacter jejuni as the ideology of the GBS without some documentation.
>
> Q.    And by "documentation", you mean either a stool culture or some other serological evidence?
>
> A.    Correct.    You might, I recall, this, I might in a large outbreak have epidemiological evidence, but I don't know that that wouldn't make a specific link for a specific diagnosis, that's what I'm saying.
>
> * * *
>
> Q.    So, in your opinion, in the developed world, it's more common to see Campylobacter jejuni infection in larger outbreaks as opposed to sporadic cases?
>
> A.    Yes.
>
> Q.    Have you ever – I'm sorry, go ahead.
>
> A.    In a larger, it doesn't have to mean thousands, it could be in a family you usually would have you know, a more common than an isolated in a specific.

Cahill Tr. at 20-21.

Dr. Cahill is aware that *Campylobacter jejuni* and vaccinations have been known to be

antecedents to GBS, and also that there many unknown causes of GBS. Cahill Tr. at 23-24. He

further believes "from the literature that, Campylobacter is the most common antecedent of [GBS];

whether you use the word 'cause' is another question because, no, I don't think a lot of people

understand how it causes GBS." *Id.* at 24. However, in this case, where there are no lab results

establishing *Campylobacter* infection, it would be speculative to presume that plaintiff's GBS was

11

caused by this bacteria. In any event, any doubt about the usefulness or reliability of Dr. Cahill's testimony should be resolved in favor of admissibility. *Marmol v. Biro Mfg. Co.,* No. 93 CV 2659 (SJ), 1997 WL 88854 at *4 (E.D.N.Y. Feb. 24, 1997).

Similarly, Dr. Block, who has lectured on GBS, bases his opinion on his review of plaintiff's extensive medical records and his over 40 years of clinical experience as a practicing and teaching neurologist along with his knowledge, training and education. Plaintiff nonetheless argues that Dr. Block's opinion is unreliable because his opinion is speculative, does not rely on any publications or articles, is not the result of any independent research, and is not based on a methodology that would be subject to peer review. Plaintiff's Memo. at 11-12. Plaintiff also contends that Dr. Block failed to consider other methods for determining a connection between *Campylobacter* and GBS. *Id.*

Dr. Block has opined that it is highly speculative to assert with a reasonable degree of medical certainty that plaintiff's GBS was caused by *Campylobacter* infection since the standard medical tests are lacking. *See* Block Report at 3-4; Block Tr. at 76-78, 81-84, 99-100, 107-09. Plaintiff's own expert is in agreement with Drs. Cahill and Block that the two ways to scientifically establish Campylobacter infection are a stool culture or serological testing for Campylobacter antibodies – neither of which was done here. *See* Golden Tr. at 31-33.

Dr. Block expressly testified that his office tests all patients who have GBS "to note the cause of illness." Block Tr. at 17. Dr. Block stated that "when Campylobacter as a cause [of GBS] came out 12, 15 years ago in papers, I believe from northern China, if I am not mistaken, with that bit of knowledge spreading around the world, we jumped on that and started to test all of our patients." Block Tr. at 18. In the over 30 or so cases of GBS that Dr. Block has overseen, he has had one GBS patient infected with *Campylobacter*, and this diagnosis was established through stool cultures and serological tests. *Id.* at 14-15.

Dr. Block also has experience with other patients diagnosed with GBS where the cause was attributed to other types of infection, such as upper respiratory or intestinal infections that were viral or spirochetal. *Id.* at 21-22. In fact, Dr. Block testified that in the majority of the cases, the cause cannot be defined. Block Tr. at 86.

Contrary to plaintiff's argument that Dr. Block "did not develop his opinion using a reliable scientific method," Dr. Block testified that he essentially uses a differential diagnosis process in each case he is retained to determine the cause.[1] Block Tr. at 81-82. In this case, however, he could not determine the cause of her GBS since the appropriate stool cultures and blood tests were not conducted. When asked what he would advise plaintiff about the cause of her GBS, he stated as follows:

> A.   I would say you had an auto-immune reaction to something in your body. And as far as we know, this is most frequently unidentified. It's most frequently thought of as being viral in origin. We know that there are other causes for [GBS]. Viral infection or spirochetal or Lyme disease including the virus HIV, as far as I know, all have been ruled out. Other viral infections might have caused the GI upset that were not considered viruses. Epstein-Barr virus. These were never ruled out. It was thought of as food poisoning. It is well known that Campylobacter is a cause of traveler's diarrhea, if you will. You don't even have to travel, you can have your GI upset in your own home, at a local restaurant. So it's a cause GI upset and clearly that has to be considered and investigated.

> Q.   Of all the universe of possibilities of [GBS], can you identify one in Lolita Pridgeon's case that would be the most likely?

> A.   The most likely cause remains cause unknown. And more than likely in that respect a viral gastroenteritis.

> Q.   You do believe that it was related to the viral gastroenteritis?

