# EXHIBIT D

## In The Matter Of:

*PRIDGEON   v.*
*AMERICAN AIRLINES*

---

*JEROME BLOCK*
*May 27, 2004*

---

*FINK & CARNEY REPORTING AND VIDEO SERVICES*
*39 WEST 37TH STREET*
*NEW YORK, NY  USA  10018*
*(212) 869-1500   or   (800) 692-3465*

Original File AF0527.TXT, 123 Pages
Min-U-Script® File ID: 3031599743

**Word Index included with this Min-U-Script®**

Page 1

[2] UNITED STATES DISTRICT COURT
[3] DISTRICT OF CONNECTICUT
[4]
  LOLITA PRIDGEON,                        :
[5]
        Plaintiff,                        :
[6]
[7]       -against-            Index No.
                    3:02 cv 1032 GLG
[8] AMERICAN AIRLINES, ET AL.,
[9]       Defendants.
[10]
[11]
[12]     DEPOSITION of JEROME BLOCK, M.D., taken by
[13] Plaintiff at the offices of Messrs. Condon & Forsyth,
[14] LLP, 685 Third Avenue, New York, New York 10017, on
[15] Thursday, May 27, 2004, commencing at 10:15 o'clock
[16] a.m., before Annette Forbes, a Certified Shorthand
[17] (Stenotype) Reporter and Notary Public within and for
[18] the State of New York.

Page 2

[2] APPEARANCES:
[3]
        Messrs. KENNY, O'KEEFE & USSEGLIO, P.C.
[4]        Attorneys for Plaintiff
           21 Oak Street, Suite 208
[5]        Hartford, Connecticut 06106
[6] BY: TIMOTHY L. O'KEEFE, Esq., of Counsel
[7]
[8]
        Messrs. CONDON & FORSYTH, LLP
[9]        Attorneys for Defendants
           685 Third Avenue
[10]       New York, New York 10017
[11] BY: MICHAEL J. HOLLAND, Esq., of Counsel
[12]
[13]
        LAW OFFICES OF PAUL A. LANGE
[14]       Attorneys for Defendants
           80 Ferry Boulevard
[15]       Stratford, Connecticut 06615-6079
[16] BY: ALISON L. McKAY, Esq., of Counsel

Page 3

[2]     IT IS HEREBY STIPULATED AND;
[3] AGREED that the filing and sealing of
[4] the within deposition be, and the
[5] same are hereby waived;
[6]     IT IS FURTHER STIPULATED AND
[7] AGREED that all objections, except as
[8] to the form of the question, be and
[9] the same are hereby reserved to the
[10] time of the trial;
[11]    IT IS FURTHER STIPULATED AND
[12] AGREED that the within deposition may
[13] be sworn to before any Notary Public
[14] with the same force and effect as if
[15] sworn to before a Judge of this
[16] Court;
[17]    IT IS FURTHER STIPULATED that
[18] the transcript is to be certified by
[19] the reporter.

Page 4

[2]     JEROME BLOCK, called as a witness,
[3] having been first duly sworn by Annette
[4] Forbes, a Notary Public within and for the
[5] State of New York, was examined and
[6] testified as follows:
[7]         **DIRECT EXAMINATION**
[8]         **BY MR. O'KEEFE:**
[9]   **Q:** Good morning, Dr. Block.
[10]  **A:** Good morning.
[11]  **Q:** My name is Tim O'Keefe, I represent
[12] Lolita Pridgeon in connection with the lawsuit
[13] that she filed in Connecticut, specifically U.S.
[14] District Court of Connecticut against American
[15] Airlines.
[16]     I'm going to ask you some questions.
[17] The first question I have for you, Doctor, is have
[18] you ever been deposed before?
[19]  **A:** Yes, sir.
[20]  **Q:** Can you tell me the last time you
[21] gave a sworn deposition?
[22]  **A:** About three weeks ago.
[23]  **Q:** Just to remind you, even though you
[24] have done this recently —
[25]  **MR. O'KEEFE:** By the way,

Page 5

**Block**

[2] usual stips?
[3]     **MR. HOLLAND:** Yes. Usual
[4] Federal Court stipulations.
[5]     **THE WITNESS:** Am I supposed to
[6] know what those are?
[7]     **MR. HOLLAND:** More for the
[8] lawyers.
[9]     **Q:** Just to remind you of some of the
[10] ground rules, this is a deposition, you understand
[11] that you are under oath this morning?
[12]     **A:** Yes, sir.
[13]     **Q:** You understand that if we have a
[14] trial in this case and you testify at the trial in
[15] this case and you should say something
[16] inconsistent with what you say on the record this
[17] morning, I might have an opportunity to point that
[18] out to the members of the jury?
[19]     **A:** Yes, sir.
[20]     **Q:** It's important that you and I and
[21] everyone in the room speak one at a time so this
[22] young lady can take down everything we say for the
[23] record, okay?
[24]     **A:** Yes.
[25]     **Q:** If you don't understand one of my

Page 6

**Block**

[2] questions, let me know, I will ask a different
[3] question or try to rephrase it for you.
[4]     Fair enough?
[5]     **A:** Fair enough.
[6]     **Q:** One last rule.
[7] If you want to say yes in response
[8] to a question, say yes rather than nodding your
[9] head; if you want to say no, say no rather than
[10] shaking your head.
[11]     **A:** Understood.
[12]     **Q:** If you want to take a break, Doctor,
[13] for any reason whatsoever, simply let us know, we
[14] will take a break, okay?
[15]     **A:** Very good.
[16]     **MR. O'KEEFE:** I am going to
[17] ask the court reporter to mark as
[18] Plaintiff's Exhibit 1 a copy of your
[19] curriculum vitae.
[20]     (Dr. Block's curriculum vitae
[21] was marked as Plaintiff's Exhibit No.
[22] 1 for identification, as of this
[23] date.)
[24]     **BY MR. O'KEEFE:**
[25]     **Q:** Dr. Block, I am handing you a copy

Page 7

**Block**

[2] of a document that's been marked as Plaintiff's
[3] Exhibit 1.
[4]     I ask you to take a quick look at
[5] that document and I will ask, is that a current
[6] version of your curriculum vitae?
[7]     **A:** There are some other guest lectures
[8] that haven't been added to it, but that is
[9] basically my CV.
[10]     **Q:** Other than some guest lectures that
[11] you would add to the CV, is there anything else
[12] that you would add to your CV in terms of
[13] publications or education or board certifications
[14] that you would need in order to make it more
[15] current?
[16]     **A:** No, sir.
[17]     **Q:** Take a look, if you would, Dr.
[18] Block, at the fourth page of Plaintiff's Exhibit
[19] No. 1. I see that you have your publications
[20] listed on Page 4.
[21]     **A:** Yes, sir.
[22]     **Q:** Other than the publications that you
[23] have listed on Page 4 of your CV, have you been
[24] published at all?
[25]     Have you published anything

Page 8

**Block**

[2] different than what is listed?
[3]     **A:** No, sir, I haven't.
[4]     **Q:** As I understand it, Dr. Block, you
[5] are board certified in the field of psychology and
[6] neurology?
[7]     **A:** Yes, sir, with a caveat that it's in
[8] neurology only.
[9]     **Q:** The reason why you listed
[10] certification by the American Board of Psychology
[11] and Neurology, is that one board?
[12]     **A:** That's the name of the board.
[13]     **Q:** Your certification is in neurology
[14] only?
[15]     **A:** That's correct.
[16]     **Q:** That board certification was first
[17] received in October of 1961?
[18]     **A:** That's correct.
[19]     **Q:** Does that board certification entail
[20] a recertification process as the years go by?
[21]     **A:** For those, I believe, who were
[22] certified after 1980, I believe it does. I'm a
[23] grandfather.
[24]     **Q:** You made the deadline?
[25]     **A:** Yes.


