# EXHIBIT F

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


LOLITA PRIDGEON,
         Plaintiff

VS.                          DOCKET NO. 3:02 CV 1032 WWI


AMERICAN AIRLINES, INC.
         Defendant


Deposition of MARJORIE GOLDEN, M.D., taken in accordance with

the Connecticut Practice Book at the offices of Updike, Kelly

& Spellacy, One Century Tower, 265 Church Street, New Haven,

Connecticut, before Meghan M. English, LSR, a Licensed

Shorthand Reporter and Notary Public, in and for the State of

Connecticut on Thursday, August 26, 2004, at 10:01 a.m.


MEGHAN M. ENGLISH, LSR
LSR NO. 211

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE

MADISON, CT 06443

203 245-9583
HARTFORD                                    STAMFORD


DEL VECCHIO REPORTING
(203) 245-9583

Page 2

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
TIMOTHY L. O'KEEFE, ESQUIRE

KENNY, O'KEEFE & USSEGLIO, P.C.
21 Oak Street
Hartford, Connecticut 06106
860-246-2700
ON BEHALF OF THE DEFENDANT - AMERICAN AIRLINES:
MICHAEL J. HOLLAND, ESQUIRE
CONDON & FORSYTH LLP
685 Third Avenue
New York, New York 10017
212-490-9100

ON BEHALF OF THE DEFENDANT - AMERICAN AIRLINES:
ALISON L. MCKAY, ESQUIRE
LAW OFFICES OF PAUL A. LANGE
80 Ferry Boulevard
Stratford, Connecticut 06615
203-375-7724

DEL VECCHIO REPORTING
(203) 245-9583

Page 3

1
2          STIPULATIONS
3
4
5          IT IS HEREBY STIPULATED AND AGREED by and
6   between counsel representing the parties that each party
7   reserves the right to make specific objections at the trial
8   of the case to each and every question asked and of the
9   answers given thereto by the deponent, reserving the right to
10  move to strike out where applicable, except as to such
11  objections as are directed to the form of the question.
12         IT IS FURTHER STIPULATED AND AGREED by and
13  between counsel representing the respective parties that
14  proof of the official authority of the Notary Public before
15  whom this deposition is taken is waived.
16         IT IS FURTHER STIPULATED AND AGREED by and
17  between counsel representing the respective parties that the
18  reading and signing of the deposition by the deponent is not
19  waived.
20         IT IS FURTHER STIPULATED AND AGREED by and
21  between counsel representing parties that all defects, if
22  any, as to the notice of the taking of the deposition are
23  waived.
24         Filing of the Notice of Deposition with the
25  original transcript is waived.

Page 4

1          MARJORIE GOLDEN, M.D., having first been
2   duly sworn, deposed and testified as follows:
3
4          DIRECT EXAMINATION
5   BY MR. HOLLAND:
6       Q    Dr. Golden, good morning.
7       A    Good morning.
8       Q    My name is Michael Holland.  I am an attorney
9   and I represent American Airlines in this case involving
10  Lolita Pridgeon against American Airlines, and I am going to
11  be here asking you some questions today.
12         Could I please have for the record your name
13  and your address?
14      A    Marjorie Golden, 4 North Sasco Common,
15  Westport, Connecticut.
16      Q    And can I have your date of birth, please,
17  Doctor?
18      A    March 4, 1960.
19      Q    And have you ever had your deposition taken
20  before?
21      A    No, I have not.
22      Q    Have you ever been retained as an expert
23  witness before?
24      A    No, I have not.
25      Q    So this is your initial encounter being an

Page 5

1   expert?
2       A    That is correct.
3       Q    Let me just give you a couple instructions for
4   witnesses that will make the deposition go smoother.
5       A    Okay.
6       Q    First of all, I will try not to interrupt you,
7   and would you please try not to interrupt me.
8       A    Fair enough.
9       Q    If you don't understand my question, will you
10  please ask me to repeat it or rephrase it?
11      A    Yes.
12      Q    If you don't ask me to repeat it or rephrase
13  it, I am going to assume that you understand the question.
14      A    Okay.
15      Q    You have to answer verbally.  You can't shake
16  your head or nod your head.  Okay?
17      A    I understand.
18      Q    Now did you -- I have your CV here and your
19  report.  I am going to mark your CV for identification as
20  Exhibit 1 and show it to you.
21         (Defendant's Exhibit 1 was marked
22          for identification, described
23          in index.)
24  BY MR. HOLLAND:
25      Q    Doctor, I have shown you what has been marked

2 (Pages 2 to 5)

Page 6

1  as Exhibit 1 for identification. Can you identify that?
2      A    Yes. This is my CV.
3      Q    And is it current?
4      A    There is one new publication since.
5      Q    And what is the new publication?
6      A    It is from a journal called Infections In
7  Medicine, looking at fever of unknown origin in patients
8  receiving what is called heart therapy, highly active
9  antiretroviral therapy.
10     Q    And where was that paper published?
11     A    Infections In Medicine.
12     Q    Okay. That's the name of the publication?
13     A    Correct.
14     Q    And when did that appear?
15     A    July.
16     Q    2004?
17     A    Correct.
18     Q    And anything other than that that's not listed
19  in your CV?
20     A    No, that's it.
21         MR. HOLLAND: Now let me mark as Exhibit
22     2 for identification then a copy of a report
23     dated May 19, 2004.
24         (Defendant's Exhibit 2 was marked
25         for identification, described

Page 7

1         in index.)
2         THE WITNESS: Yes, this is mine.
3  BY MR. HOLLAND:
4      Q    That's the report you prepared in this case?
5      A    That is correct.
6      Q    And it's dated May 19, 2004, correct?
7      A    Correct.
8      Q    And is that the final version of your report?
9      A    Yes, it is.
10     Q    And are there any drafts of the report?
11     A    No, there are not.
12     Q    Did you prepare any drafts of it?
13     A    No, I did not.
14     Q    So you just went through it one time, prepared
15  it and that was it?
16     A    I was actually on a medical leave. I had all
17  of the information spread out in my home office. I sat at my
18  computer and typed it up.
19     Q    In one go-round?
20     A    In one go-round. You know, obviously you
21  write a sentence, you revise it; but it was accomplished in
22  one sitting.
23     Q    So my question is: You didn't save any of the
24  sentences that you deleted or anything like that?
25     A    Correct.

Page 8

1      Q    So it was just one report without any drafts
2  that are in existence?
3      A    That is correct.
4      Q    When did you start working on the report?
5      A    Do you mean when did I start reviewing the
6  information with the case or when did I actually sit down to
7  type the report?
8      Q    That's a good question. So let's go back to
9  the beginning. When were you first contacted about becoming
10  an expert witness in this case?
11     A    I am looking for the original letter that I
12  got from Mr. O'Keefe notifying me of this. It was a while
13  ago. I believe that the first formal notice that I got was
14  March 1, 2004. Please be advised that our office represents
15  the above-referenced client in connection with personal
16  injuries. It's our understanding you treated Miss Pridgeon,
17  etc.
18         MR. HOLLAND: Let's mark that as Exhibit
19     3 for identification, please.
20         (Defendant's Exhibit 3 was marked
21         for identification, described
22         in index.)
23  BY MR. HOLLAND:
24     Q    Let me just look at it.
25         So this was a letter that was sent to you by

Page 9

1  Mr. O'Keefe's office to obtain your records and treatment
2  notes, correct?
3      A    Correct. And what I would have done with this
4  is to forward it to our medical records department because I
5  only saw her when she was an inpatient at the hospital of St.
6  Raphael's. All of those medical records are kept by the
7  hospital's medical record department. So when there is a
8  request made, we forward the request to medical records and
9  then at their leisure they will process the request.
10     Q    You saw her, as I understand it, over the 4th
11  of July weekend in the year 2000; is that correct?
12     A    That is correct.
13     Q    And I take it you were covering that weekend
14  for the other doctors?
15     A    That is correct.
16     Q    Since you were the junior person you probably
17  got 4th of July weekend?
18     A    Actually, 4th of July weekend is one of the
19  better weekends to get.
20     Q    Who was the original infectious disease doctor
21  who was treating her at St. Raphael's?
22     A    Helena Brett, B-R-E-T-T, dash Smith.
23     Q    And is Dr. Brett-Smith still at the hospital?
24     A    No, she is not.
25     Q    And do you know where she works now?

3 (Pages 6 to 9)

Page 10

1    A    She now works for Bristol Meyers Squibb.

2    Q    Is that here in Connecticut?

3    A    It's in Wallingford.

4    Q    When were you first retained as an expert

5    witness in this case?

6    A    I met with Mr. O'Keefe on March 30, 2004.

7    Q    Let's go back to when you treated Miss

8    Pridgeon, and we will go through the records later. I just

9    want to ask you some general questions if I can. All right?

10   A    Okay.

11   Q    You saw her, and at the time you saw her she

12   had Guillain-Barre Syndrome?

13   A    The diagnosis has been made when I saw her,

14   that's correct.

15   Q    And I take it do you know -- do you have a

16   recollection of seeing her?

17   A    I remember her very vividly.

18   Q    You do. Okay. And why is that?

19   A    She at the time I saw her was a very young

20   woman. I have kind of lost track at the time.

21   Q    That's okay.

22   A    I think as physicians, especially as young

23   physicians, we are really often particularly struck by

24   patients who are close to our own age. She was also in

25   excruciating pain when I saw her, and I suspect that part of

Page 11

1    why she remembers me was the effort that I put into getting

2    somebody to pay attention to her pain control even though I

3    was the infectious disease consult.