> A.   I think she had a GI upset. Now, if she had a GI upset anywhere up to three weeks before or if she had an upper respiratory infection by a virus up to three weeks, [GBS] can follow....

---

[1] The Second Circuit appears to recognize differential diagnosis as a reliable method to determine medical causation. *See McCullock*, 61 F.3d at 1044.

Notably, Dr. Golden is in agreement with the specific scientific basis for Drs. Block and Cahill's view that the standard medical procedures to determine the presence of *Campylobacter* is a stool culture or antibody tests, which were not done in this case. Golden Tr. at 31-33, 48-49; Block Tr. at 76-77, 107-09; Cahill Tr. at 58-60. Dr. Golden also is in accord with Drs. Block and Cahill that there is no evidence in plaintiff's medical records establishing that she consumed any tainted or undercooked meals. Golden Tr. at 33, 48-49.

Dr. Block also considered whether there was epidemiological evidence available regarding an outbreak of *Campylobacter* infection on plaintiff's flight. Block Report at 3-4. There was none. While Dr. Block did not rely on any specific article in formulating his opinion, he is well read on neurological issues, including GBS, and relied in making his opinion on his review of the medical records and his experience, knowledge and training as a practicing and teaching neurologist. Block Tr. at 86, 93-95. Such experience and knowledge consistently had been held to be a sufficiently reliable method for medical experts to opine on causation issues. *See, e.g,* *McCullock,* 61 F.3d at 1043-44; *Figueroa,* 254 F. Supp. 2d at 368 ("expert may base his opinion on experience alone").

Dr. Block also testified that any statistics or information in the medical literature linking *Campylobacter* to GBS would not change his mind in this case regarding the cause of plaintiff's GBS since he does not believe that "you can prove something in an individual by reference to the literature in regard to Campylobacter infection. I think you have to prove it in the individual. All you can say from the literature is it's possible, highly likely, you can't say it's definite." *Id.* at 98-99. Moreover, it would be too speculative, even considering plaintiff's deposition testimony, to presume that the chicken consumed by plaintiff on the American flight was the source of the *Campylobacter.* Block Tr. at 76-78, 98, 113-14; Block Report at 4.

14

Plaintiff erroneously compares this case to two unreported decisions, *Turrentine v. Bell Canada*, No. 98-7942, 1999 WL 220146 (2d Cir. Apr. 13, 1999) and *Maurizio v. Goldsmith*, No. 96 Civ. 4332 (RPP), 2002 WL 535146 (S.D.N.Y. Apr. 9, 2002), wherein expert testimony was excluded. The *Maurizio* case did not involve medical testimony based on years of clinical experience. Similarly, although *Turrentine* involved a medical expert, there was no detailed discussion of the expert's experience or methodology. The Second Circuit simply held that the trial court did not abuse its discretion by excluding the testimony.

Accordingly, because Dr. Block's opinions are based on "good grounds", they are properly admissible. *See Amorgianos,* 303 F.3d at 267 (citation omitted).

## CONCLUSION

Defendant respectfully requests that this Court deny plaintiff's motion in its entirety.

Dated: New York, New York
May 5, 2005

Law Offices of Paul A. Lange

By _____
       Alison L. McKay
Bar No. CT 22260
alm@lopal.com
80 Ferry Boulevard
Stratford, Connecticut  06615-6079
(203) 375-7724
(203) 375-9397 (facsimile)

- and -

15

CONDON & FORSYTH LLP

By _____

Michael J. Holland
Bar No. CT 22894
mholland@condonlaw.com
685 Third Avenue
New York, New York 10017
(212) 894-6740
(212) 370-4482 (facsimile)
Attorneys for Defendant
AMERICAN AIRLINES, INC.

To:  Timothy L. O'Keefe, Esq.
     Kenny, O'Keefe & Usseglio, P.C.
     Attorneys for Plaintiff
     21 Oak Street
     Hartford, CT  06106
     (860) 246-2700

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
                         : ss.:

COUNTY OF NEW YORK )

        Tara Nyack, being duly sworn, deposes and says that deponent is not a party to the action, is

over 18 years of age and resides in Bronx, New York.  That on May 5, 2005 deponent served the

within **Memorandum of Law in Opposition to Plaintiff's Motion to Preclude Defendant**

**American Airlines, Inc.'s Expert Witnesses** upon:

        Timothy L. O'Keefe, Esq.
        Kenny, O'Keefe & Usseglio, P.C.
        Attorneys for Plaintiff
        21 Oak Street
        Hartford, CT  06106
        (860) 246-2700

the address(es) designated by said attorney(s) for that purpose by depositing a true copy thereof

enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive

care and custody of United States Post Office within the State of New York.

                                      *Tara Nyack*
                                      Tara Nyack

Sworn to before me this
5th day of May, 2005

*Mary Ann Rooney*
        Notary Public

        MARY ANN ROONEY
      NOTARY PUBLIC, State of New York
            No. 31-4672706
        Qualified in Queens County
      Commission Expires May 31, 2006