Page 9

**Block**

[2] Q: There has been no need for you to
[3] become recertified by the board?
[4] A: That's correct.
[5] Q: Have you ever, in your career, been
[6] board certified in any other discipline other than
[7] neurology?
[8] A: No. I have been board qualified in
[9] rehabilitation medicine, not certified.
[10] Q: Board qualification, can you explain
[11] that to us, please?
[12] A: Board qualification means that you
[13] have had all of the education required and had all
[14] of the clinical experience required to take your
[15] boards.
[16] I chose not to take my boards in
[17] rehabilitation medicine primarily because my
[18] training in rehab was all in neurologic
[19] rehabilitation, and I would have had to become an
[20] amateur orthopedic and arthritic expert to stand
[21] for that board, and I chose not to have another
[22] year or two of education.
[23] Q: So that was just a free choice, that
[24] you chose not to become board certified in
[25] rehabilitation medicine?

Page 10

**Block**

[2] A: That's correct.
[3] Q: I take it then that you are not
[4] board certified in the field of infectious
[5] diseases?
[6] A: You take it correctly, sir.
[7] Q: What is your present occupation, Dr.
[8] Block?
[9] A: I'm a physician who practices
[10] neurology, with a subspecialty in the
[11] rehabilitation of the neurologically disabled.
[12] I'm self-employed in that respect.
[13] However, I am employed at Lenox Hill
[14] Hospital as director of the division of neurology.
[15] Q: So you maintain a private practice
[16] as a neurologist here in New York City?
[17] A: Yes, I do.
[18] Q: Do you see patients on a regular
[19] basis?
[20] A: Oh, yes.
[21] Q: If you would just give us a sense of
[22] how many patients you would see on a weekly basis
[23] in your private practice?
[24] A: In hospital, in private practice,
[25] perhaps ten patients per week, almost on a daily

Page 11

**Block**

[2] basis, and in my office probably 30 to 40 patients
[3] per week.
[4] Q: I take it then you are still
[5] actively holding office hours as a neurologist?
[6] A: I'm a workaholic.
[7] Q: So the answer is yes?
[8] A: Yes, sir.
[9] Q: In your position as the director of
[10] the neurology department at Lenox Hill Hospital,
[11] would you just describe briefly what your duties
[12] entail there?
[13] A: Let me just indicate to you that
[14] neurology is not a separate department, it's a
[15] division of the department of medicine, so I'm a
[16] director of the division.
[17] And my responsibilities there entail
[18] teaching of the house staff and medical students,
[19] medical students coming from New York University
[20] School of Medicine, and seeing to it that either I
[21] or one of 16 of our other neurologists in that
[22] section or in that division take excellent care of
[23] the unassigned patients, usually known as the ward
[24] cases, unassigned patients, emergency room
[25] consultations and consultations throughout the

Page 12

**Block**

[2] hospital on all other services.
[3] So I have to schedule about 150
[4] lectures per year, see to it that either I or
[5] someone else gives those lectures appropriately
[6] and that either I or one of the other neurologists
[7] is on call and making rounds on the unassigned
[8] patients and answering consultations on a daily
[9] basis.
[10] Q: The lecture that you give, Doctor,
[11] have you ever lectured on a topic related to a
[12] food-borne illness?
[13] A: As such, no, not the topic of
[14] food-borne illnesses, but I have given teaching
[15] sessions on illnesses such as botulism and its
[16] effect on the neurologic system, Guillain-Barre
[17] syndrome and others, which clearly can be found,
[18] including Cituatara intoxication.
[19] Q: You have lectured on the topics of
[20] Guillain-Barre syndrome?
[21] A: Yes, I have.
[22] Q: Getting back to your treatment of
[23] patients currently, do you or have you ever
[24] treated patients specifically for food-borne
[25] illnesses?

Page 13

**Block**

[2] A: Yes, sir, I have.
[3] Q: Have you had any recent cases where
[4] you have treated patients in connection with
[5] food-borne illnesses?
[6] A: No, I can't say anything recent.
[7] Q: Do you have any specific recall of
[8] treating any patients who had suffered from
[9] Campylobacter jejuni infection?
[10] A: Yes, sir.
[11] I have not treated them personally,
[12] I have supervised grand rounds of such patients at
[13] Lenox Hill Hospital when they were contained in a
[14] ward service or when they were patients of other
[15] neurologists in hospital, and those cases were
[16] presented at neurology grand rounds.
[17] Q: Dr. Block, do you recall cases where
[18] you have been involved in patient care of
[19] something called Campylobacter jejuni infection?
[20] A: Not in the past several years.
[21] Q: When you say several years, can you
[22] give us a more specific estimate of what you mean
[23] by that?
[24] A: I would think three to four years.
[25] Q: So is it fair to say that it's been

Page 14

**Block**

[2] approximately three to four years since you have
[3] dealt specifically with a patient case that
[4] involved Campylobacter jejuni infection?
[5] A: Yes. There have been other cases of
[6] Guillain-Barre syndrome which I have been involved
[7] in in the past several years, as recently as
[8] several months ago, but no one with that
[9] particular cause for Guillain-Barre syndrome.
[10] Q: Have you ever made a diagnosis in
[11] your career that one of your patients who had
[12] contracted Guillain-Barre syndrome had had that
[13] caused by a Campylobacter jejuni infection?
[14] A: Yes, sir.
[15] Q: Can you estimate for us on how many
[16] occasions?
[17] A: I don't think I have had more than
[18] one patient where we proved that it was
[19] Campylobacter jejuni infection.
[20] Q: Do you recall when that was?
[21] A: Had to be six or seven years ago.
[22] Q: When you say that we proved, do you
[23] mean something specific by that?
[24] A: Yes, sir.
[25] There were actual cultures and

Page 15

**Block**

[2] titers for that particular organism that were
[3] positive.
[4] Q: The culture would have been a stool
[5] culture?
[6] A: Yes.
[7] Q: The titers would have been something
[8] that you could determine as a result of
[9] virological study?
[10] A: Yes.
[11] Q: A blood test?
[12] A: That's right.
[13] Q: So sometime in approximately the
[14] past six or seven years you have had one patient
[15] that you can recall who had contracted
[16] Guillain-Barre syndrome where you had concluded
[17] that the cause of Guillain-Barre was Campylobacter
[18] jejuni infection?
[19] A: Yes, sir. That was my personal
[20] patient.
[21] There have been others discussed,
[22] but that was the only one which the patient was
[23] mine, so to speak.
[24] Q: I may have heard you wrong, but have
[25] there been any other points at all in your career,

Page 16

**Block**

[2] Doctor, with your patients alone where you have
[3] had somebody who had contracted Guillain-Barre
[4] where you concluded the cause was Campylobacter
[5] jejuni infection?
[6] A: To the best of my recollection, no,
[7] sir.
[8] Q: The occasion where you had the one
[9] patient you had concluded that there was a causal
[10] link between Campylobacter and Guillain-Barre, was
[11] that case involved in litigation at all, as far as
[12] you know?
[13] A: No, sir, it was not. I don't think
[14] it would be, because that was a number of years
[15] ago.
[16] I would have heard about any
[17] litigation by now, I imagine.
[18] Q: Do you recall, Dr. Block, in that
[19] case whether or not you had come to any
[20] conclusions as to the cause of Campylobacter
[21] infection?
[22] A: No, sir, we could not trace it to
[23] specific events.
[24] Q: Had you formed any hypothesis with
[25] the patient as to how the Campylobacter jejuni

 
Page 17

**Block**

[2] could have been contracted in that case?
[3]  A: To the best of my knowledge, it had
[4] to be food borne.
[5]  Q: Other than the fact that you, to the
[6] best of your knowledge, you believed the
[7] Campylobacter jejuni infection in that case had to
[8] have been food borne, do you recall anything more
[9] specific about the possible cause?
[10]  A: No, sir, I do not. We test all
[11] patients with Guillain-Barre for whatever
[12] bacteria.
[13]     In this particular patient of mine,
[14] there was no specific event that we could pin
[15] down. The patient had had some problems with GI
[16] distress in the prior week, I think five days
[17] before is the best of my recall, but there was
[18] nothing specific.
[19]     The patient had eaten meals at home.
[20] It was one of those rare New Yorkers who didn't go
[21] out for dinner.
[22]  Q: When you say we test all patients
[23] who have Guillain-Barre for Campylobacter, why is
[24] that?
[25]  A: It's nice to note cause of illness.