4    Q    Was she in the ICU when you saw her?

5    A    She was on the subacute side of the ICU, to

6    the best of my recollection.

7    Q    And when you saw her, it wasn't for an

8    infectious disease problem as I read your notes.

9    A    We were -- the infectious disease service was

10   originally consulted to assess possible infectious triggers

11   of her Guillain-Barre, and if you read the original consult

12   note from Helena Brett-Smith, she specifically lays out the

13   reason for the consult.

14   Q    That was back on June 23rd? I interrupted

15   you. I am sorry.

16   A    Dr. Brett-Smith saw her on June 24th.

17   Q    So that was the day after her admission?

18   A    She came through the ER it looks like late on

19   the 22nd.

20   Q    By the time Dr. Brett-Smith saw her, a Lyme

21   serology had been sent off and had come back as low positive.

22   The way the diagnosis of Lyme is made is by sending off a

23   screening antibody test called an ELISA. If that's positive,

24   then it's followed up with a confirmatory test called a

25   Western Blot which basically looks at specific protein bands

Page 12

1    that are unique to the organism that causes Lyme disease.

2    Her ELISA was positive. The Western Blot was pending. So

3    she was asked to address the issue of whether Lyme could have

4    induced Miss Pridgeon's Guillain-Barre Syndrome.

5         During the time that I covered her, I believe

6    she also developed a urinary tract infection, a common

7    complication of patients in an intensive care unit; and I

8    also, I believe, addressed the issue of whether she could

9    have had some liver function test abnormalities from her

10   Doxycycline, the antibiotic that was being used to treat this

11   questionable Lyme disease.

12   Q    When was she put on that antibiotic?

13   A    The Doxycycline?

14   Q    Yes.

15   A    I don't know that off the top of my head. The

16   hospital has since gone to computerized order entry for all

17   antibiotics. I don't remember. I don't think that it

18   happened yet so it should be in here. The first dose was

19   ordered by Dr. Brett-Smith on 6/23/00 at 10 p.m.

20   Q    So she had been there in the hospital is it

21   fair to say about twenty-four hours before that antibiotic

22   was ordered?

23   A    She registered in the emergency room at 7:30

24   a.m. on 6/22, and that was ordered at 2200 6/23. There can

25   be a significant delay from the time the antibiotic order is

Page 13

1    faxed to the pharmacy until the time the bag actually hangs,

2    and there is always a record of medication administration

3    from the nurse's record. It will take me a while.

4    Q    That's okay.

5         MR. HOLLAND: Off the record.

6         (Whereupon a discussion was held

7         off the record.)

8         THE WITNESS: I do not see the medical

9         administration record in here.

10   BY MR. HOLLAND:

11   Q    It wouldn't have been administered, though,

12   before ten o'clock on the evening of the 23rd?

13   A    Correct.

14   Q    Probably within a couple of hours thereafter;

15   is that fair to state?

16   A    I would say at a maximum within six hours.

17   Q    So it would have been the night nurse that

18   would have administered it then?

19   A    Wait a minute. Here it is. It appears that

20   the medication administration record is only here from the

21   time she was on the rehabilitation unit and not the acute

22   hospital admission.

23   Q    So there was at least a preliminary diagnosis

24   that she had some evidence of Lyme disease based on the

25   initial ELISA test?

4 (Pages 10 to 13)

Page 14

1    A    No. There was a positive -- there was a low
2    positive ELISA antibody.
3    Q    What does that mean? Tell me.
4    A    It was nondiagnostic.
5    Q    However, there were other, I take it, tests
6    that were performed on her when she was in the hospital to
7    determine whether she had Lyme's disease?
8    A    That is correct.
9    Q    And what were those?
10   A    That was the Western Blot.
11   Q    And what is the Western Blot?
12   A    It's an electrophoresis test where the
13   patient's blood sample is loaded on a gel and an electrical
14   current is applied to that gel and different size proteins
15   migrate at different speeds through this gel and a radio
16   label is applied and they identify certain specific known
17   protein bands and there are formal criteria. If you have a
18   certain number of bands and certain specific bands positive,
19   that's a positive test. If you have no positive bands,
20   that's a negative test. So that's really a much more
21   specific and sensitive test.
22   Q    Now can Lyme disease be the cause of
23   Guillain-Barre Syndrome?
24   A    Yes.
25   Q    And is that recognized in the medical

Page 15

1    literature?
2    A    I would think so.
3    Q    I mean you would certainly accept that
4    proposition as an infectious disease specialist?
5    A    I would accept that.
6    Q    Now, in fact, have you looked at the discharge
7    diagnosis in this case that was made?
8    A    I have.
9    Q    And doesn't the discharge diagnosis find that
10   she had Lyme disease?
11   A    A low positive ELISA is not a diagnosis of
12   Lyme disease.
13   Q    But in the medical records on the discharge
14   summary sheet, and I guess it was prepared by Dr. John
15   O'Brien, isn't her discharge diagnosis Guillain-Barre is
16   Number 1 and Lyme disease is Number 2?
17   A    I would have to disagree with his assessment.
18   Q    But you have seen the medical record where it
19   says that?
20   A    I have seen the medical record.
21   Q    But you disagree with it?
22   A    I disagree.
23   Q    Let's back up and change speeds a little bit.
24   After you got the letter which was marked as Exhibit 3 from
25   Mr. O'Keefe and you sent him -- I guess the medical records

Page 16

1    were sent to him -- what was the next contact that you had
2    with Mr. O'Keefe's office?
3    A    He called me.
4    Q    Okay. And when was that?
5    A    I do not have a record of the date of the
6    phone call.
7    Q    Did you make any notes of the phone calls that
8    you had with Mr. O'Keefe?
9    A    No, I didn't.
10   Q    What did he ask you to do?
11   A    He asked me to meet with him to discuss the
12   case.
13   Q    And I take it you did that?
14   A    Yes.
15   Q    At his office?
16   A    He came to my office.
17   Q    And when did that meeting take place?
18   A    I believe that was March 30, 2004.
19   Q    And how long did that meeting last?
20   A    About one hour.
21   Q    Did you review any records with Mr. O'Keefe
22   during that meeting?
23   A    Yes, I did.
24   Q    And what did you review?
25   A    The contents of this binder sitting on the

Page 17

1    table. (Indicating)
2    Q    And this binder is the -- is it fair to say
3    that's the medical record from St. Raphael's?
4    A    That's correct.
5    Q    And it's the complete medical records so far
6    as you know?
7    A    To my knowledge.
8    Q    And it goes from the time of admission until
9    the time of discharge from the rehabilitation center?
10   A    Correct. And that is technically two hospital
11   admissions. It's a totally separate admission for the acute
12   inpatient hospitalization and for the rehabilitation
13   hospitalization.
14   Q    So she was moved I think sometime in July from
15   the hospital to the rehab?
16   A    I don't recall the exact date.
17   Q    Anything else other than those records that
18   you looked at?
19   A    No, not at that meeting.
20   Q    At any time subsequent to the meeting, did you
21   review any other documents?
22   A    I have read Ms. Pridgeon's deposition as well
23   as the deposition from the neurologist from New York City.
24   Q    Dr. Block.
25   A    Dr. Block. And the statement from the other

5 (Pages 14 to 17)

Page 18

1  infectious disease physician.
2     Q    Did you read Dr. Block's statement as well as
3  his deposition?
4     A    Yes, I did.
5     Q    And you read Dr. Cahill's statement?
6     A    Correct.
7     Q    Did you read the statements from the catering
8  company, Mr. Laurent Faye, F-A-Y-E?
9     A    I don't recall seeing that statement.
10    Q    Did you read the statement from the chicken
11  processing company, a lady named Matrix Devries?
12    A    I do not believe I saw that.
13    Q    So there was nothing nonmedical that you
14  looked at other than the deposition testimony of Miss
15  Pridgeon?
16    A    I believe that's correct.
17    Q    Anything else that you looked at?
18    A    Not that I recall. I reviewed a lot of the
19  medical literature.
20    Q    Right. And those are referred to in your
21  report?
22    A    Correct.
23    Q    And it's fair to say that you got copies or
24  read all of the things that you referred to in your sources?
25    A    That's correct.

Page 19

1     Q    Including the CDC website?
2     A    I reviewed the CDC website for this case and
3  for a talk that I gave relatively recently on foodborne
4  illness.
5     Q    Some of the -- one of the paragraphs in your
6  report appears to closely track the CDC website. Is it fair
7  to say that was the source of your information for that one
8  paragraph in your report?
9     A    That's very likely.
10         MR. HOLLAND: I think we should mark your
11         whole file if we can next, and that would be a
12         good way to proceed, which is two manila
13         folders.
14         (Defendant's Exhibit 4 was marked
15         for identification, described
16         in index.)
17  BY MR. HOLLAND:
18    Q    And if you could kind of go through it and
19  tell me what is in the file, Doctor.
20    A    Excuse me. So I have the correspondence from
21  Mr. O'Keefe's paralegal. This is in no particular order.
22    Q    That's okay.
23    A    The Notice of this deposition today. A copy
24  of the fee that I submitted to Mr. O'Keefe's company. A
25  letter from Mr. O'Keefe enclosing the deposition transcript