Page 18

**Block**

[2] Guillain-Barre has been around for a long, long
[3] time.
[4]     I think Dr. Landry first described
[5] Guillain-Barre in the early syndrome and then
[6] Guillain-Barre cashed in on it, and they got
[7] credit, named for it.
[8]     Poor Dr. Landry had been forgotten
[9] by most people, and it's well known that
[10] Guillain-Barre will be proceeded in a very large
[11] percentage of cases with upper respiratory or
[12] gastrointestinal problems, which have largely been
[13] felt to be and shown to be virus in nature.
[14]     Again, when Campylobacter as a cause
[15] came out 12, 15 years ago in papers, I believe
[16] from northern China, if I am not mistaken, with
[17] that bit of knowledge spreading around the world,
[18] we jumped on that and started to test all of our
[19] patients.
[20]  Q: Would it be fair to say then that it
[21] has been pretty widely known in the medical
[22] community, at least your medical community, for
[23] the past, say, 10 to 15 years?
[24]  A: No, counsel, my estimates of date
[25] may be inaccurate, plus or minus three or four

Page 19

**Block**

[2] years, that it's been known that Campylobacter
[3] jejuni plays a causal role in precipitating
[4] Guillain-Barre.
[5]  Q: Again, I don't want to hold you to a
[6] specific time frame if you are not comfortable
[7] with it, but can you give us a general sense or
[8] specific sense as to how long you have, for
[9] instance, known there is a causal link based upon
[10] scientific evidence between Campylobacter jejuni
[11] and Guillain-Barre?
[12]  A: To the best of my recall, sir, and I
[13] probably read a thousand pages of new medical
[14] literature per week, I'm sorry, per month, it
[15] would be about 10 to 15 years ago.
[16]  Q: Have you yourself, Dr. Block, ever
[17] published any articles related to Guillain-Barre?
[18]  A: Only in one of the rehabilitation
[19] articles, rehabilitation of patients with
[20] neurologic disorders, and that was in six
[21] chapters, published a long time ago, 1977, where
[22] there was reference to Guillain-Barre and how to
[23] rehabilitate patients with that problem.
[24]     There was not a specific paper on
[25] Guillain-Barre, but a specific paper on the

Page 20

**Block**

[2] rehabilitation of people with peripheral
[3] neuropathologic problems.
[4]  Q: And that work, Doctor, did that
[5] involve at all a treatment of the relation between
[6] Campylobacter jejuni and Guillain-Barre?
[7]  A: If it would have, sir, I would have
[8] been given credit for the discovery of
[9] Campylobacter as the cause.
[10]  Q: It was published in '77, I think you
[11] said?
[12]  A: Yes, sir.
[13]  Q: And that was before the medical
[14] community, generally speaking, was knowledgeable
[15] of the causative link between Campylobacter and
[16] GBS?
[17]  A: Yes, sir.
[18]  Q: And by GBS, I mean Guillain-Barre.
[19]  A: I thought so.
[20]  Q: Then I take it that you haven't
[21] published any articles related to Campylobacter
[22] jejuni specifically?
[23]  A: That's correct.
[24]  Q: Have you ever yourself performed any
[25] research, whether published or not, that studied

Page 21

**Block**

[2] the causal link between Campylobacter and
[3] Guillain-Barre?
[4]   **A:** No, sir.
[5]   **Q:** Now, you mentioned already that you
[6] recall one patient of yours that was a patient
[7] some six to seven years ago where you had
[8] concluded based upon laboratory results that there
[9] was a causal connection between Campylobacter
[10] jejuni infection and Guillain-Barre.
[11]   Can you recall having any other
[12] patients who had contracted Guillain-Barre
[13] syndrome where you had rendered an opinion or a
[14] diagnosis as to the cause of the GBS that was
[15] something other than Campylobacter jejuni?
[16]   **A:** Yes, sir. Just about in every case
[17] where Guillain-Barre syndrome was preceded by an
[18] upper respiratory infection or intestinal problem,
[19] we felt there was an infectious cause of it.
[20]   And in naivete, perhaps it was
[21] always ascribed to a virus.
[22]   We have seen cases of HIV mimic
[23] Guillain-Barre. We have seen cases of Lyme
[24] disease mimic Guillain-Barre.
[25]   Once we have determined it's Lyme

Page 22

**Block**

[2] disease or HIV, it is known by another name,
[3] clearly there are other cases of Guillain-Barre
[4] that were viral or spirochetal or what have you.
[5]   **Q:** I take it you have had occasion to
[6] make a diagnosis of a patient with Guillain-Barre
[7] where you determined that the cause was something
[8] other than Campylobacter jejuni infection?
[9]   **A:** Yes, sir.
[10]   **Q:** Given your understanding of the
[11] Lolita Pridgeon case, do you understand that it
[12] was earlier, but prior to the forming of the
[13] diagnosis of Guillain-Barre, it was suspected at
[14] Saint Raphael Hospital that she had Lyme disease?
[15]   **A:** Yes, sir, I'm aware of that.
[16]   **Q:** In your experience, with these
[17] cases, is that a medically responsible thing where
[18] there will be a thought that it's Lyme disease
[19] rather than Guillain-Barre syndrome?
[20]   **A:** Yes, Lyme disease can present with a
[21] syndrome such as Guillain-Barre.
[22]   She lives in an endemic area for
[23] Lyme disease, so that has to raise suspicion.
[24]   Her spinal fluid study showed cells
[25] and a normal protein, which is what you expect

Page 23

**Block**

[2] with central nervous system problems due to Lyme
[3] disease, whereas with Guillain-Barre, not Lyme or
[4] HIV infection, you generally tend to see no cells
[5] and a high protein.
[6]   I can understand why they suspected
[7] Lyme disease.
[8]   They also had one test which was
[9] suggestive, if not highly positive, but suggestive
[10] and indeed by agreement doxycycline, as I recall,
[11] and withdrew that with further testing that didn't
[12] seem to confirm the thought that Lyme disease was
[13] the cause.
[14]   **Q:** So ultimately is it your
[15] understanding that it was determined at St.
[16] Raphael Hospital that Ms. Pridgeon did not have
[17] Lyme disease at the time that she was at the
[18] hospital?
[19]   **A:** That certainly was the opinion of
[20] her treating physician, sir.
[21]   **Q:** Do you have any reason to disagree
[22] with that opinion?
[23]   **A:** No, no firm reason to disagree. You
[24] have to be a bit suspicious of the atypical
[25] findings on spinal fluid examination, but I think

Page 24

**Block**

[2] they made the right decision in treating her as
[3] they did for Guillain-Barre.
[4]   **Q:** Do you think they made the right
[5] decision ultimately in diagnosing her with
[6] Guillain-Barre?
[7]   **A:** Yes.
[8]   **Q:** You mentioned doxycycline. That's
[9] an antibiotic, is it not?
[10]   **A:** It is.
[11]   **Q:** And that's a treatment that's
[12] indicated for somebody with Lyme disease?
[13]   **A:** Yes, sir.
[14]   **Q:** Is it an indicated treatment for
[15] somebody with Guillain-Barre?
[16]   **A:** No, sir.
[17]   **Q:** Why not?
[18]   **A:** Well, it's not known to be caused by
[19] an organism that is responsive to doxycycline.
[20]   **Q:** Can you estimate for us, Dr. Block,
[21] on how many occasions in your medical career you
[22] have attempted to determine the cause of
[23] somebody's Guillain-Barre?
[24]   **A:** I probably over the years have had
[25] up to 30 or 35 patients with Guillain-Barre, and