Page 20

1  from Dr. Block. A report from Dr. Block. A report from Dr.
2  Cahill. A copy of Deposition Notice. I have my typed notes
3  from the review of the chart. I have a copy of the statement
4  that I prepared as well as a fax transmittal sheet that I
5  sent to our hospital's attorney so that she is aware of my
6  involvement in this proceeding.
7     Q    Is that the report of May 19th or is that
8  something different?
9     A    No. That's the report. I have a number of
10  medical references.
11    Q    Those are some of the articles you referred
12  to?
13    A    That is correct. And I have a packet from
14  April 8th with an interview with Ms. Pridgeon and a cover
15  letter from Mr. O'Keefe.
16    Q    When you say "interview," you mean the
17  deposition transcript?
18    A    Yes, the deposition transcript. And I have a
19  few pages from the notes that I wrote in the chart that were
20  Xeroxed from that black binder.
21    Q    So those were the notes from your treatment of
22  July 1st to July 5th?
23    A    Right. This is my handwriting. These are the
24  notes that I would have put in the medical record.
25    Q    Now is that everything that you have in your

Page 21

1  file?
2     A    That is the complete file.
3     Q    Now I take it that you reviewed the entire
4  medical record in this case; is that fair to say?
5     A    I reviewed in great detail the inpatient
6  hospital admission. I quickly perused the rehab unit
7  admission.
8     Q    Because for your purposes the rehab portion
9  wasn't really terribly significant?
10    A    Correct.
11    Q    Now the medical record in this case is quite
12  extensive; is that correct?
13    A    That is correct.
14    Q    Did you see any reference anywhere in the
15  medical record to Ms. Pridgeon's illness being attributable
16  to any food that she consumed aboard an American Airlines
17  flight on June 13, 2000?
18    A    No, I did not.
19    Q    The medical record in numerous places contains
20  a statement of the history of Miss Pridgeon's travels,
21  correct?
22    A    Correct.
23    Q    And it mentions that she was in France?
24    A    Correct.
25    Q    And that she was in the Virgin Islands?

6 (Pages 18 to 21)

Page 22

1    A    St. Thomas.
2    Q    St. Thomas.
3         Why would doctors get that information?
4    A    Infectious disease consults in general inquire
5  in great detail about patients social history and that
6  includes what they drink, how much they smoke, use of elicit
7  substances, sexual practices, ingestion of food, travel
8  history, pets. That's part of our standard evaluation every
9  time we do a consultation. There are certain infections that
10 are more common in certain parts of the world. There are
11 certain infections that are more common in travelers in
12 particular. Somebody gives us a history of drinking well
13 water, that raises certain questions. Somebody gets a bite
14 from a cat, that raises the spector of certain infections.
15 So for us to really generate a complete differential
16 diagnosis, that information is very helpful.
17   Q    So it's part of the information that you
18 gather in making your diagnosis?
19   A    Correct.
20   Q    Now you mentioned that some infections are
21 more common in travelers; is that correct?
22   A    Yes.
23   Q    Can you tell me what some of those infections
24 are, Doctor?
25   A    The most common infection in travelers is an

Page 23

1  upper respiratory infection, contrary to popular lore,
2  followed by gastroenteritis.
3    Q    And both of those infections can trigger
4  campylobacter jejuni, right?
5    A    Respiratory infections are not associated with
6  campylobacter.
7    Q    Are they associated with Guillain-Barre
8  Syndrome?
9    A    I am not aware of the common respiratory
10 infections that you get from travel triggering
11 Guillain-Barre. The link is much stronger for campylobacter.
12   Q    Now when something is called a syndrome rather
13 than disease, is there a reason why something is called a
14 syndrome?
15   A    I don't know the specific answer. My guess is
16 a syndrome in general is a constellation of symptoms and
17 signs. Symptoms being the things that people complain of and
18 signs being the objective evidence of disease that you find
19 on exam.
20   Q    Because sometimes, you know, people call it a
21 Lyme's disease but they call it a Guillain-Barre Syndrome;
22 and as an infectious disease specialist, do you draw a
23 distinction between a disease and a syndrome?
24   A    Operationally, no.
25   Q    Okay. Theoretically, do you know why --

Page 24

1    A    Theoretically, there is a distinction, and I
2  don't recall it off the top of my head. I know, for example,
3  I believe that a disease -- the best example that comes to
4  mind is Cushings Disease and Cushings Syndrome which is a
5  condition of excess steroid hormone production. Cushings
6  Syndrome refers to what you see on exam, so fat
7  redistribution, diabetes, high blood pressure, etc. Cushings
8  Disease is that state of excess steroid caused by a specific
9  tumor in a specific location. There are other causes of
10 Cushings Syndrome aside from Cushings Syndrome. It's a
11 little bit semantics.
12   Q    Okay. Did you find this significant in your
13 review of the medical records in this case that there was no
14 mention of any food that was consumed by Miss Pridgeon aboard
15 the American Airlines flight?
16   A    It did not strike me as unusual.
17   Q    It did not?
18   A    It did not.
19   Q    And why is that?
20   A    When I saw the patient, she was in an
21 incredible amount of distress. When I saw her, she was
22 literally writhing in pain. It wouldn't surprise me that she
23 omitted really what she probably thought was an irrelevant
24 detail. At the time she was admitted to the emergency room,
25 she was a young woman who was almost paralyzed, who was

Page 25

1  almost undoubtedly petrified, and I think it's reasonable
2  that she would have omitted details. In my experience,
3  people omit details from their medical history
4  unintentionally all of the time.
5    Q    That may be -- but how about when she is a
6  couple of weeks post admission, does it strike you as
7  surprising that she never mentioned it to anybody during that
8  time?
9    A    My assumption would be that she did not think
10 there was any link between the two events.
11   Q    Do you know if she gave all of the history
12 that was given to the various medical providers at the
13 hospital or whether that history was provided in part or in
14 whole by someone else?
15   A    I don't know.
16   Q    Do you know if Dr. Kraw provided any of the
17 history?
18   A    I don't know. In the ideal world, when the
19 medical students are taught how to write their notes they are
20 supposed to say who provided the history, but in reality that
21 rarely happens.
22   Q    And, in fact, in this case you don't really
23 have any idea of who provided the history based on your
24 review of the notes?
25   A    That is correct.

7 (Pages 22 to 25)

Page 26

1    Q    Other than Miss Pridgeon herself?
2    A    That's correct.
3    Q    That would be your operating assumption, that
4    she was the one who provided the history?
5    A    Yes.
6    Q    And now I take it you're affiliated with Yale
7    Medical School as well?
8    A    Correct.
9    Q    And so is Dr. Hasbani?
10   A    I don't know.
11   Q    Dr. Kraw?
12   A    I believe so. I am not positive.
13   Q    Dr. Goldstein?
14   A    Yes.
15   Q    And what is Dr. Goldstein's affiliation?
16   A    I do not know his title.
17   Q    What is his field of specialty?
18   A    Neurology. He is actually an EMG specialist,
19   I believe.
20   Q    What is an EMG specialist?
21   A    Somebody who studies nerve transmission,
22   interprets nerve conduction studies, and EMG stands for
23   electromyogram, I think.
24   Q    Before the time that you were retained in this
25   case, had you ever discussed Miss Pridgeon's condition with

Page 27

1    Dr. Hasbani?
2    A    I don't recall if he overlapped my weekend
3    coverage. I recall speaking with Dr. Burn.
4    Q    And what is Dr. Burn's medical specialty?
5    A    He is also a neurologist.
6    Q    Was he covering that weekend?
7    A    Can I?
8    Q    Sure.
9    A    I know there was a note that I called one of
10   the neurologists to discuss her pain control. Discussed with
11   Dr. Werdiger who was one of the other neurologists on that
12   weekend. I believe that was my only contact. I do not
13   recall talking to Dr. Hasbani.
14   Q    And how about Dr. Goldstein, did you ever
15   discuss the case with Dr. Goldstein before you were retained
16   as an expert?
17   A    Not to my recollection.
18   Q    How about Dr. Kraw?
19   A    I have spoken with Dr. Kraw intermittently in
20   the hospital on a number of occasions since her discharge
21   informally, generally chatting about how she was doing. I
22   don't recall exactly when but at one point I remember
23   suggesting that he consider taking her to the Kessler Rehab
24   Institute in West Orange, New Jersey for some additional
25   physical therapy. I don't recall when that was, but we have

Page 28

1    never spoken specifically about any of the details. I was
2    aware that he was planning a lawsuit. That goes back several
3    years.
4    Q    And when did you first become aware of that?
5    A    That he was planning a lawsuit?
6    Q    Yes.
7    A    I don't recall. It was several years ago.
8    Q    And how did you become aware of that?
9    A    He told me in the hallway of the hospital.
10   Q    Okay.
11   A    He did not tell me that I would be involved.
12   Q    Well, that's your choice to become involved
13   though, Doctor?
14   A    That's correct.
15   Q    How about Dr. O'Brien, did you ever discuss
16   the case with Dr. O'Brien?
17   A    I don't believe so.
18   Q    Is Dr. O'Brien affiliated with Yale?
19   A    He is on staff at St. Raphael's. Most but not
20   all of the St. Raphael's attending physicians have academic
21   appointments at Yale. I don't know what Dr. O'Brien's status
22   is.
23   Q    Now all of the conclusions that you have
24   reached with respect to Miss Pridgeon's condition, they are
25   all contained in your report, correct?