Page 25

[1] **Block**
[2] when I say over the years, in ten days I should be
[3] celebrating the 50th anniversary of my
[4] graduation from medical school, so that's over the
[5] years.
[6] And then as professor of clinical
[7] neurology at NYU I have seen dozens of patients
[8] down at Bellevue Hospital and Manhattan Veterans
[9] Administration who were not my patients, but they
[10] were under my care as I was supervising house
[11] staff, as well as since 1968 as director of the
[12] division of neurology at Lenox Hill there would
[13] have been dozens more patients, other patients or
[14] ward service patients where I have been familiar
[15] with their patients and possibly contributed
[16] opinions or at least provoked discussion.
[17]   Q: Of all of those cases that you have
[18] just spoke about either in your private practice
[19] or in your work consulting and working with the
[20] various hospitals and other medical institutions,
[21] is it your testimony that you can only recall one
[22] case where you have concluded that Guillain-Barre
[23] was caused by a Campylobacter jejuni infection?
[24]   A: That's, to the best of my
[25] recollection, only one of my own personal cases.

Page 26

[1] **Block**
[2] There were other cases in which I
[3] contributed opinions in teaching and what have you
[4] where Campylobacter was established, but I think
[5] you had asked me about my personal cases.
[6]   Q: I had.
[7] And to be more succinct, when you
[8] tell us that over the years you recall, again, not
[9] holding you to an exact figure, somewhere between
[10] 30 and 35 patients of your own who have had
[11] Guillain-Barre, of those 30 to 35, you can recall
[12] only one?
[13]   A: That's correct.
[14]   Q: Where you concluded that there was a
[15] connection between Campylobacter and
[16] Guillain-Barre?
[17]   A: That's correct.
[18]   Q: Can you estimate for us in any
[19] rational way how many other cases in your career
[20] where you have drawn the conclusion that there is
[21] a connection between a Campylobacter jejuni
[22] infection and Guillain-Barre?
[23]   A: Well, I can recall at least two
[24] other cases that were presented at grand rounds,
[25] private patients of other physicians or service

Page 27

[1] **Block**
[2] cases where Campylobacter was the cause.
[3]   Q: Have those cases been recent cases
[4] within the past ten years?
[5]   A: They go back over the past ten
[6] years.
[7]   Q: Was it sometime after it had become
[8] known to you that there is a scientifically
[9] researched causal connection between Campylobacter
[10] and Guillain-Barre?
[11]   A: Yes, sir.
[12]   Q: Do you recall in those two other
[13] cases that you recall from grand rounds whether it
[14] was ever determined what the precedent cause of
[15] the Campylobacter infection was?
[16]   A: It was presumed to be food borne.
[17]   Q: Anything more? Was it chicken?
[18]   A: I don't remember the menus.
[19] There was nothing very specific
[20] about it. Patients had eaten three meals a day on
[21] the average every day and then come down with some
[22] GI problems with no specific complaints about any
[23] one particular meal.
[24]   Q: Now, you are obviously licensed by
[25] the State of New York to practice medicine?

Page 28

[1] **Block**
[2]   A: Still, yes, sir.
[3]   Q: And have you ever been licensed by
[4] any other state?
[5]   A: Yes.
[6]   Q: Which other states?
[7]   A: New Jersey and California.
[8]   Q: Are you presently holding licenses
[9] from those two states?
[10]   A: No, sir. I surrendered my license
[11] in California about seven or eight years ago,
[12] finally concluding I wasn't going to move to San
[13] Diego in retirement years.
[14]   Q: Have you ever had your license to
[15] practice medicine revoked by the licensing
[16] authority of any state?
[17]   A: I'm so squeaky clean, sir, it's
[18] never been revoked. I have never had any
[19] disciplinary actions of any sort taken against me.
[20]   Q: Have you ever been sued for
[21] malpractice?
[22]   A: Oh, yes.
[23]   Q: On how many occasions?
[24]   A: I think you have to clarify the
[25] question.

Page 29

**Block**

[2] How many times have I been named in
[3] malpractice suits or how many times did a
[4] malpractice suit go forward against me?
[5] **Q:** Let's start with the first.
[6] **A:** I have probably been named in
[7] malpractice suits 30 times.
[8] **Q:** And the latter?
[9] **A:** If I may expand on that?
[10] **Q:** You may.
[11] **A:** That is one of the penalties of
[12] being director of a service, is when anybody in
[13] the hospital falls out of bed and gets injured,
[14] you get called to see the patient if they have a
[15] neurologic problem and when your name is on the
[16] chart, even after the event, you are mentioned in
[17] the malpractice suit.
[18] These have always been dropped as
[19] far as any personal problem for me, so that's
[20] always been dismissed, but I have been named a
[21] number of times.
[22] There have been three malpractice
[23] actions brought against me and other doctors who
[24] participated in a patient's care.
[25] **Q:** Have any of those suits gone to

Page 30

**Block**

[2] trial?
[3] **A:** Three suits went to trial.
[4] **Q:** When was the most recent trial where
[5] you have been involved?
[6] **A:** The most recent one I would think
[7] was about 1988, somewhere in that range.
[8] **Q:** Was that here in New York?
[9] **A:** It was.
[10] **Q:** Was that in New York City?
[11] **A:** New York City, yes.
[12] **Q:** In the Supreme Court of New York at
[13] the trial level?
[14] **A:** Yes, sir.
[15] **Q:** What was the verdict in that case?
[16] **A:** The verdict in the case was that
[17] three doctors were held at fault for precipitating
[18] multiple injuries in a patient who had a disease
[19] that was known as tropical spastic paraplegia.
[20] On appeal it went to the Appellate
[21] Division of the State of New York, who in their
[22] wisdom said that the testimony of the expert
[23] witness against us was absurd and the case was set
[24] up for retrial.
[25] The plaintiff's attorneys could not

Page 31

**Block**

[2] find another witness to stand up on the stand and
[3] make accusations and the case was dropped with
[4] prejudice.
[5] The physician who testified against
[6] us was disciplined by Columbia-Presbyterian for
[7] having made outrageous statements, so that was a
[8] very happy ending, but it did cause an ulcer.
[9] **Q:** Through a long and tortured process?
[10] **A:** Just awful.
[11] **Q:** I take it you were one of the three
[12] doctors against whom the jury had rendered a
[13] verdict?
[14] **A:** Yes.
[15] **Q:** Ultimately, once a case has made its
[16] way through an appeal process, the case is
[17] dismissed?
[18] **A:** The case was not dismissed, the
[19] Appellate Division sent it back for retrial, then
[20] the plaintiff's attorneys dropped the case. They
[21] could not find another skillful testifier, if you
[22] will.
[23] **Q:** They dismissed or withdrew the case?
[24] **A:** They did.
[25] **Q:** Before another trial occurred?

Page 32

**Block**

[2] **A:** Yes.
[3] **Q:** Let's talk about the other two suits
[4] in which you have been involved.
[5] **A:** There was another case where I
[6] walked onto the ward at Lenox Hill Hospital and
[7] two of the house staff with arguing as to whether
[8] the patient had a particular abnormal reflex or
[9] not. I was not in charge of the case.
[10] They said, "Dr. Block, would you see
[11] if this patient has a reflex or not."
[12] I went to the patient's bedside,
[13] touched the bottom of her foot, and said, "Yes,
[14] that reflex is there."
[15] The resident who won the discussion
[16] was very happy and put a note on the chart Dr.
[17] Block sees patient and agrees with reflex
[18] abnormality. I was named, that case went to
[19] trial.
[20] I testified as to the 15 seconds
[21] that I was involved in the patient's case and the
[22] judge said, "I do think you ought to go home now,
[23] Doctor, there is nothing here that is
[24] meritorious."
[25] So that was dismissed.