Page 29

1    A    Correct.
2    Q    Are there any opinions that you intend to
3    offer at trial that are not contained in your report?
4    A    No.
5    Q    Now how long a period of time did you treat
6    Miss Pridgeon for?
7    A    I had saw her for the first time on July 1st.
8    I saw her again on the 2nd, the 3rd, the 4th and the 5th of
9    July.
10   Q    And that was the last time that you saw her
11   while she was in the hospital then was on July 5th?
12   A    That is correct. 2000.
13   Q    Okay. And when you saw her, it was as part of
14   your making rounds; is that fair to say?
15   A    That's correct.
16   Q    So you would see a number of patients in the
17   hospital and you would stop in to see her?
18   A    Exactly.
19   Q    Let's look at your notes for July 1st, if we
20   can, and can you read them to me?
21   A    Okay. Dated 7/1/00. ID, that's the name of
22   the consult service. Doxycycline Number 8. That implies it
23   was her eighth day of therapy. Patient examined. Chart
24   reviewed. 39-year-old female with GBS probably secondary to
25   campylobacter, infection. Currently on empiric Doxycycline,

8 (Pages 26 to 29)

Page 30

1  given low positive ELISA. Steroids being tapered. Generally
2  seems much stronger. Has been up in chair for over three
3  hours this morning and has increased shoulder shrug.
4      Q    Now when you say probably Guillain-Barre
5  Syndrome probably secondary to campylobacter, right, that's
6  what your notes say?
7      A    That's correct.
8      Q    And what did you base your diagnosis on?
9      A    So what I do when I am the covering person, I
10 get a list of patients from my colleague, typically with a
11 line that describes their problem.  That obviously is
12 inadequate, and we are generally very compulsive and are not
13 comfortable with that, so we read the entire medical record
14 the first day on service especially when we are going to be
15 covering over a long holiday weekend.  I read her chart.  I
16 reviewed the information.  I reviewed the working diagnosis
17 of the other consultants, and I try to put in -- I typically,
18 you know, write that I examined the patient.  I reviewed the
19 chart.  I usually try to write a sentence or two about what
20 the working diagnosis is.
21     Q    So was that a diagnosis that you made, or did
22 you pick up that diagnosis from the doctors who had treated
23 her previously?
24     A    I believe that I wrote that because my
25 impression from the previous notes suggested that.  I did not

Page 31

1  generate this out of the blue.  I suspect I was following the
2  tentative diagnosis of Dr. Brett-Smith who was the original
3  consultant.
4      Q    Now are there medical tests that are run to
5  determine the presence of campylobacter?
6      A    Our standard would be to order a stool
7  culture.
8      Q    And was the stool culture ordered in this
9  case?
10     A    Yes, it was.
11     Q    And was it ever done?
12     A    She never was able to produce a specimen.
13     Q    Was she ever given any suppositories or
14 something to help her produce a specimen?
15     A    She was -- there are several notes that
16 document that she was constipated.  I would have to review --
17 the orders will just tell you whether something was ordered.
18 It doesn't actually tell you whether it was given, and lots
19 of medications are ordered on an as-needed basis; so in order
20 to find whether she got a suppository or other laxative, you
21 would need to get the AMR, the medication administration
22 record, to document exactly what she was giving for that, and
23 I don't believe that's in this.  So I have no idea whether
24 she actually received a suppository or not.
25     Q    But you're certain and it's your testimony

Page 32

1  based on your review of the medical record that there was
2  never a stool sample analysis done of Miss Pridgeon?
3      A    That is correct.
4      Q    And you have reviewed the records carefully?
5      A    That is correct.
6      Q    Now is a stool culture -- a stool sample or a
7  stool culture -- what is the right word?
8      A    Culture.
9      Q    A culture, is that the definitive way to show
10 campylobacter?
11         MR. O'KEEFE:  Object to the form.
12         THE WITNESS:  Yes.
13 BY MR. HOLLAND:
14     Q    And your answer is yes?
15     A    Yes.
16     Q    And that wasn't done in this case?
17     A    It was ordered but not done.
18     Q    Is there a blood test that could determine
19 campylobacter?
20     A    There are serologic tests that look for the
21 presence of antibody.
22     Q    And what are those tests called?  Is there a
23 special name for them?
24     A    Antibody test.
25     Q    And were antibody tests done in this case?

Page 33

1      A    They were not ordered.
2      Q    So they weren't done?
3      A    Correct.
4      Q    So there is no serological evidence that she
5  had campylobacter bacteria?
6      A    That's correct.
7      Q    And there is no stool culture test to show she
8  had campylobacter?
9      A    That is correct.
10     Q    So your diagnosis of campylobacter is based on
11 essentially what she told you?
12     A    Correct.  It's based on her history of bloody
13 diarrhea associated with high fever and arthritis which is a
14 clinical constellation that is highly suggestive of
15 campylobacter.
16     Q    And you would agree with me, would you not,
17 that there is nothing in the record to indicate that the
18 cause of that bloody diarrhea was the chicken that she
19 consumed on the American Airlines flight on June 13, 2000?
20     A    That's correct.
21     Q    Did you ever conduct any investigation to see
22 whether or not any other persons who were aboard that flight
23 or on flights around that time period had become ill as a
24 result of eating the chicken?
25     A    I did not.

9 (Pages 30 to 33)

Page 34

1    Q    Now did you ever talk to Miss Pridgeon
2  personally about what she ate on the flight?
3    A    I did not.
4    Q    So your only basis for concluding that it was
5  the chicken was reading her deposition testimony?
6    A    That's correct.
7    Q    In preparing your report, Doctor, did you
8  consult any other sources other than those that you listed on
9  page 3 of your report?
10   A    Yes.
11   Q    And what other sources did you consult?
12   A    As you know, I did look at the CDC website.
13   Q    An article by Dr. Amos.
14   A    I don't recall the author offhand.
15   Q    He was at Vanderbilt, I think.
16   A    This is it. There is another New England
17  Journal article from December 23, 1999, which is what is
18  referred to as a CPC, or clinical case presentation. They
19  are case histories from the Mass General Hospital. A case is
20  presented. It's discussed. The guest discuss and arrives at
21  a differential diagnosis. A pathologist steps in with the
22  answer and then there is a discussion. That's the case of
23  Guillain-Barre after campylobacter so that was not cited, and
24  then there is a review article from the Lancet from August
25  22, 1998, volume 352, page 635 to 41 which is also a review

Page 35

1  article on Guillain-Barre. I didn't cite it because I didn't
2  think it added any additional information. Then I have a
3  literature search from Emory website which basically is just
4  a list of potential references which I perused to see whether
5  I thought there were any other articles that were worth
6  reviewing, but I did not actually pull any of them.
7    Q    Let's go back for a minute, if we can, and I
8  am sorry. I apologize for changing gears here, but the
9  serological tests you said were not ordered; do you know why?
10   A    We felt it wouldn't change the management.
11   Q    But it would have assisted you in finding --
12  in confirming that it was the campylobacter, wouldn't it?
13   A    It would in no way have changed the management
14  of her care.
15   Q    It wouldn't change the management of her care,
16  but would it have helped you in determining whether she
17  really had campylobacter bacteria?
18   A    Yes, but that would not change our treatment
19  of her in any way.
20   Q    Let's go to July 2nd and see what you did
21  there. Let's go back to those notes.
22   A    Okay. July 2nd --
23   Q    I think we covered the whole July 1st note,
24  Doctor, correct? I am sorry.
25   A    In the July 1st note, I also mention that she

Page 36

1  had some abnormal liver function tests that were improving.
2  That we were waiting the final Lyme serology and that I
3  anticipated we could stop the Doxycycline, and I recommended
4  a follow-up urinalysis because she had had a recent abnormal
5  urine culture.
6        July 2nd, complaining of excruciating back and
7  leg pain this morning. No relief despite number of
8  medications which I have listed: Soma, Tegretol, Ultram,
9  Serax, Celebrex. Began on Neurontin. Afebrile but quite
10  tachycardia. Meaning her heart rate was very rapid. Blood
11  pressure was a little elevated. I noted that her title
12  volume was 1,100 which is a marker of her respiratory
13  capacity which predicts somebody who may be needing
14  intubation, so that's a good number. She was not looking
15  like she would require mechanical ventilation. I summarized
16  her laboratory values. I noted that her liver function tests
17  were worse. That I thought maybe it was from one of her
18  medications, Tegretol. I noted that the Tegretol can rarely
19  cause muscle pain and that maybe we should stop that
20  medication. Noted my conversation with Dr. Werdiger.
21  Recommended starting a medication for nerve pain called
22  Neurontin, and I recommended a dose escalation of that.
23   Q    And does it reflect what time of day you saw
24  her?
25   A    I did not write the time down.

Page 37

1    Q    Do you customarily do that?
2    A    It would have been the morning.
3    Q    It would have been in the morning?
4    A    I always round on the intensive care unit
5  patients first so it would have been the morning.
6    Q    So she was in the intensive care unit?
7    A    She was on the subacute side of the intensive
8  care unit.
9    Q    Okay. July 3rd?
10   A    July 3rd, much more comfortable. More
11  movement of her arms and hip girdle. Minimal oral intake.
12  No abdominal pain. I noted that her Lyme serologies were
13  still pending. I noted her liver function tests which were
14  still abnormal. Mono spot was negative which is a screening
15  for EBV infection. I noted a negative Hepatitis A serology
16  and recommended continuing the Doxycycline pending the final
17  Lyme serology, and I noted that she was generally improving.
18        July 4th, continues to have significant pain.
19  Constipated. No fever. Vital signs were stable. I
20  described her exam. Noted that now she was able to lift her
21  arm off the pillow. Improving strength. Noted her
22  laboratories. Her white count was a little high. I noted
23  that the Lyme serology was still pending. The abnormal liver
24  functions were better. Assessment and plan, liver functions
25  better. Discussed with Dr. Aaronson who was the GI consult

10 (Pages 34 to 37)

Page 38

1  covering the weekend. Continue Doxycycline today. Hope to
2  stop tomorrow once serology back. Increase white blood cells
3  noted. Please check urinalysis and culture, and I put in
4  parenthesis indwelling Foley. That's a chronic indwelling
5  urinary catheter and to check blood cultures because she had
6  a central line in place.
7       7/5, agitated and tachycardic. Tearful.
8  Bowel movement yesterday. Feels better. No shortness of
9  breath. Afebrile. Listed her vital signs. Noted that her
10  heart rate was rapid. Able to lift her right arm off the
11  bed. Listed her labs. Noted that she now had yeast in the
12  urine culture. Suggested they change the urinary catheter.
13  Repeat urinalysis, if yeast still present treat. Lyme test
14  was negative. Suggested stopping the Doxycycline and
15  recommended changing her antidepressants because she was
16  anxious and depressed. Pain under good control.
17       Q     Now it says that she had bowel movement on
18  July 4th?
19       A     Correct.
20       Q     Was there a stool culture taken then?
21       A     The order gets put into the computer and it
22  remains active or at the mercy of the nurses to collect the
23  specimen and send it down.
24       Q     So the answer is still no if she --
25       A     So it was not sent down, that's correct.