Page 33

**Block**

Q: That was dismissed?

A: Yes.

The very first case was in 1974.

Again, I was named with three doctors. I was accused of having ordered a test which was then not skillfully performed by the radiologist. It was alleged that — by the way, I think it was skillfully performed.

It was alleged that that test, a pneumoencephalogram, is something that hasn't been done since CAT scans came on the scene, led to a patient developing a subdural hematoma, which I then diagnosed. That led to surgery.

That surgery he got a blood transfusion, poor Mr. Friedman got hepatitis from a blood transfusion and died from hepatitis two years later.

The suit was brought against me for sending him for a test inappropriately performed which caused a subdural hematoma.

We were at trial for about five weeks when his neighbor came to court and said this gentleman fell down outside the apartment, I picked him up and he was complaining of headache.

Page 34

**Block**

The case was settled immediately thereafter that for, I forget whether it was 60 or $80,000, with no guilt admitted on the part of any physicians.

It was a terrible situation. Wonderful man.

But those were the three cases which I have been involved.

Q: No others, other than those three where you have just described where you were truly personally involved?

A: That's correct.

Q: Have you ever been convicted of committing a crime?

A: No, sir.

Q: What do you charge for expert consultation, such as the one that you have here? Do you have an hourly charge?

A: Yes. I charge $350 an hour for review of records. I charge $500 an hour for deposition testimony.

Q: How about court testimony?

A: It's basically $350 per hour, plus expenses. I ask in advance for a check for $4,000 and surprise an awful lot of attorneys when I send them a check in return mail if my expenses have

Page 35

**Block**

not been that high.

Now, expenses are not the taxi or the subway ride, it's the number of cases that I have had to cancel out that day, the number of patients that I haven't been able to see, and, in general, when I'm in court, I have to pay another doctor to make rounds and fill in for me, so that when I go to court it costs me about $1,000 in fees to other physicians to cover my responsibilities for the day. So that's part of the expense.

Q: So, in addition to the $350 an hour that you will charge for your court time to go to court, you will also charge the person who has asked you to come to court expenses which will include the loss of income for patients that you otherwise would have seen?

A: And any fees that I might have to pay for physicians to cover my responsibilities.

Q: Have you ever testified in a Connecticut court?

A: Not that I recall.

I have testified quite a bit, but I don't recall being in Connecticut. Could be.

Page 36

**Block**

If so, it would have had to be decades ago, but I don't think so.

Q: Do you recall testifying in any courts other than New York?

A: Oh, yes, sir.

Q: Have you had any recent cases, I mean within the past five years, where you have testified in a court outside of the State of New York?

A: I would think that would be correct. It would be on the margin of four to five years ago or five to six years ago, but I have testified outside of the State of New York.

Q: Within the past year, can you estimate for us on how many occasions you have actually gone to court to give expert testimony?

A: On the average of once a month, sir.

Q: Are the great majority of those cases within the State of New York?

A: Yes.

Q: On those occasions where you have been testifying in court on average of one time per month, can you give me a breakdown as to specifically what those cases would entail, and

Page 37

**Block**

[2] specifically what I'm looking at is do you testify
[3] as a treating physician?
[4]  A: Often.
[5]  Q: Within the past year, can you
[6] estimate for us on how many occasions you have
[7] testified as a treating physician?
[8]  A: Probably twice.
[9]  Q: And the balance of the occasions
[10] where you go to court would be as a consulting
[11] physician?
[12]  A: As a so-called expert witness, yes.
[13]  Q: Do you keep a list of cases where
[14] you testify?
[15]  A: Yes, sir.
[16]  Q: Is that something that you have kept
[17] up to date, as best as you can?
[18]  A: I think my office staff is pretty
[19] good about keeping it up to date. They may forget
[20] to put one in or they may put one in where it was
[21] cancelled, but it's probably rather accurate.
[22]  Q: Do you have any belief that you
[23] wouldn't be able to come to Connecticut to testify
[24] in October of this year?
[25]  A: No. I have nothing scheduled for

Page 38

**Block**

[2] October of this year, except perhaps the birth of
[3] a new grandchild in Switzerland, in which case —
[4]  Q: We can roll the videotape.
[5]  A: — I will be over there. I don't
[6] know whether it's October or November, but
[7] somewhere in there.
[8]  Q: We don't know yet either at this
[9] point in time.
[10]   Have you ever had occasion within
[11] the past three years, say, to testify on behalf of
[12] a plaintiff or claimant in a case where you were
[13] not the treating physician?
[14]  A: Oh, yes, sir.
[15]  Q: Can you give us a sense of how often
[16] that has occurred over the past three years?
[17]  A: I would say that if I go to court on
[18] the average of once a month, probably 20 to
[19] 25 percent of the time it's on behalf of
[20] plaintiff.
[21]   Sometimes when I'm in court and
[22] listed in what they call a jury verdict report, is
[23] that what it is, I'm testifying on behalf of the
[24] defense for a physician or hospital, but basically
[25] testifying against a different physician or

Page 39

**Block**

[2] hospital, so that I'm often listed as a defense
[3] witness, but giving testimony for one or against
[4] another.
[5]   And I can recall three occasions in
[6] the past year or so where I was listed as a
[7] defense witness, but I was subpoenaed to go to
[8] court by the plaintiff's attorney, because my
[9] report as a defense expert documented every
[10] complaint that the plaintiff had as real and, as a
[11] matter of fact, found things that their own
[12] neurologist hadn't found.
[13]   So plaintiff's attorney found my
[14] report pleasing enough to send me a check and a
[15] subpoena and I was listed as a defense witness,
[16] but, yes, I have testified on behalf of plaintiffs
[17] a number of times.
[18]   I would say before 1990, the
[19] percentage of times when I testified on behalf of
[20] plaintiff was much higher than it is now, but —
[21]  Q: Is there any particular reason why
[22] that was so?
[23]  A: I think so.
[24] I don't know that I was considered
[25] mature enough by some of the defense firms to be

Page 40

**Block**

[2] considered an expert at that time, although they
[3] were using me.
[4]   So that became a bit more prevalent
[5] as I aged or matured. And also probably 30 to
[6] 40 percent of the patients I see in my office on
[7] medical/legal consultation are sent by plaintiff
[8] firms.
[9]   And one of two things happened. If
[10] I send back the report to the plaintiff's attorney
[11] that I find nothing of merit in the case, they
[12] don't call me to court.
[13]   On the other hand, if I send back a
[14] report that indicates I find something that's
[15] remarkably meritorious, it's amazing how
[16] frequently those cases are scheduled for trial and
[17] how frequently they are settled before I go to
[18] court.
[19]   I would like to think the reason for
[20] that is the defense firm is recognizing that I
[21] don't bend one way or another and that if I see
[22] something there, I really mean it's there, and can
[23] usually be accused of being able to get that
[24] message across to a jury, so that the defense bar
[25] respects my reports and tends to settle the case,

Page 41

**Block**

[2] I believe.
[3] No one has ever explained it to me,
[4] but that's my opinion of why.
[5] **Q:** That's fair.
[6] Would it be fair to say, Dr. Block,
[7] that the greater majority of your cases where you
[8] are called upon to give an expert opinion either
[9] for the plaintiff or for the defense are medical
[10] malpractice cases?
[11] **A:** No, sir. That's a minority.
[12] Most of the cases in which trips and
[13] falls and car accidents or scaffolds going down,
[14] injured workers, innocent bystanders who get
[15] struck by one thing or the other thing.
[16] **Q:** Cases where there is either a true
[17] or alleged neurological disorder or injury at
[18] issue?
[19] **A:** Yes, sir. I'm only called upon as a
[20] neurologist.
[21] **Q:** Have you ever, in your career, given
[22] an opinion in court related to the relations
[23] between Campylobacter jejuni and Guillain-Barre?
[24] **A:** Not that I recall.
[25] **Q:** Have you ever been called upon in