Page 39

1       Q     Because the nurses -- well --
2       A     For whatever reason.
3       Q     No one picked it up?
4       A     Correct.
5       Q     July 5th.
6       A     That was July 5th.
7       Q     So that was the last time you saw her --
8       A     That's correct.
9       Q     -- for treatment?
10       A     Correct.
11       Q     In fact, that's the last time you have ever
12  seen her?
13       A     Correct.
14       Q     The last time you ever talked to her?
15       A     Correct.
16       Q     Did you recall specifically any conversations
17  you had with her?
18       A     After that?
19       Q     During those five days.
20       A     I don't remember any specific details.
21       Q     Do you recall ever saying, you know, What
22  happened to you; or, How did you get like this? What
23  happened to you?
24       A     No.
25       Q     None of those conversations?

Page 40

1       A     No.
2       Q     Now you testified before that the doctors that
3  -- most of them who attend at St. Raphael's also hold
4  academic affiliations at Yale Medical School?
5       A     Correct.
6       Q     And can you tell me so far how many hours you
7  have spent working on this case?
8       A     I submitted an invoice. Let me give you the
9  exact number. I estimated spending six hours.
10       Q     Six hours from the time -- and that includes
11  the hour you spent consulting with Mr. O'Keefe?
12       A     Correct.
13       Q     And your review of the records?
14       A     Correct.
15       Q     And your writing the report?
16       A     Correct.
17       Q     Has anybody asked you to do anything further
18  on this case other than testifying today?
19       A     I am not sure I understand the question.
20       Q     Doctor, has Mr. O'Keefe asked you to do
21  anything further in connection with this case other than to
22  come today to give your deposition?
23       A     No.
24       Q     If this case were to go to trial, can you
25  think of any other steps or tests or things you would want to

Page 41

1  do before testifying other than simply reviewing your report
2  again?
3       A     No.
4       Q     Were you ever told that any other infectious
5  disease specialists had reviewed this file and had declined
6  to become involved as an expert on behalf of Miss Pridgeon?
7       A     I am not sure I quite understand that question
8  either.
9       Q     Did anybody ever tell you that other
10  infectious disease specialists had reviewed this file, had
11  been asked to testify as expert witnesses and declined to do
12  so?
13       A     No.
14       Q     Have you discussed your report or your review
15  of the file with any other doctors since you were retained in
16  this case at the end of March in 2004?
17       A     My section chief is aware.
18       Q     And who is that?
19       A     John Boyce.
20       Q     And he is the head of infectious diseases?
21       A     That is correct.
22       Q     At St. Raphael's?
23       A     Correct.
24       Q     And was Dr. Boyce involved at all in the
25  treatment of Miss Pridgeon?

11 (Pages 38 to 41)

Page 42

1    A    I believe there is a note from him in the
2    chart as well as a covering person.
3    Q    He was just covering for her treatment?
4    A    Correct.
5    Q    On a weekend or something like that?
6    A    I would assume so.
7    Q    And what was the substance of your
8    conversation with Dr. Boyce?
9    A    That I was giving a deposition in this matter.
10   He walked in when I was meeting with Tim this past weekend
11   Q    I take it that before this case you hadn't had
12   the pleasure of meeting Mr. O'Keefe?
13   A    That's correct.
14   Q    And other than the one meeting that you had in
15   person with Mr. O'Keefe when you were first retained, have
16   you met with him again before your deposition today?
17   A    I met with him this past weekend.
18   Q    And that was to review your testimony?
19   A    Correct.
20   Q    And how long did that last?
21   A    An hour and a half.
22   Q    And he came down to your house?
23   A    To the hospital.
24   Q    To the hospital. Okay. And how about on the
25   phone, any phone conferences?

Page 43

1    A    No.
2         MR. O'KEEFE: We spoke for about thirty
3         seconds yesterday just to confirm that we were
4         coming here. I am sure you weren't thinking of
5         that.
6         MR. HOLLAND: That's not a big deal.
7    BY MR. HOLLAND:
8    Q    Now you said in your report that you had
9    initially treated her for the urinary tract infection?
10   A    Correct.
11   Q    And that is caused by the catheter?
12   A    Correct.
13   Q    And that's fairly common, I take it?
14   A    Extremely common.
15   Q    Now campylobacter bacteria is frequently
16   carried in birds; is that correct?
17   A    Poultry, yes.
18   Q    And other birds as well?
19   A    I am not aware of that.
20   Q    Is the campylobacter bacteria, does it grow in
21   the body of birds at the bird's body temperature? Strike
22   that. It's a bad question.
23        Why is it that campylobacter bacteria grows in
24   birds?
25   A    As opposed to?

Page 44

1    Q    Any other organism.
2    A    Most infectious -- well, I will rephrase that.
3    Many infectious agents are species specific. The best known
4    which has been in the news a lot is this Avian influenza.
5    Influenza generally starts in flocks of poultry in the Far
6    East and then spreads and can cross the species barrier and
7    cause disease in other organisms. Trichinella, the agent of
8    trichinosis, is found mostly in polar bear meat and pork.
9    There is a number of links where certain organisms tend to
10   colonize certain species of animals. Why specifically
11   campylobacter chooses poultry, I don't know.
12   Q    But your understanding is that it's poultry as
13   opposed to other birds?
14   A    My sense is that chicken is much more often
15   colonized with campylobacter than duck, for example, but I
16   don't know for certainty.
17   Q    And how about these birds that fly around, you
18   know?
19   A    Crows, for example?
20   Q    Robins, crows, yes.
21   A    I think crows carry West Nile, for example,
22   but I don't believe they carry campylobacter, although I
23   don't know that for a fact.
24   Q    There is a notation in the medical records
25   that there were a couple of dead birds that were found around

Page 45

1    Miss Pridgeon's home. Do you recall reading that?
2    A    I do, and there was a note from Dr.
3    Brett-Smith who said that she was going to specifically
4    investigate the link between West Nile and Guillain-Barre.
5    Q    And was there anything further on that; do you
6    know?
7    A    There was nothing written in the chart.
8    Q    Have you done any follow-up or -- strike that.
9         Has anybody to your knowledge done any
10   follow-up on that issue in this case?
11   A    To my knowledge, there is no link of West Nile
12   and Guillain-Barre.
13   Q    And is that based on any research that you
14   have done?
15   A    I did a literature search. West Nile as an
16   emerging infection is a disease that we don't understand all
17   that well. There is a huge volume of literature generated
18   about it frequently, and so if something new has been
19   published on that since I prepared this statement in May, I
20   am unaware of it.
21   Q    It primarily seems to strike older people; is
22   that right, the West Nile?
23   A    I think that my sense from what I know about
24   West Nile is that it can infect all ages with equal
25   frequency, but the people who develop significant illness are

12 (Pages 42 to 45)

Page 46

1    at the extremes of age. So I don't think it's more common in
2    older people. I think older people are more likely to get
3    sick and present for medical attention.
4        Q    Now campylobacter can also come from
5    unpasteurized milk; is that correct?
6        A    That's correct.
7        Q    And it can come from mushrooms?
8        A    I don't know, but I would have no trouble
9    believing it.
10       Q    Shellfish?
11       A    I am unaware of campylobacter with shellfish.
12   Shellfish raises the spector of other infectious agents,
13   especially Hepatitis A. There are -- there is a list of all
14   of the food stuffs that have been linked with campylobacter
15   and it's quite --
16       Q    That's what I was referring to.
17       A    -- and it's quite extensive. So if your
18   question is: Are there lots of other foods besides chicken
19   that can give you campylobacter, the answer would be yes.
20       Q    Pork is certainly one of them -- strike that.
21            Is pork one of them?
22       A    I am unaware of a link with pork in
23   campylobacter, but I would go back to my prior statement.
24       Q    Okay. Eggs?
25       A    Yes.