Page 42

**Block**

[2] any case that didn't proceed to court where you
[3] were consulted where you had been asked to give an
[4] opinion drawing a causal link between
[5] Campylobacter jejuni and Guillain-Barre?
[6] **A:** No, sir.
[7] **Q:** Is it fair to say that this is the
[8] first case in which you have been called upon to
[9] give such an opinion?
[10] **A:** To the best of my recollection, and
[11] it's pretty good, about something like this, this
[12] is the first such case.
[13] **Q:** Have you ever in your career been
[14] called upon as a consulting expert to give an
[15] opinion about any subject that related to
[16] food-borne illnesses in court cases?
[17] **A:** Not that I recall, sir.
[18] **Q:** Forgive the repetition if it occurs,
[19] but have you ever been called upon to either
[20] testify or consult in any legal cases that have
[21] involved Guillain-Barre?
[22] **A:** Again, not that I recall. That's a
[23] pretty definite no.
[24] I don't recall going to court about
[25] a Guillain-Barre. That could be challenged. I

Page 43

**Block**

[2] have been around for a long time, but I don't
[3] recall that.
[4] **Q:** Nothing specific that comes to mind?
[5] **A:** No.
[6] **Q:** Then I take it that you have never
[7] been called upon, at least as far as you can
[8] recall, to give an opinion as to the cause of
[9] somebody's contracting Guillain-Barre in a court
[10] case?
[11] **A:** That's correct.
[12] **Q:** Have you ever participated in a
[13] case, whether to give an opinion or not, where
[14] Guillain-Barre was somehow at issue in the case?
[15] By a case, I mean a legal case.
[16] **A:** Again, to the best of my recall,
[17] that has not occurred.
[18] **Q:** Have you ever had any cases where
[19] you have served as an expert consultant in
[20] connection with Mr. Holland's firm before this
[21] case?
[22] **A:** To the best of my recollection, this
[23] is my first case with this firm.
[24] What's your recollection?
[25] **MR. HOLLAND:** I think you are

Page 44

**Block**

[2] accurate.
[3] **THE WITNESS:** Can I get some
[4] coffee?
[5] **MR. HOLLAND:** Sure.
[6] (Whereupon, at 10:55 o'clock
[7] a.m., a recess was taken to 11:05
[8] o'clock a.m.)
[9] (The deposition resumed with
[10] all parties present.)
[11] JEROME BLOCK, resumed and
[12] testified further as follows:
[13] **BY MR. O'KEEFE:**
[14] **Q:** We were talking about whether you
[15] could recall ever having been an consultant for
[16] Mr. Holland's firm.
[17] I think you don't recall?
[18] **A:** I don't recall it at all.
[19] **Q:** Have you ever been to his office
[20] before today?
[21] **A:** No, sir.
[22] **Q:** Have you ever met personally with
[23] Mr. Holland before today?
[24] **A:** Yes, sir.
[25] **Q:** Let's start with on how many

Page 45

**Block**

occasions?

**A:** Twice, I believe.

**Q:** Can you tell us when?

**A:** Day before yesterday, and after that I would have to call my secretary and find out.

**Q:** But one other time, other than the day before yesterday?

**A:** I might have something in here about that, I don't know, but I think we discussed this case in my office on two occasions, did we not, sir?

I'm not allowed to ask questions. I don't have any reference to that, but I think it was the day before yesterday, then some time ago, how about a legal conference on 8/27/03?

**Q:** Sounds fair. I will take your word for it. So on two occasions you have met in your office with Mr. Holland in connection with this case?

**A:** Yes.

**Q:** Starting with the meeting that occurred day before yesterday, how long did that meeting last?

**A:** Half an hour, 40 minutes.

Page 46

**Block**

**Q:** Do you recall anything specifically you discussed?

**A:** Well, we discussed this case and my opinion of it.

**Q:** Just getting a general sense as to the questions that would be asked today and the process, what have you?

**A:** Well, I think I didn't have to do that meeting with Mr. Holland to imagine what questions might be asked today.

He basically asked my opinion and I indicated to him.

**Q:** During that meeting or just prior to that meeting, were you shown any new materials in connection with this case?

**A:** Prior to that meeting, I did receive a report a few days before that meeting, which I did read. The author of that report's name is not the name printed in my frontal lobe as yet.

**Q:** Would it be Dr. Golden?

**A:** It might be, but give me a moment and I might be able to come up with that answer for you, but it was the opinion, as I recall, of a physician, of a woman physician, I think.

Page 47

**Block**

**MR. HOLLAND:** It was Dr. Golden.

**A:** Here it is, Marjorie P. Golden report of 5/19/04.

**Q:** That report was faxed over to you before you met with Mr. Holland the day before yesterday?

**A:** Yes, it was.

**Q:** Did you review the contents of that report with Mr. Holland the day before yesterday?

**A:** I don't think we spoke about it specifically.

**Q:** Were you provided with any other —

**A:** We did make some reference to it, yes, but in no particular detail.

I can recall remarking on one of her comments that 98 percent of retail chicken meat has been reported to have this organism, and I said that's pretty high, but maybe it's one study as opposed to maybe all from one farm as opposed to in general.

I don't recall any other specific remarks about her report.

**Q:** We will get to the report in a

Page 48

**Block**

minute.

If you will, Doctor, I just want to know whether there were any other materials that you were provided just prior to your meeting with Mr. Holland the other day, other than Dr. Golden's report?

**A:** Not that I recall, sir.

**Q:** You have issued two written reports in connection with this case, sir?

**A:** I issued a report on November 26th of '03. I believe there was another report.

**MR. HOLLAND:** I think it was January 21st.

**Q:** January 31st?

**A:** January 31st of '04.

**Q:** Have you rendered any other written reports other than those two reports in connection with this case, Doctor?

**A:** No, sir. I have written to counsel that I have completed review of documents and a call to my secretary would suffice to reserve time for conference, but no other report.

**Q:** Between the time that you issued a last report in this case, which would be the

Page 49

**Block**

January 31, '04 report, to the time that you received a copy of Dr. Golden's report, did you receive any other materials in connection with this case that you can recall?

**A:** I'm sorry to have to shuffle papers around, but I like to be accurate.

No, I don't believe I received anything after January 31st of '04 aside from Dr. Golden's report — hold on a minute. Here is March 29th of '04.

I reviewed documents that were forwarded on 3/16, a report of Dr. John O'Brien dated 10/13/03, a report of O'Brien on 3/30/01 and 6/19/01, and a report of a neurologist, Dr. Haspani, of 6/30 and 7/30/02.

So I reviewed those sometime in March of this year.

**Q:** May I just see the paper that you are reading?

**A:** (Handing).

**Q:** The letter that you were just referencing is a letter dated March 29, 2004 over your signature and it's written to Mr. Holland?

**A:** Yes. I don't have the date, but you

Page 50

**Block**

have it in front of you.

Yes, March 29, '04.

**Q:** I will hand that letter back to you. Is it fair to say that there was nothing in the materials that were forwarded to you on March 16, '04 that changed any of the opinions that you had rendered in the preceding two reports that you had drafted?

**A:** I think that's quite fair.

**Q:** Have you ever testified on behalf of American Airlines before in your career?

**A:** No, sir.

**Q:** Have you ever consulted at all with American Airlines on any cases?

**A:** Not that I recall.

I did consult on an airline case some time ago, but I don't recall if it was American Airlines. I don't think so.