Page 47

1        Q    Because they are poultry?
2        A    Correct.
3        Q    And you said shellfish you don't know?
4        A    I am unaware of a link with shellfish. It
5    certainly does not mean it doesn't exist.
6        Q    Would you agree that snails are shellfish?
7        A    Are they shellfish or are they mollusks? I
8    don't know that snails are in the shellfish family actually.
9    I have to go back to my zoology.
10       Q    Can campylobacter be spread to humans if they
11   come into contact with animal feces?
12       A    I believe so.
13       Q    And do you know if there is any record --
14   well, did you review in medical records of Miss Pridgeon the
15   fact whether or not she had family pets around?
16       A    There was I believe a pet who I think actually
17   had been ill, as I recall, from reading the testimony.
18       Q    Did you -- do you think that had any
19   significance with respect to her illness?
20       A    I am really unable to comment on that.
21       Q    You haven't formed an opinion one way or the
22   other?
23       A    That's correct.
24       Q    And I mean we would agree that, you know, you
25   weren't with Miss Pridgeon on her vacation to France,

Page 48

1    correct?
2        A    Unfortunately not.
3        Q    So you don't have any firsthand knowledge of
4    what she ate or didn't eat during that time period?
5        A    That's correct.
6        Q    And, in fact, you base your opinion based on
7    the medical records you have read and the deposition
8    testimony of Miss Pridgeon?
9        A    That's correct.
10       Q    So you would agree with me that the accuracy
11   of your opinion depends on the accuracy of what Miss Pridgeon
12   told you?
13       A    Absolutely.
14       Q    In fact, when you read the whole medical
15   record, there is no indication of any chicken meal served
16   aboard the American Airlines flight having anything to do
17   with Miss Pridgeon's illness, correct?
18       A    There is no mention of a meal at all.
19       Q    Right. Okay. So your whole -- the basis for
20   your whole expert opinion is based on your reading of the
21   deposition testimony of Miss Pridgeon?
22       A    Correct, as well as the review of the medical
23   record.
24       Q    As well as the medical record?
25       A    As well as the medical record.

Page 49

1        Q    But you would agree with me that the medical
2    record doesn't talk about any meals aboard any American
3    Airlines flights?
4        A    That's correct.
5        Q    Now if chicken is cooked, do you have an
6    understanding of whether the cooking of chicken destroys the
7    campylobacter bacteria?
8        A    It should -- adequate cooking of the chicken
9    should destroy the campylobacter bacteria.
10       Q    And when you say "adequate cooking," what do
11   you mean by that, Doctor?
12       A    That it has to come to an internal temperature
13   that is well outlined in the CDC website.
14       Q    It's in the CDC website?
15       A    I want to say 170 degrees, but I wouldn't bet
16   the farm on it.
17       Q    Do you have it handy?
18       A    Yes, that's correct, 170.
19       Q    Now what about freezing chicken, does that
20   destroy campylobacter?
21       A    No, it does not.
22       Q    It does not?
23       A    It does not.
24       Q    How about freezing the chicken after it's
25   cooked, does that destroy the campylobacter?

13 (Pages 46 to 49)

Page 50

1    A    If it was not destroyed by the cooking
2  process, it could still be viable when you take it out of the
3  freezer.
4    Q    So your testimony is if you cook the chicken
5  and it's not to 170 degrees and then you freeze the chicken,
6  when you take the chicken out the campylobacter could still
7  be viable?
8    A    Correct. Which, you know, as an aside
9  unrelated to this case is why it's so important when you're
10  doing your own food preparation at home in dealing with
11  poultry that they always tell you don't put something on your
12  cutting board and take it off and put something else on it
13  and the importance of washing your hands when you're doing
14  all that poultry preparation.  Not just campylobacter but a
15  number of --
16    Q    You should have a separate cutting board for
17  chicken they say?
18    A    Absolutely, and it should always go into the
19  dishwasher and not just rinsed in the sink.  Just FYI.
20    Q    Okay. Let's go to your report. Let's look at
21  page two. The first full paragraph where you say based upon
22  my review of the medical record and Miss Pridgeon's
23  deposition it seems that she ate a small amount of uncooked
24  chicken on an airline flight on June 13, 2000.  What is the
25  basis for that statement

Page 51

1    A    Her deposition comments that she took a bite
2  of chicken. She thought it tasted funny so she did not eat
3  any more of it.
4    Q    Now you say it was uncooked.  What is the
5  basis for that?
6    A    I believe there is a description of the color
7  in her deposition.
8    Q    I think it's on page 35 if you look for it.
9    A    Thank you.
10    Q    You're welcome.
11    A    So line 16, After I cut into it, it was pink.
12  Did you see any blood run out of it?  Not that I remember.
13  So it was the description of it being pink.
14    Q    That led you to conclude that it was uncooked?
15    A    Or undercooked.
16    Q    Well, you say undercooked later and uncooked
17  here, so what I am trying to pin down is if there is any
18  reason for the distinction that you make when you use those
19  two phrases, Doctor?
20    A    I did not intend any distinction.
21    Q    You didn't intend any distinction?
22    A    No.
23    Q    So you use the words uncooked or undercooked
24  interchangeably; is that fair enough?
25    A    That's fair enough.

Page 52

1    Q    And when you say "seems," what do you mean by
2  "seems"?
3    A    I wasn't there.
4    Q    And so you're relying on what she said in her
5  deposition?
6    A    That's correct.
7    Q    And that's all that your opinion is based on
8  is what she said?
9        MR. O'KEEFE:  Object to the form.
10  BY MR. HOLLAND:
11    Q    Is there anything else -- strike that.
12        Is there anything else in your opinion that
13  she seemed to have consumed a small amount of uncooked
14  chicken on an airline flight other than her deposition
15  testimony?
16    A    That is the sole source of information that I
17  have.
18    Q    Now the medical record that you reviewed
19  indicates that she traveled on the 13th of June back from
20  France to the U.S.?
21    A    That's correct.
22    Q    And when according to the medical records did
23  she came ill -- I think she had vomiting and diarrhea?
24    A    Yes, diarrhea, fever, vomiting and joint
25  pains.

Page 53

1    Q    And when did those symptoms begin?
2    A    I believe the 15th of June.
3    Q    And when did they end?
4    A    The diarrhea was self-limited and ended --
5  6/17 there is a note from the infectious disease consult that
6  the diarrhea resolved.
7    Q    It doesn't say when though?
8    A    6/17 diarrhea resolved.
9    Q    So is it your opinion that she had the
10  diarrhea for three days?
11    A    Yes, that's correct.
12    Q    Did you read her -- now did you read her whole
13  deposition?
14    A    I did. I read her whole deposition.
15    Q    And does her deposition indicate that the
16  diarrhea lasted for three days?
17    A    Okay. Let's see. So now we are on this, so
18  this is the deposition page 47.
19    Q    Well. Okay. You can go back to 46, if you
20  could. Let me refer you to page 46 of Miss Pridgeon's
21  deposition, lines 16 to 18.
22    A    Here she says it was a ten-hour period of
23  diarrhea.
24    Q    And then go up to page 46, lines 1 to 3.  In
25  fact, strike that.  Go back to page 45, line 22 through page

14 (Pages 50 to 53)

Page 54

1    46 line 4.
2        A    Okay.
3        Q    So you would agree with me that it was her own
4    deposition testimony that she had diarrhea for about a
5    ten-hour period?
6        A    Correct, which is different from what she had
7    reported when she was in the hospital.
8        Q    Is that significant to your analysis in this
9    case?
10       A    My sense is the history of the details are
11   going to have been more accurate when she was in the
12   hospital. It was a much more recent event. I think it's
13   hard to remember specific details years later, so with two
14   discrepant pieces of information I would be more inclined to
15   put more weight on the hospital report.
16       Q    Well, would you agree with me that it's fair
17   to say that she wasn't thinking about filing a lawsuit on
18   June 21st when she was admitted -- on June 22, 2000, when she
19   was admitted to the hospital?
20       A    I have no idea what she was thinking when she
21   was admitted to the hospital.
22       Q    But certainly when she testified at her
23   deposition in December 18, 2003, the lawsuit has been pending
24   for some period of time, correct?
25       A    I don't know when the lawsuit was filed.

Page 55

1        Q    If the --
2        A    Can I make another comment?
3        Q    Go ahead.
4        A    You know, I spent a fair bit of time reviewing
5    all of the different consultant notes. The neurologist
6    consultant noted that her diarrhea had lasted for three days.
7    The infectious disease consult noted that the diarrhea lasted
8    for three days, so those would be totally independent
9    evaluations from different people.
10       Q    But did you also note in there something where
11   she said she had diarrhea three weeks ago, there was one note
12   that says something to that effect?
13           MR. O'KEEFE: Objection to form.
14   BY MR. HOLLAND:
15       Q    Go ahead. I will stand with the question.
16           Did you -- I will withdraw the question
17   because it's a good objection.
18           Did you note any notes in the medical records,
19   Dr. Golden, which indicated that she had sustained diarrhea
20   as long ago as the early part of June of 2000?
21       A    Well, I am not seeing it. I assume you saw
22   it somewhere since you are mentioning it. I don't recall
23   reading it.
24           MR. O'KEEFE: And perhaps I can
25   interject and maybe this will be helpful. I

Page 56

1    don't know. Are you alluding to the record
2    that was subject of my colloquy with Dr.
3    Block?
4        MR. HOLLAND: Yes, that's exactly it.
5        THE WITNESS: So that's the resident
6    note, that illegible resident note.
7        MR. O'KEEFE: I suspect that's what he
8    was referring to.
9        MR. HOLLAND: Yes, I can't put my hand on
10   it at the moment. Let's take a five-minute
11   break.
12       (Whereupon a recess was taken.)
13       THE WITNESS: So this is -- so basically
14   the way the process works when somebody gets
15   admitted to a teaching hospital is that there
16   is an intern who does a formal history and
17   physical and writes it all up. Then there is
18   a supervising resident who does the same and
19   then the attending physician does the same and
20   then whatever consult services are asked to
21   come each individual consultant also comes in.
22   So that's why there are, you know, six, seven,
23   ten admission notes. So this is the note from
24   the second-year resident who says, Returned
25   from a trip to St. Thomas and Paris two weeks