**Q:** Did that airline case involve the Condon & Forsyth firm, that you recall?

**A:** I have never been involved with this firm. If I have, my apologies, I have forgotten it.

**Q:** The meeting that took place between

Page 51

**Block**

you and Mr. Holland on August 27, '03, do you recall or do you have anything in your chart or file that would help to refresh your recollection as to how long that meeting lasted?

**A:** I charged $350 for that meeting. Now, that means that in reading over any notes I might have had prior to that meeting and adding that time up with the time we were together, it was an hour.

So I think we met for less than an hour, but I probably spent 10 or 15 minutes looking over my notes that I may have made or that had been forwarded.

**Q:** Now, that meeting, I take it, would have taken place where you rendered either of your two written reports in this case?

**A:** Well, if that meeting was on August 27th of '03 and my written reports were November of '03 and January '04, yes, sir, that meeting was before these reports.

**MR. O'KEEFE:** I'm going to ask the reporter to mark the next exhibit as Plaintiff's Exhibit No. 2.

(Affidavit was marked as

Page 52

**Block**

Plaintiff's Exhibit No. 2 for identification, as of this date.)

BY MR. O'KEEFE:

**Q:** Handing you what has been marked, Dr. Block, as Plaintiff's Exhibit 2, this is an affidavit that you signed on March 31, 2004?

**A:** Yes, sir.

**Q:** Would you take just a brief moment to review the paragraphs of that affidavit?

**A:** (Perusing document.) Yes, sir.

**Q:** Is it still your belief, as you sit here today, that the assertions that you swear to in this particular affidavit are true and accurate, to the best of your knowledge and belief?

**A:** Yes, sir.

**Q:** Turning to Page 2, you signed that affidavit in the presence of a notary public?

**A:** Yes, sir.

**Q:** Where were you when you signed that document?

**A:** In my office.

**Q:** Was the notary there with you?

**A:** Probably, yes. How else would they

Page 53

**Block**

have signed it? The notary must have come to my office.
   I have a secretary who was a notary who was not there at the time, so somebody had to be there.
   **Q:** So the notary came to your office to take your oath in person on that affidavit?
   **A:** I have no particular recall of that, but I don't know of any exception to the rule.
   **Q:** So you wouldn't know of any reason why you would swear to an affidavit not in the presence of a notary?
   **A:** I might swear to an affidavit. I don't have to have a notary public to say that what I am saying is the truth. That's a legal thing, I suppose.
   **Q:** But in this particular case your recall is that the notary came to your office to take your oath?
   **A:** I have no full recall of the date I signed this and I realize that was not that long ago, but I signed, there is a notary who signed, I could only presume that the notary was there.
   **Q:** I take it you brought your case file

Page 54

**Block**

with you this morning, Dr. Block?
   **A:** Yes, sir.
   **Q:** May I take a quick look at that, please?
   **A:** You may, certainly.
   **Q:** What do you have here?
   **A:** This is material that I was sent for review, which has not been discarded or returned to counsel.
   I reviewed a pile of records and we return those or discard them. You will find a notice in there saying pick it up or recycle. They were not picked up.
   Since I received them recently enough, they were not recycled.
   **Q:** So is it your practice when you are consulting on a legal case that if there were voluminous medical records, once you have had an opportunity to review those, you will either recycle those or discard them or return them to the office that sent them to you?
   **A:** We routinely will send a note to whoever sent us the material that they have got a month to pick it up or we will recycle.

Page 55

**Block**

If they don't pick it up in a month, we send them a we-really-mean-it note.
   After two months, we recycle. There is no room to store these things.
   **Q:** Other than the process that you have just described, either discarding, recycling or returning medical records, have any other documents ever been removed from your case file in this case?
   **A:** No, sir.
   **Q:** Have you retained all correspondence that you have received and/or written yourself and sent on your behalf in your case file?
   **A:** To the best of my knowledge, yes, sir, I give files to my staff and say file it and I suggest that they are probably 99 percent accurate in filing it.
   But if a letter got lost, it was not on my desk, it was sent from my desk to the front desk, I would simply hope that all of the letters were filed and I retain them in the patient's file.
   **Q:** That would certainly be general practice. You wouldn't intentionally discard

Page 56

**Block**

something?
   **A:** Absolutely, absolutely.
   **Q:** Dr. Block, given the fact that it is your practice to either discard, recycle or return medical records that you review in connection with your legal cases, do you keep a log anywhere in your chart of exactly what it is that you have reviewed or would that be something that would just be referred to in the reports themselves of the correspondence to the attorney?
   **A:** It would be recorded in what I dictate as I am reviewing.
   So whatever I review, I simultaneously talk into a little microphone and say I have reviewed a record dated XYZ from whatever source and then make reference to it in my notes.
   **Q:** Do you do your best, in working on the cases upon which you consult, to try to note the date upon which you received certain documents, materials that are provided to you?
   **A:** I don't make a note on when the materials were received in my office. I make a note as to basically when I began my review of

Page 57

**Block**

[2] them or when I completed the review of them.
[3] I have no idea when correspondence
[4] comes into the office, so sometimes it's something
[5] that has to be handled immediately and other times
[6] it's handled a month or so later.
[7] MR. O'KEEFE: I'm going to
[8] have the case file marked as an
[9] exhibit. I will return the original
[10] to you, certainly ask counsel to have
[11] copies made.
[12] MR. HOLLAND: We will make
[13] copies here.
[14] MR. O'KEEFE: Just mark it as
[15] Plaintiff's Exhibit 3, please. If
[16] it's okay, I will mark the outside of
[17] the file.
[18] A: No problem. I have no copies of
[19] anything in there.
[20] MR. HOLLAND: We will send
[21] them out, make them now so we have
[22] them made before the deposition is
[23] over.
[24] (Case file was marked as
[25] Plaintiff's Exhibit No. 3 for

Page 58

**Block**

[2] identification, as of this date.)
[3] MR. O'KEEFE: I will ask that
[4] the deposition, plus some other
[5] medical reports, be marked as Exhibit
[6] 4.
[7] (Depositions and other records
[8] were marked as Plaintiff's Exhibit No.
[9] 4 for identification, as of this
[10] date.)
[11] BY MR. O'KEEFE:
[12] Q: Dr. Block, we have marked your
[13] entire case file as Plaintiff's Exhibit 3 and
[14] Mr. Holland has agreed he will make a copy of the
[15] entire file and forward it to me.
[16] I have a few questions about the
[17] content of your file.
[18] A: Surely.
[19] Q: I am going to pull out of your file
[20] a version of the affidavit that has already been
[21] marked as Plaintiff's Exhibit 2 and just show that
[22] to you.
[23] If you turn to Page 2, I notice that
[24] that version of the affidavit has the notary stamp
[25] on it and the notary signature, but it doesn't

Page 59

**Block**

[2] have your signature on that.
[3] Do you see that there?
[4] A: Yes.
[5] Q: Can you recall, Doctor, when it was
[6] that you received this particular document that
[7] you are holding in your hands?
[8] A: No, sir.
[9] Q: Does looking at this particular
[10] document refresh your recollection at all as to
[11] whether or not you were in the notary's presence
[12] when you actually signed this sworn affidavit?
[13] A: Well, I didn't sign, this is the
[14] notary's signature there. I made corrections on
[15] it. I have no recall of the notary being present
[16] when I made these corrections.
[17] Q: It would seem that the notary's
[18] signature is on it, the original signature is
[19] dated March 31, 2004.
[20] Would you agree with that?
[21] A: It looks that way, sir.
[22] Q: I take it given the fact that it's
[23] in your file, it's something that you received in
[24] connection with this case?
[25] A: It must be.