Page 57

1    ago. This is dated 6/23 and while -- and
2    there is a word that I can't read which I will
3    show you in a minute. She experienced fever,
4    diarrhea times two days. Then everything
5    resolved. Seven days ago had hip pain and
6    then it goes on so.
7    BY MR. HOLLAND:
8        Q    So this is dated 6/23?
9        A    So this is dated 6/23. So it says she
10   returned two weeks ago, so 23 minus 16 is 9, so that date is
11   not correct. Then it says "while" and I don't know what that
12   says.
13       Q    You're right. It looks like L-E-S but we
14   don't know what it is.
15       A    You can't read it but this date is wrong.
16       Q    The 9th is wrong?
17       A    Correct.
18       Q    But we agree she didn't return on the 9th?
19       A    Correct.
20       Q    So go ahead. Keep just reading that.
21       A    Okay. Experienced fever and diarrhea, loose
22   explosive bowel movement and nausea times two days then
23   everything resolved.
24       Q    Then the next sentence, read that.
25       A    Seven days ago noticed increasing hip pain,

15 (Pages 54 to 57)

Page 58

1  bilateral knees and hands, went to the emergency room 6/22.
2      Q    So stop there for one second. So seven days
3  before the 23rd of June would be the 16th of June?
4      A    Correct.
5      Q    Now would that be consistent for the onset of
6  Guillain-Barre Syndrome after campylobacter jejuni assuming
7  she was ill with diarrhea and vomiting on the 15th of June?
8      A    You wouldn't have symptoms of campylobacter
9  one day later -- I mean symptoms of Guillain-Barre one day
10  later. That's not within the expected range. This note is
11  not consistent with any of the other notes.
12      Q    I don't think anybody disputes that, but there
13  are -- strike that. I don't think anybody disputes that but
14  my question is: You know what this note said?
15      A    Yes.
16      Q    All right. Now you read her deposition. Did
17  you read about the vacuum cleaner incident?
18      A    Yes, I did.
19      Q    And you read that she experienced some pain on
20  the 17th of June which was a Saturday when she went out to
21  buy a new vacuum cleaner; is that right?
22      A    This was my recollection on page 51, was that
23  it was heavy.
24      Q    It was heavy and she --
25      A    I remember thinking I made a mistake because

Page 59

1  it was so heavy and hard to push. So you had a weakness?
2  Right, but I didn't know at the time that's what it was. You
3  had trouble with the vacuum cleaner? Correct. And trouble,
4  no strength in your arms and hands. So my recollection it
5  was more weakness more than pain at that point.
6      Q    Is that a sign of Guillain-Barre Syndrome
7  setting in, the weakness?
8      A    Weakness can certainly be one of the findings
9  with Guillain-Barre.
10      Q    And that was on the 17th of June according to
11  her deposition testimony?
12      A    Correct.
13      Q    And would that fit within the parameters of
14  having gotten a campylobacter bacteria infection on the 13th
15  of June and having diarrhea and vomiting on the 15th of June?
16      A    The typical timing is ten days to three weeks.
17      Q    So this would be two days after, correct?
18      A    Correct.
19      Q    And that wouldn't fit within the typical case,
20  correct?
21      A    That timing is not the typical timing.
22      Q    She went for an MRI on the 20th, correct? Not
23  connected with this illness. I want to clue you in on that.
24  I am not trying to tie that in.
25      A    I don't recall seeing that MRI report on that

Page 60

1  date.
2      Q    Let me just refer you to a radiological
3  consultation report from Yale-New Haven Ambulatory Service
4  indicating that on June 20, 2000, she had an MRI of the
5  cervical spine before Dr. Goodrich.
6      A    Okay.
7      Q    And would that have been conducted at the
8  hospital or no?
9      A    This was Temple Radiology which is not part of
10  St. Raphael's.
11      Q    Now when does the -- so we can put that down.
12      When does the medical record next indicate she
13  experienced any pain?
14      A    Pain?
15      Q    Pain or that she made complaints of pain or
16  that she saw a doctor for treatment of pain.
17      A    You mean in her deposition, not the medical
18  records?
19      Q    Well, either in the medical record or her
20  deposition. How about the medical record?
21      A    In the admission note from the emergency room,
22  there was a description that she had had leg pain since the
23  19th. Somewhat that complicates. That is, there are several
24  references to knee pain at the same time that she had the
25  diarrhea. So I think there may have been two different

Page 61

1  symptoms. There are a number of extra intestinal
2  manifestations, meaning things outside of the GI tract. So,
3  for example, with campylobacter and other infectious agents
4  you can get a lot of knee pain and actually frank arthritis
5  along with the acute symptom. So I think she probably had an
6  infectious or kind of an autoimmune arthritis with the
7  episode of diarrhea. So it can be a little hard sometimes to
8  sort out what is residual discomfort from that versus pain
9  from Guillain-Barre.
10      Q    Does Guillain-Barre typically cause pain in
11  the knees?
12      A    It doesn't give you arthritis.
13      More reference to joint pain. To my
14  recollection, most of the original admission notes talk a lot
15  about weakness. Okay. So the note from the neurologist
16  6/23, which I believe is Dr. Hasbani, 6/13 started having --
17  this one says 6/13 started having severe diarrhea.
18      Q    Is that the Hasbani's note?
19      A    Yes, Hasbani. Diarrhea lasted three days but
20  has been since associated with persistent joint pain in the
21  knees and ankles.
22      Q    Well, hold on one second. Let's stop there.
23  But has since, so does that record indicate that from the
24  16th she has had severe joint pain?
25      A    That would be the implication from this 6/13

16 (Pages 58 to 61)

Page 62

1 unless you think that's not a 3.
2     A    It looks like a 3 to me.
3     A    Having severe diarrhea upon returning from
4 Paris. Previously also in St. Thomas. Diarrhea lasted three
5 days but has been since associated with persistent joint pain
6 in the knees and ankles.
7     Q    So would that indicate to you that the joint
8 pain in the knees and ankles started after the three days of
9 diarrhea?
10     A    Yes. I would interpret that to mean exactly
11 that. So that's neurology. Okay. Then there is the note
12 from the resident that we know has the error in timing
13 already who said seven days ago, so that's a note dated 6/23.
14 So seven days ago would mean 7/16, increasing leg pain,
15 knees, hands.
16     Q    So it would be 6/16, June?
17     A    6/16. I am sorry.
18     Okay. Then there is another second
19 neurologist from the 23rd.
20     Q    Who is that; do you know?
21     A    It appears that the note is not signed.
22 Actually, that's not right. I can't --
23     Q    You just can't read it?
24     A    It's just like a scribble.
25     It's doctors' writing other than yours. I

Page 63

1 must compliment you on your writing.
2     A    I have to take offense at that.
3     Q    On the record I am complimenting you on your
4 handwriting.
5     A    Okay. 6/23 diarrhea one week ago with
6 severe -- I can't read what that says. Maybe none since
7 then, about two days ago, so that would be 6/21, severe knee
8 and ankle pain bilaterally. Seen by the neurosurgeon. Agree
9 that clinical picture of pain in legs, loss of deep tendon
10 reflexes and weakness and history of GI illness two weeks
11 ago. Last dated 6/23.
12     Q    So two weeks ago would be back around the 9th?
13     A    Correct.
14     Q    I interrupted you, I think. Were you
15 finished?
16     A    That's fine. Then the note from our
17 infectious disease fellow who gives the most detailed
18 information. Usual state of health. Traveled to St. Thomas
19 5/18 to 5/28. Denied any particular exposure to illness
20 during that travel. Returned to Connecticut in usual state
21 of health 5/28. 5/31 traveled to Paris. Further traveled to
22 Bordeaux, Provence and other towns in the south of France.
23 Returned from travel to Connecticut 6/13. 6/15 began to
24 experience abdominal pain, fever, sweats. 6/16 some
25 decreased diarrhea. 6/17 diarrhea resolved. 6/18 patient

Page 64

1 states she was back to baseline. 6/21 increased fatigue.
2 Began to feel, quote, achy all over, unquote. She began to
3 experience knee pain, so that would be 6/21 was the first
4 note of pain. Saw her PMD 6/22, significant increase in knee
5 pain. Went to the emergency room. Knee tapped 6/23 and she
6 got up and basically fell because of severe weakness. So
7 that's kind of the most detailed chronology.
8     Q    6/22 when it says knee tap, does that mean
9 they took fluid from it?
10     A    Exactly.
11     Q    And did they diagnose the fluid or biopsy the
12 fluid, or what do they do to it?
13     A    The fluid is typically sent for cell count, so
14 if you have infectious arthritis you expect to see a very
15 high white cell count in the joint fluid. Test for sugar.
16 In the presence of infection sugar, typically very low
17 because the bacteria eat up the sugar. They test for
18 presence of uric acid crystals to rule out gout. Fluids
19 processed for gram stain and culture, and in a woman her age
20 they would have looked for gonorrhea as part of the routine
21 screening.
22     Q    Do you know what the results were of the fluid
23 testing?
24     A    Yes. Eighteen white cells, no red blood cells
25 and the culture was negative, so it was very benign fluid.

Page 65

1     Q    Okay. I think we are through with that line
2 of questioning. Let's go back to your report, if we can.
3     The second full paragraph is the information
4 that is obtained pretty much from the CDC website?
5     A    As well as the other references.
6     Q    Most retail chicken is contaminated with
7 campylobacter jejuni. Isolation reports of 98 percent for
8 retail chicken meat have been reported. What does that mean?
9     A    That means if you go to the supermarket and
10 you swab the chicken and you plate it out on special media
11 that grows campylobacter, it's called a campy plate, you can
12 isolate the organisms from 98 percent of the specimens. Now
13 that's one report. Other studies show lower isolation rates,
14 closer to the 88 to 90 percent, but that's still extremely
15 high.
16     Q    So if I go into Waldbaum's, or whatever
17 supermarkets they have up here, and I buy fifty packages of
18 chicken, is it possible that forty-nine of them are going to
19 have campylobacter jejuni?
20     A    It's possible.
21     Q    That's what the CDC website says or one of
22 those similar sources?
23     A    That's correct.
24     Q    So it's all over?
25     A    It's all over.