Page 60

**Block**

[2] I don't know whether the signature
[3] was here before I made these corrections or after.
[4] I have no recall of that.
[5] Q: You don't have any independent
[6] recall of someone by the name of Maryann Rooney
[7] coming to your office to sign this?
[8] A: I really do not, sir.
[9] Q: I am also going to hand you a
[10] four-page document which I am pulling out of your
[11] case file and ask who prepared that document?
[12] A: Well, I dictated this report, or
[13] it's not a report, it's my notes, not addressed to
[14] anybody and not signed, and I can't tell you which
[15] of my staff or typing services typed it out.
[16] Q: But that's not something that was
[17] prepared by Mr. Holland or somebody at the law
[18] firm?
[19] A: No. This is my work, January 24,
[20] '04 dictated notes, abstracting information which
[21] I thought was worthy of commemorating and so that
[22] I would have a recall, something to refresh my
[23] memory of what I read and the contents of it.
[24] Q: It's at least dated January 24, '04.
[25] Would that be the date that it was transcribed?

Page 61

**Block**

A: That would be the date it was dictated.

Q: So it was dictated approximately seven days prior to the date that you issued your second report in this case, if your second report in this case was issued on January 31, 2004?

A: I don't know if it was issued on January 31st. It was dictated on January 31st. There is often a two or three-day turnaround time.

Q: But this was dictated between the time that you dictated your first report and your second report?

A: Again, I forget the dates of my first and second reports, but I believe that to be correct.

Q: You note in this particular case file notes dated January 24, 2004, that you had an opportunity to review Ms. Pridgeon's deposition?

A: Yes, sir.

Q: You note that she testified at her deposition that she ate two or three bites of chicken on a flight from Paris to New York on June 13, 2000?

A: That's the best of my recall, yes.

Page 62

**Block**

Q: Do you have any reason to believe that she is not telling the truth when she gave sworn testimony that she actually ate chicken aboard that flight?

A: I have no reason to disbelieve her.

Q: And you further note that she testified that the chicken that she ate was pink?

A: Yes, sir.

Q: Do you have any reason not to believe her when she says that the chicken was pink?

A: If she felt it was pink, that's what she testified to. I have no reason to disbelieve her opinion of the color of that chicken.

Q: Further, she testified that the chicken had a funny taste.

Again, same question, do you have any reason to not believe her when she gave sworn testimony that the chicken had a funny taste?

A: I don't know the individual. I have no reason to disbelieve her.

Q: You further testified that she registered no complaints.

Is there any scientific

Page 63

**Block**

significance, in your opinion, the fact that she registered no complaints?

A: I don't think there is anything scientific about it or not. She said the chicken tasted funny and she didn't complain about it was what her testimony was.

Q: In rendering the opinions that you ultimately rendered in this case, does the fact that Ms. Pridgeon made no complaints about the chicken factor into your scientific analysis?

A: No, I don't think it factors into the scientific analysis.

Q: If she had made a complaint about the chicken that she had on the flight, would that change your opinion in any way?

A: No. I don't think it would change my opinion. Had she made a complaint, it would have lent a lot more credibility to her statements about the chicken being pink, undercooked, if you will, and having a funny taste.

I don't know whether this is her statement based on what happened that day or whether there is some retrospective thoughts about it. I just don't know the individual and can't

Page 64

**Block**

pass judgment on it.

Had she complained, I think it would have lent more credibility to what she testified to. I have no other opinion on that.

Q: Why do you think it would lend more credibility to her?

A: Sometimes people look for cause and then they go back in retrospect as to why did grandma have a stroke on such and such a day. Well, that's because grandpa went to the racetrack the day before type thing.

People look for reasons. They look for something to blame. Sometimes what is a small infraction becomes a major infraction and sometimes they will pick out a specific event, one meal from the last ten meals or last 20 meals that they think may have offended them or caused a problem or would be something easier to blame than saying I forgot what restaurant I ate in the day before.

So I think a complaint registered at that time would have lent more credibility to her analysis of why she developed Guillain-Barre.

Q: Do you know, do you have any

Page 65

**Block**

[2] knowledge at all as to whether or not Ms. Pridgeon
[3] had ingested any chicken or poultry products in
[4] the two weeks prior to the flight from Paris to
[5] New York?
[6]   A: I have no knowledge of that.
[7] My recall of her deposition
[8] testimony, I don't recall that she said she ate
[9] chicken. She may have said she couldn't recall if
[10] she ate chicken, I just don't know.
[11]   Q: You just don't know one way or the
[12] other?
[13]   A: That's correct.
[14]   Q: You do note in this note and at
[15] least your first report, I believe both reports,
[16] that Ms. Pridgeon had several years prior to her
[17] flight from Paris to New York undergone surgery
[18] related to her cervical spine?
[19]   A: Oh, yes, sir.
[20]   Q: Do you have any opinion at all, Dr.
[21] Block, as to whether or not the situation with the
[22] lesion on the cervical spine had anything to do
[23] whatsoever with her Guillain-Barre?
[24]   A: Well, to be more precise, it wasn't
[25] a lesion of the cervical spine, the cord, it was

Page 66

**Block**

[2] the cervical spinal cord. I do not believe that
[3] had anything to do with her Guillain-Barre.
[4]   Q: You also note in this note and in
[5] several of your reports that your understanding is
[6] that Ms. Pridgeon was in St. Thomas from May 18th
[7] through May 28th of 2000.
[8]     Is there any particular scientific
[9] significance to that fact?
[10]   A: Only in reading over things, I kind
[11] of wonder what illnesses might have been
[12] contracted in St. Thomas, which is why somewhere
[13] in one of those reports or abstracts I was
[14] considering dandy fever, toxicity.
[15]     That's simply the rambling thoughts
[16] of a neurologist reading reports.
[17]     I don't think that her trip to St.
[18] Thomas had anything to do with what eventually
[19] happened to her.
[20]   Q: So is it fair to say that you don't
[21] believe that the trip to St. Thomas had anything
[22] to do with the fact that she contracted the
[23] Guillain-Barre?
[24]   A: That's correct.
[25]   Q: I will take another document out of

Page 67

**Block**

[2] your case file, Dr. Block, and hand that to you
[3] briefly and note that I believe that's an 11-page
[4] set of notes.
[5]   A: Pardon?
[6]   Q: I would note that that's an 11-page
[7] set of notes; is that correct?
[8]   A: Yes.
[9]   Q: Is that something that you prepared,
[10] Doctor?
[11]   A: Yes.
[12]   Q: Is there a date there on that set of
[13] notes?
[14]   A: There is not a date on there, but if
[15] you look at the billing form, it will tell you
[16] what the date was.
[17]   Q: I will look at the billing form
[18] later. That's noting something that was prepared
[19] for you or given to you?
[20]   A: No, sir. This is entirely the fault
[21] of Jerome M. Block, M.D. He read over a lot of
[22] records and put this down in abstract.
[23]   Q: Do you know when it was that Ms.
[24] Pridgeon first suffered from any gastrointestinal
[25] illnesses upon her return from France?

Page 68

**Block**

[2]   A: Well, you know, there are notes
[3] recorded by a variety of physicians that indicate
[4] that as early as three weeks before she was seen
[5] at the hospital she had gastrointestinal problems.
[6] So it ranges from anywhere from nine days before
[7] or seven days before to three weeks before.
[8]     If you read over the notes of a
[9] number of the physicians who recorded her history
[10] in the hospital, you will find various amounts of
[11] time indicated as to when she developed the
[12] gastrointestinal problems.
[13]     I think according to her testimony,
[14] rather than that, according to the statement she
[15] made to a number of physicians when hospitalized,
[16] she developed the gastrointestinal problem two
[17] days after the flight from Paris.
[18]     Now you are testing my memory, but I
[19] believe it's two days after the flight from Paris
[20] and that the problem was severe, associated with
[21] lots of a gastric pain and that it was basically
[22] circumscribed lasting about two days.
[23]     But if you go into statements by
[24] others recorded contemporaneously with her
[25] illness, it ranges significantly, and in my notes