17 (Pages 62 to 65)

Page 66

1    Q    You say one drop of juice from raw chicken may
2    be enough to cause infection. That's from your sources?
3    A    Yes. If you look up -- actually, for most
4    foodborne illnesses, what is called the infectious dose has
5    been worked out. Meaning how many organisms do you have to
6    ingest to get disease and that's basically laboratory
7    experiments. So campylobacter has a very low infectious
8    dose. So you don't need to eat a lot to get sick.
9    Q    But you're not saying that Miss Pridgeon
10    consumed -- strike that.
11        When you say "juice," you mean blood; is that
12    right? Or strike that.
13        What do you mean when you say "juice" in your
14    report, Doctor?
15    A    When you cut into a piece of meat, chicken
16    usually, there is some liquid that seeps out and that's what
17    I would be referring to.
18    Q    Well, is that blood or what is that?
19    A    I think it depends on how well cooked the
20    individual food is. I mean you can cook chicken so dry that
21    you cut into it and you get nothing. You know, there are
22    various degrees. There is interstitial fluid, you know, it's
23    meat and so there is also --
24    Q    So there is going to be fluid it in?
25    A    There is extracellular fluid and when you cut

Page 67

1    into it some of that is going to ooze out. So it may be
2    mixed with blood. It may not be mixed with blood. It
3    depends on how well cooked it was. Was it marinated in
4    something that it could have absorbed juice. You know, if
5    you marinate it in oil and vinegar and whatever else, some of
6    that is going to seep in; so when you get -- when you cut
7    into it, it depends a little bit on how it's prepared I would
8    think.
9    Q    When you have a Sunday dinner and your mother
10    put a chicken in the oven for dinner, okay, and you get it
11    out, I mean there is going to be juices in the pan, right?
12    A    Yes.
13    Q    And is that the juice you're referring to?
14    A    Well, it's not necessarily the same thing
15    because it depends again what she cooks it in. If she slaps
16    butter all over it, then, you know, that's an external thing
17    that you have applied. When you cook -- if you just stuck a
18    turkey straight in the oven, there is fat in the skin that
19    cooks off and drops down. That's not necessarily the same
20    stuff that you would get when you cut into the meat.
21    Q    Now Miss Pridgeon did not testify that she saw
22    any blood running from this chicken, did she? And again, I
23    will refer you to page 35.
24    A    There is a specific question to her: Did you
25    see any blood run out of it? Not that I remember. I think

Page 68

1    there was like a sauce or something with it.
2    Q    Now again, you refer in this report here in
3    the same paragraph to raw poultry. Are you using raw
4    interchangeably with undercooked and uncooked, or do you mean
5    something different?
6    A    Well, raw and undercooked are not the same
7    thing. You know, raw implies uncooked. Whereas undercooked
8    I think for this purpose would mean it didn't achieve that
9    170 degree internal temperature.
10    Q    Now from what you have learned in your work as
11    an expert in this field, up to 40 percent of Guillain-Barre
12    Syndrome may be triggered by campylobacter; is that right?
13    A    That's correct.
14    Q    So where does the other 60 percent come from?
15    A    There are obviously cases, what we call
16    idiopathic, meaning we don't know what they come from. There
17    are other infections that can trigger Guillain-Barre
18    including EBV, the agent of mononucleosis, Lyme, HIV
19    infection, theracelazoster, the agent of Chicken Pox,
20    Hepatitis A. Those would be sort of the most common
21    infectious etiologies.
22    Q    What percentages is idiopathic of GBS?
23    A    I don't know.
24    Q    Can you give me any kind of best estimate?
25    A    I would guess 15 to 20 percent.

Page 69

1    Q    Now in your report you say up to 40 percent of
2    GBS may be triggered by campylobacter. When you use the word
3    "trigger", Doctor, what do you mean?
4    A    Well, the pathophysiology of Guillain-Barre is
5    thought to reflect an autoimmune response to the organism so
6    that the body sees the campylobacter as foreign and there is
7    a certain of -- so it attacks, it mounts an immune response
8    and it attacks it. There are certain determinates on the
9    surface of the bacteria that are chemically similar to
10    chemical structures within the nervous system and so the body
11    ends up mounting an immune response to the nervous system.
12    Q    So essentially it's attacking itself?
13    A    Exactly.
14    Q    If you get -- if somebody gets the
15    campylobacter jejuni, their chances of getting GBS as a
16    result of that are less than one in 1,000, aren't they?
17    A    One in 1,058 to be exact.
18    Q    So it's pretty rare?
19    A    You know, as things in medicine go, it's not
20    that rare.
21    Q    Really? What determines -- what are the
22    factors that determine whether if somebody has campylobacter
23    they are going to get GBS?
24    A    Excellent question. I don't think really
25    anybody knows. It's been, you know, looked as to whether or

18 (Pages 66 to 69)

**Page 70**

1 not there may be certain genetic predispositions to
2 campylobacter, but I don't think that it's really well
3 understood why some people are more predisposed to get it
4 than others.
5 Q   It doesn't go on age or sex or race?
6 A   There is a sex predisposition. I believe it's
7 more common in men than women.
8 Q   And is there any research that you know of in
9 this field that has made that determination or is trying to
10 find the answer to that question?
11 A   Well, there are lots of epidemiologic studies.
12 There is a paper that was actually just published. I am
13 trying to look at some of the -- the pathphysiology of
14 Guillain-Barre and what they look at -- and this is more kind
15 of looking at some of the specific fat and sugars that are on
16 the organism that mimic what's in the nervous system and sort
17 of trying to figure out why there may be a link. There is
18 obviously a lot of ongoing research, but the basic neurology,
19 this is really outside my area of expertise. I know there
20 have been studies that have looked at certain haplotypes,
21 which basically are the very unique markers that everybody
22 carries on their individual cells. It's what identifies you
23 as you and would make you reject an organ transplant from a
24 colleague because we each have our own set of unique surface
25 proteins. So it's been looked at whether there may be

**Page 71**

1 certain surface proteins that are expressed on the surface of
2 every cell, whether if you have a certain set of those
3 proteins that that can predispose you to Guillain-Barre, but
4 there is really no clear link at this point.
5 Q   What about the fact that she had this tumor.
6 I guess it was removed from her neck in 1997. Did that have
7 any effect on her? Would that make her more predisposed here
8 to GBS?
9 A   There is no evidence to suggest that that
10 would in any way predispose her. I think it's bad luck.
11 Q   Fair enough.
12 A   I will add, you know, the one HLA marker that
13 has generally been thought to be the biggest link to a whole
14 bunch of autoimmune disease is something HLAB27.
15 Q   What is that?
16 A   It's again one of these haplotype markers.
17 She was tested and was negative for that which is just sort
18 of an aside.
19 Q   Now in the New England Journal of Medicine
20 article that you use as a source in your report you say that
21 the median interval from the onset of diarrhea to the time of
22 neurological disease the Guillain-Barre Syndrome is nine
23 days?
24 A   Yes.
25 Q   So median means half more and half less?

**Page 72**

1 A   Correct.
2 Q   Would you consider the vacuum cleaner incident
3 on the 17th to be the onset of neurological disease?
4 A   I think it's very difficult to know.
5 Q   And again, in you looked at the fellow's note,
6 and I think that's says on June 21st she developed severe
7 pain in the feet and the knees.
8 A   6/21 fatigue, achy all over, knee pain,
9 correct.
10 Q   So that was within six days after the diarrhea
11 resolved?
12 A   Correct.
13 Q   And that's --
14 A   No. I am sorry. That's six days after --
15 Q   You're right. It's not six days after she --
16 strike that. I am sorry. Go ahead, Doctor. I interrupted
17 you.
18 A   Six days after the onset of symptoms.
19 Q   And five days after it resolved?
20 A   According to his note the diarrhea resolved
21 6/17 so that would be four days.
22 Q   Four days. Okay. And that's substantially
23 less than the median time as discussed in the New England
24 Journal of Medicine study?
25      MR. O'KEEFE: Object to form.

**Page 73**

1 BY MR. HOLLAND:
2 Q   I mean four days is less than typically you
3 would expect to see Guillain-Barre Syndrome after the end of
4 the diarrhea?
5 A   Well, the statements actually relate to the
6 beginning of the diarrhea, not to the end of the diarrhea.
7 Q   Okay.
8 A   So that puts her at five days. Yes, five
9 days. Obviously, you know, keeping in mind that there is
10 always a bell shape curve to these things that the median
11 isn't necessarily the lower limit of what we see. Similarly,
12 there have been cases reported farther out as well, so I
13 think there is variation that goes on both sides.
14 Q   Have you seen a lot of -- well, strike that.
15      In the articles or the research or the
16 articles that you have reviewed in the field with respect to
17 campylobacter infections, do you usually see more than one
18 person getting infected at a time?
19 A   The article that I think addresses that best I
20 am going -- but I am going to have to find it, but it cites
21 that you can certainly see sporadic cases.
22 Q   Sporadic cases meaning one person?
23 A   Exactly.
24 Q   Rather than a whole bunch of school kids or
25 prison inmates or someone being infected?

19 (Pages 70 to 73)